Chicago & N. W. R. Co. v. The State, 128 Wis. 553.

CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant,
vs. THE STATE and others, Respondents.

*May .17—June 21, 1906.*

TAXATION: RAILROADS: CONSTITUTIONAL LAW. (1) *Uniformity required only as to property taxed directly.* (2) *Taxation not limited to property.* (3–5) *Classification of property: Exemptions.* (6, 7) *Uniformity of burden, not of methods.* (8, 35) *Public service corporations: Franchises: Valuation of property as a unit and as personalty.* (9, 10) *Private corporations: Valuation.* (11) *Real property, how assessed.* (12, 13) *Errors of assessing board: Relief in equity.* (14, 15) *Levy of taxes by legislative power: What may be delegated to administrative officers.* (16, 17) *Amount of tax: Determination by legislature: General provisions.* (19–21) *Taxation of mortgages: Statute construed: Validity: Classification of debts.* (23) *Presumption as to validity of statute.* (18, 24, 35) *Ad valorem taxation of railroad property: State and local taxation involved: Constructive accounting.* (22) *Validity of method: Average rate of preceding year.* (25, 26) *Duty of state board in determining rate is ministerial: Notice to owners not necessary: Date fixed by law.* (27) *Railroads in separate class as to methods.* (28–35) *Situs of property for taxation: Railroad property: Personalty: Power of legislature: Taxing districts: Judicial review: Value of railroad property to be treated as a unit: Tax belongs to state: Constructive accounting with municipalities.*

Ch. 315, Laws of Wisconsin for 1903, among other things provides:

(A) For a preliminary assessment of all railway property in the state on the unit system, by a state board of assessors, they to consider certain specified evidentiary matters and others in their discretion and accord owners of such property a hearing and complete their determination of the cash value of the property by the first day of November of the year of commencing the work;

(B) For a determination by such board, by the day aforesaid, of the cash value of all general property in the state assessed to be taxed in the then year, certain specified data to be considered and all other evidentiary matters obtainable from all sources:

(C) For a determination by said board, on and between the first Monday of December in the year aforesaid and the following 15th day of January, with reference to certain specified data, of the aggregate tax in the whole state for all purposes, state and local, except special assessments for local improvements, levied on the valuation aforesaid;

(D) For a session of such board, substantially continuing from the second Tuesday of November aforesaid till the 15th day of the following January, for the purpose of reviewing the assessment of railway property and the valuation of the general property made as aforesaid, any owner of railway property to have an opportunity during such period to be heard, (a) as to the valuation and assessment thereof, (b) as to the valuation of general property, and (c) as to the taxes to be levied on its property;

(E) For a determination by such board of the average rate of taxation on general property;

(F) For the making of a tax roll showing the names of all owners of railway property and the taxes thereon;

(G) For collecting, in due course, of such taxes by the state treasurer.

1. The first clause of sec. 1, art. VIII, of the constitution, declaring that the rule of taxation shall be uniform, relates to all property taxed directly, and that only.   pp. 588–591.

2. Sec. 1, art. VIII, aforesaid does not limit the exercise of the power of taxation to that on property.   p. 604.

3. Sec. 1, art. VIII, of the constitution limits taxation of property to such as the legislature shall prescribe, makes all such property one class, and ordains that the rule of taxation shall be uniform in respect thereto.   pp. 603, 604.

4. The second clause of such section leaves the legislature unlimited authority as to what property shall be taxed and what shall not be taxed, subject to other equality clauses of the organic law, particularly sec. 1, art. I.   In prescribing property for taxation all of any particular class must be so prescribed or be exempted.   pp. 604, 606.

5. In prescribing property for direct taxation, or instrumentalities to effect such taxation, but not otherwise, under sec. 1, art. VIII, of the constitution, the legislature may classify and subclassify property, to the extent of distinguishing differences as to a particular class or subclass, reasonably requiring special treatment to promote the constitutional requirement that as to all property taxed the rule of taxation shall be uniform.   pp. 609, 613, 655.

6. The rule of uniformity has reference to uniformity of burden, not

necessarily uniformity of methods of imposing burdens and realizing thereon. pp. 613, 614.

7. The rule of uniformity for direct taxation on property is the rule ordained by the constitution itself, vitalized by legislative essentials necessary to its execution and aided by legislative details promoting its purpose to burden every dollar in value of all property prescribed for direct taxation, having regard to special conditions in the respective taxing districts, the same, as near as practicable, as every other dollar in value of such property is burdened. p. 613.

8. The property of a public service corporation is to be valued for taxation as a unit, the franchise element and tangible elements, whether in land or movables, being regarded as inseparable parts of one thing in which the former so far predominates as to stamp all with the impress of personal property. pp. 617–620.

9. In assessing property of ordinary corporations or of firms or individuals, the same is to be valued with reference to its use, situation, and all that concerns the same, no value being placed on such intangibles as good will or mere ordinary corporate rights or other mere circumstances other than as the same is included in the actual value of the tangible things, in the places and under the conditions in which they are found. p. 617.

10. Property owned by mere private corporations is to be valued the same as if owned by a private person. p. 625.

11. In assessing railway property for taxation, the assessing agency is not concerned with physical value, except as evidence of physical conditions; nor specially concerned with franchise value. All is to be valued as a unit, inseparable for the purpose of valuing any one element or determining the value, in the whole, by adding together the separate values of elements. pp. 620–624.

12. If the assessing agency, in valuing the general property taxed, commits jurisdictional or other error by including property not assessed by local assessors, such error affords owners of special property no ground for invoking equity jurisdiction. pp. 625, 626.

13. Unintentional omissions in assessing property for taxation, referable to mere error of judgment or inadvertence; or differences between different assessors as to the treatment of the same kind of property under the same or similar circumstances, or other mere errors of judgment or mistakes without fraud, do not affect the validity of the tax. pp. 626, 627.

14. A tax, state or local, must be levied, in the sense of voting the tax, by the legislative power to which the same is referable. That cannot be delegated to administrative officers. The act of

laying the tax, and of determining the basis thereof as regards the valuation of property on the legislative plan, is administrative. The former is an act of making law, the latter of executing it. p. 629.

15. When the legislature determines to raise a stated sum of money by taxation, or the sum which a specific form of taxation may produce, and delegates to administrative officers the duty of ascertaining facts and making computations from given data or facts to be ascertained by such officers and of thereby fixing the rate and eventually the amount of the tax, it levies the same in a constitutional sense. p. 629.

16. Sec. 5, art. VIII, providing that "the legislature shall provide for an annual tax sufficient," etc., "and whenever the expenses of any year shall exceed the income, the legislature shall provide for levying a tax for the ensuing year sufficient, with other sources of income," etc., is satisfied if the legislature determines, as shown by what it does, to raise by taxation a specific sum for public purposes, or such sum as the form of taxation adopted will produce. No express legislative estimate of the public needs is necessary, nor is annual or biennial legislation necessary. A law in that regard may provide generally for the future or till changed by the legislature. pp. 631–634.

17. Sec. 2, art. VIII, of the constitution, and sec. 5 are to be read together. The latter limits the exercise of the taxing power to public purposes, and the former, likewise, limits the use of the avails of such exercise. They do not limit the method of determining the needs therefor. p. 634.

18. The purpose of the *ad valorem* railway taxing law being to tax railway property upon the same basis and at the same rate as other property prescribed for direct taxation throughout the state is taxed, exclusive of special assessments, the avails in money should be regarded as the result, in effect, of state, county, city, town, village, and school and road district taxation, and as taking the form of state funds by a constructive accounting between the state and the localities. pp. 635, 636.

19. The effect of ch. 378, Laws of 1903, is to exempt from taxation, in cases mentioned, as personal property, any ordinary mortgage or lien in the nature of a mortgage on realty, and the debt secured thereby to the extent of the value of the security, such value being regarded as an interest in the realty in place of such mortgage and such part of the mortgage indebtedness, and to make the same taxable to the mortgagee separately from the value of the equity or to the mortgagor with the equity, the

same as if the land were unincumbered, at the latter's option. pp. 637–639.

20. Under such law, so much of the mortgage indebtedness as measures the value of the security is excluded from that which the mortgagor may set off against his credits in determining the excess of the latter over his liabilities, and so subject to taxation, and is also not available to the mortgagee in making up his balance of credits over liabilities subject to taxation, but the excess of the mortgage indebtedness over the value of the security is a matter receivable as to the mortgagee and payable as to the mortgagor, to be taken account of by them respectively in determining the amount of their respective credits subject to taxation. p. 638.

21. The classification of mortgage indebtedness, as indicated, is legitimate under the doctrine of classification before stated. p. 647.

22. The feature of ch. 315, Laws of 1903, as to applying the average rate of taxation on general property one year on the value of railway property as to such year, in taxing the latter the succeeding year, is legitimate, regarded as a reasonable exercise of legislative judgment as to the method of burdening railway property with state and local taxes, except special assessments, the same as general property throughout the state, as near as practicable, and is consistent with sec. 1, art. VIII, of the constitution. p. 648.

23. It must be presumed in favor of an act of the legislature that the lawmaking power intended a valid enactment, and it is to be sustained if in any reasonable view thereof it can be fairly read in harmony with constitutional requirements. p. 650.

24. It is considered that ch. 315, Laws of 1903, contemplates, in effect, state and local taxation of railway property the same as of other property, as near as practicable, the state acting as agent for the localities and the latter for the former, the avails of the imposition on the railway property, after reaching the state treasury, and the corresponding results of the local impositions, after reaching local treasuries, remaining with the respective agencies for their use, as upon a constructive accounting and exchange of equivalents. pp. 651, 652.

25. The duty of the state board under ch. 315, Laws of 1903, as to determining the average rate of taxation on general property is wholly ministerial. No notice to the owners of railway property, or proceedings in that regard, with opportunity to be heard, is required under the constitutional provision as to due process of law, and none whatever except as provided by the written law. p. 652.

26. A date being fixed by the law for the session of an administrative board to perform duties of a *quasi*-judicial nature, in which individuals are specially interested, no notice to the latter is necessary unless otherwise required by statute.     p. 654.

27. It is within legislative discretion to place railway corporations in a class by themselves as regards instrumentalities for imposing upon their property the same rate of taxation, as near as practicable, as is imposed on all other property throughout the state, the design as to such instrumentalities being, in the judgment of the legislature, reasonably appropriate to effect the purpose that all property taxed directly shall be burdened according to the mandate of the constitution, that the rule of taxation shall be uniform.     p. 655.

28. The legislature cannot arbitrarily or capriciously give property a situs for taxation.     Tax burdens must be imposed on the state at large, the county at large, and on the smaller taxing districts at large, according as the purpose thereof is purely general or purely local to the particular taxing district.     p. 661.

29. The scope of the power of the legislature to fix the situs of railway property for taxation has regard to the nature of such property as personalty.     p. 662.

30. The doctrine that the situs of personal property for taxation is the home of the corporation, is the law of the state only in the absence of a law fixing some other situs within constitutional limitations.     p. 665.

31. The limit of legislative power as to territory in fixing the situs of personal property for taxation is not the taxing districts in which the visible part of the railroad and its office or offices are located.     p. 665.

32. The limitation above mentioned includes any taxing district where such relations exist between it and the owner of the property, either directly or with reference to such property, that, reasonably, it may be said the duty to pay the tax is a return obligation for some duty of the payee to extend to the former, either as to person or property, the benefits of its government.     p. 665.

33. Whether the relations stated exist in any given circumstances is a legislative question, and wholly beyond judicial interference, except in case of manifest caprice or violation of the command that the rule of taxation shall be uniform.     p. 665.

34. The peculiar nature of railway corporations as to their commanding position, the universality and closeness of their touch with the everyday life of the people, the mutual relations of de-

pendence for well-being both as to persons and property, reaching the state at large, the needs of such corporations as to support and protection, the significant degree in which the administrative energy of all departments of the state is devoted to affairs concerning their regulation and well-being, and their public privileges springing from the whole people, warrant the exercise of legislative power, giving to their property for the purposes of taxation a general situs, and applying thereto the average rate of taxation throughout the state on general property prescribed for taxation, whether regarded as having a situs throughout the state or one limited to the taxing districts touched by their tracks. pp. 666–669.

35. The rule that property of a railway corporation, for the purposes of direct taxation, must be valued as a unit, reasonably demands that such value be treated as a unit, and, to the end that the rule of taxation may be uniform, that the average rate of taxation on general property throughout the taxing districts which, in any reasonable view, are entitled to participate in taxing such property, be applied thereto, and the avails be treated as belonging to the state for public purposes, on the theory of a constructive accounting between it and such taxing districts. pp. 670–676.

[Syllabus by MARSHALL, J.]

CASSODAY, C. J., concurring in the judgment, is of the opinion that under sec. 1, art. VIII, Const., the legislature has power to classify property for the purposes of taxation, and then to impose different rates of taxation upon the different classes. p. 677.

APPEAL from a judgment of the circuit court for Dane county: S. D. HASTINGS, Judge. *Affirmed.*

Action to enjoin collection of taxes levied upon the property of the plaintiff for 1904 pursuant to ch. 315, Laws of 1903.

The action was to test the validity of the law changing the method of requiring railway companies in this state to share with other property owners therein the burdens of its government from the indirect way to the *ad valorem* method. The facts pleaded and in issue and matters covered by the evidence, showing the general situation giving rise to the questions discussed in the opinion, are indicated in the following

epitome of the trial court's findings. It should be noted that those portions thereof which are in *italics* were excepted to by the plaintiff, and those inclosed in brackets by the defendant:

(1) At and since the inception of this action defendant *Kempf,* as state treasurer, was in possession of the tax roll for 1904, made, as to railway property, by the state board of assessors under ch. 315, Laws of 1903.

(2) On December 12, 1904, plaintiff was duly notified thereof from the said treasurer's office, and of the tax thereon assessed against the plaintiff for the year 1904, that the same was $189,231.61 after allowing credit for license fees paid by defendant for such year, and payment within thirty days was demanded.

[(3) The assessment was made as of the year 1903.]

[(4) The value of such property was determined by the board as of the time in such year it determined the value of property generally *but not as of the time of local assess-ment.*]

[(5) The rate of taxation used in making the roll was determined thus: The value of all property in the state for 1903, exclusive of railroad property, taxed by the *ad valorem* method for state and local purposes was preliminarily determined at $1,753,120,000, without notice to plaintiff. Likewise the value of plaintiff's property in this state was determined. Such first-mentioned determination was entered in October, 1903. In September thereafter plaintiff was given a hearing as to both such determinations. The board then fixed the value of all property in the state other than railway property, taxed *ad valorem,* at $1,804,187,000, and taxes levied thereon for 1903 at $20,640,543.16, the latter without notice to plaintiff. On such basis the board determined the rate of taxation upon all property so taxed *ad valorem,* other than railroad property, for 1903, and applied the result to the assessment of plaintiff's property.]

(6) In determining the *ad valorem* taxes paid in the state

for 1903, the board included all such taxes of every nature collected in any taxing district.

(7) During the time material to this litigation plaintiff did not have any property or office in any one of twenty-five counties of the state.

[(8) The rate of taxation in this state on all property other than railroad property, for 1903, and the rate also for 1904 in many counties where plaintiff's road was located, were less than that applied to plaintiff's property.]

(9) Plaintiff, during all the time affected by this litigation, was a corporation organized under the laws of Illinois, Michigan, and Wisconsin, and was engaged in local and interstate business, the latter extending into many states.

(10) *In assessing plaintiff's property, the board considered the entire railway system and all things affecting the value, but did not include any sum on account of franchises other than those referable to the laws of Wisconsin.*

[(11) When ch. 315, Laws of 1903, became effective there were and since have been numerous street railway systems in the state, some doing the ordinary business of such systems and some operating in and through two or more cities, villages, or towns, and doing, in some respects, ordinary railway business.]

(12) Such street railway systems were not taxed for 1904 under the aforesaid law.

(13) During the time affected by this litigation there were several railway systems in the state operated by electric power, the owners having the right of eminent domain and having used it in the establishment of such systems in the manner of ordinary railway companies. Such owners were authorized by their charters to carry freight and passengers and to make rates, and the systems were operated between cities wide apart. [*The board did not know thereof when making the assessment of plaintiff's property.*]

(14) *Neither sleeping-car companies nor the owners of*

*railway property mentioned in findings 11, 12, and 13, are classed with ordinary railroads under such law, nor in fact belong thereto, nor are engaged in the same business, nor are operated under the same conditions, nor do they possess in all respects the same powers and privileges.*

[(15) None of the corporations mentioned in (13) were treated by the state board as under said law of 1903.]

[(16) Twenty-eight assessors, under objection by counsel for defendants, testified, in effect, that in valuing the property for taxation for 1903 they did not include any sum for corporate franchises other than in a few cases, such as gas companies and electric light companies, whose franchises are expressly required to be taxed, or include business done by such companies, or consider the amount, character, market price, or actual value of the capital stock or funded indebtedness of any corporation or joint-stock company, but fixed the value solely with reference to the physical property, and that the elements omitted, had they been included, would have largely increased the aggregate value of the property assessed.]

[(17) *The state board, in fixing the value of general property, considered all elements mentioned in sec. 9 of ch. 315, aforesaid, including the local tax rolls: generally speaking, all official statistics and all others obtainable affecting the matter and all evidence obtainable from all sources, and acted upon their best judgment and knowledge, and raised the aggregate value of local assessments without adding anything specifically for value of franchises, only considering the same as affecting the value of corporate property. They did not add, specifically, for good will of business, or specially consider earnings or profits, or the value of stock or bonds, and make additions on account thereof.*]

[(18) In valuing plaintiff's property its franchises were considered; its earning capacity, and the market value of its stocks and bonds.]

[(19) Members of the board were of the opinion that the value of plaintiff's physical property in Wisconsin in 1904 was several million dollars less than the value placed upon its property in the state as a whole, the difference between such physical value and the assessed value being on account of franchises and other things considered by the board.]

(20) *The local assessors acted honestly in doing their work, assessing all property at what they considered the actual value, any omissions being attributable to ignorance or error of judgment.*

[(21) In 1903 and 1904, as a rule, mortgage interests in lands in this state owned by residents thereof, but residing outside of the districts where the lands were situated, were assessed to the owners of such interests, to the extent of the value thereof, the value of the equities in the lands being assessed to the mortgagors. Plaintiff's property in Wisconsin, though incumbered by mortgages to the amount of many millions of dollars, as was well known to said board when the assessment complained of was made, was assessed regardless thereof, no deduction being made on account of the same. In some instances said mortgages did not contain any requirement for the mortgagor to pay the taxes levied on the mortgaged property.]

[(22) When the action was commenced said treasurer was not financially capable of responding to plaintiff, in case of a judgment in its favor, for return of the tax in question.]

(23) Plaintiff's gross earnings in Wisconsin for 1903 were $15,718,846.17, and in due course, on account thereof, it paid the statutory license fee tax, amounting to $628,753.84, receiving a license to transact business for one year under sec. 1212, Stats. 1898. [It has offered and is ready to pay any additional sum which it ought to pay upon the same being duly ascertained.]

(24) *Said board throughout acted in good faith and according to law, as they viewed the same.*

Chicago & N. W. R. Co. v. The State, 128 Wis. 553.

The legal results of such facts, the court concluded, were these: The law of 1903 is valid; the proceedings complained of were regular; defendant is entitled to a dismissal of the complaint with costs.

There were numerous exceptions filed to refusals to find as requested by plaintiff's counsel, which will be referred to in the opinion if found necessary.

From the judgment entered according to the foregoing this appeal was taken.

*Edward M. Hyzer,* attorney, and *Lloyd M. Bowers,* of counsel, for the appellant, contended, *inter alia,* that ch. 315, Laws of 1903, violates sec. 5, art. VIII, of the state constitution. That section requires that a tax levied by the legislature for the state be founded upon a legislative consideration and estimate of the state expenses, for meeting which the tax is raised. By ch. 315 the legislature has made the state's revenue depend upon, and vary directly with, the amounts of taxes raised from year to year by the several local legislatures of the various counties, cities, towns, villages, and school districts for their local purposes; and the question in hand is whether the state tax so resulting can be considered to be what the legislature has decided to be the amount needed for the state's expenses. The answer to that question must depend upon the test whether it is a *reasonable* idea that the state's expenses are proportionate to the aggregate amount which county boards, city councils, town boards, village boards, and school-district boards throughout the state decide from year to year that they will raise in taxes for the purposes of their various local communities; which purposes embrace not only those of local government, but also (and largely) those of local improvements and investments. *People v. Fire Asso.* 92 N. Y. 311. Local taxes raised for purposes like the establishment or maintenance of parks, public baths, municipal gas works, water works, etc., are purely private

and proprietary, fundamentally different from taxes for truly governmental purposes. *Milwaukee v. Milwaukee,* 12 Wis. 93; *State ex rel. Board of Ed. v. Haben,* 22 Wis. 660; *Becker v. La Crosse,* 99 Wis. 414, 418, 419, 421. How can it be said that the state's expenses are proportionate to the private investments of the various local communities in the state? As well might the legislature say that plaintiff's tax should be determined by inclusion in the average-rate process of all amounts spent by strictly private gas companies, water companies, street railway companies, etc., for their plants in the state. How can the collective action of the numerous local legislatures, in determining local policies—partly governmental, but also largely private and proprietary—and fixing local taxes in aid of those policies, be said to afford any reasonable test, or measure, of the revenue which the state needs for its own purposes? See *Pingree v. Auditor General,* 120 Mich. 95, 102. The two fundamental questions before a legislature, in exercising a power to tax, are: (1) how much revenue the state needs; and (2) what will be a just distribution of the burden. The first of these questions is the more radical. The revenue that the state needs is independent of its distribution among different classes of taxpayers; but that distribution concerns, and should stop with, the needed revenue. The statute turns the general problem of taxation upside down, by making the apportionment of taxation generally, as between all citizens for all purposes, control the amount of the state's revenue. The constitution limits the annual tax to an amount "sufficient to defray the estimated expenses of the state for each year." *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 578; *State ex rel. Garrett v. Froehlich,* 118 Wis. 129, 141. But the tax now provided for is made independent of and wholly unrelated to the state's expenses. Ch. 315 violates sec. 5, art. VIII, Const., for the further reason that the "average rate" is required to be com-

puted on the basis of the state and local taxes paid on other property in the year preceding that for which the railroad is taxed at such average rate.

Ch. 315 violates sec. 13, art. I, Const., which declares that "the property of no person shall be taken for public use without just compensation therefor," because the "average rate" of tax exacted from a railroad is founded in large part upon the governmental expenses and proprietary outlays of local communities whose benefits the taxpaying railroad does not share, because it has no property whatever and no office in those communities. The rule is that a tax must be founded upon the expenses of a government whose benefits the taxpayer shares. *State ex rel. New Richmond v. Davidson,* 114 Wis. 563; *State ex rel. Garrett v. Froehlich,* 118 Wis. 129, 140, 141; *Marsh v. Clark Co.* 42 Wis. 502, 509; *Warden v. Fond du Lac Co.* 14 Wis. 618, 619, 620; *Sleight v. People,* 74 Ill. 47, 49; *Allhands v. People,* 82 Ill. 234; *Drake v. Ogden,* 128 Ill. 603; *Bellepoint v. Pence,* 13 Ky. Law Rep. 371, 17 S. W. 197; *County Comm'rs v. County Comm'rs,* 50 Md. 245, 259, 260; *Wells v. Weston,* 22 Mo. 384; *In re Lands in Flatbush,* 60 N. Y. 398, 406, 407; *Platt v. Milton,* 58 Vt. 608; *Simon v. Northup,* 27 Oreg. 487, 503, 504; *Berlin M. Co. v. Wentworth's Location,* 60 N. H. 156; *In re Madera Irr. Dist.* 92 Cal. 296, 304; *Farris v. Vannier,* 6 Dak. 186. This rule requires more than that a tax be laid by, and paid into the treasury of, a government from which the taxpayer benefits. It demands that one taxpayer be not charged more than others of the expenses of a government (the state) which they both enjoy, because of and in proportion to the taxes which those others pay for the support of other governments (a city, town, village, or school district) from which the first named taxpayer does not benefit. See 1 Cooley, Taxation (3d ed.) 187, 188; *Bellepoint v. Pence,* 13 Ky. Law Rep. 371, 17 S. W. 197; *Howell v. Bristol,* 8 Bush, 493, 499; *County Comm'rs v. Comm'rs,* 70 Md. 443,

447; *Ryerson v. Utley,* 16 Mich. 269, 276; *State ex rel. Leffingwell v. Chouteau,* 54 Mo. 458, 473.

Ch. 315 violates sec. 1, art. I, and also sec. 13, art. I, Const., because it taxes a railroad—no less because indirectly—for the relief of the inhabitants of counties, cities, towns, villages, and school districts of Wisconsin, in which the railroad has no property or office, from a part of the expenses of their purely local governments and private local investments and enterprises. *State Treasurer v. Auditor General,* 46 Mich. 224, 230, 231; *Callam v. Saginaw,* 50 Mich. 7, 11; *Louisville & J. F. Co. v. Kentucky,* 188 U. S. 385; *Delaware, L. & W. R. Co. v. Pennsylvania,* 198 U. S. 341; 1 Cooley, Taxation (3d ed.) 82, 249; Judson, Taxation, § 354. The legislature cannot (as by ch. 315 it has attempted) give railroad property (and such property only) a situs all over the state, in disregard of the actual location of that property and of the railroad company's principal office or place of business. *Teagan Transp. Co. v. Board of Assessors* (Mich.) 102 N. W. 273; *Union R. T. Co. v. Kentucky,* 199 U. S. 194.

The power of fixing the rate (and so the amount) of tax upon a railroad is delegated by ch. 315 to the various local legislatures of the counties, cities, towns, villages, and school districts of Wisconsin (including those local legislatures within whose jurisdiction the railroad has no property or office); and this violates sec. 1, art. IV, Const., which declares that "the legislative power shall be vested in a senate and assembly." There is no tax until its amount is prescribed, and the body that determines the amount levies the tax. "An undetermined tax is in law no tax." 1 Cooley, Taxation (3d ed.) 557; *Morton v. Comptroller General,* 4 S. C. 430, 454; *Houghton v. Austin,* 47 Cal. 646; *San Francisco & N. P. R. Co. v. State Board,* 60 Cal. 12, 34. The amount of tax required to be paid on railroad property is largely, and indeed chiefly, determined by the local legisla-

tures throughout Wisconsin in their *legislative* prescription of local taxes; for by the amount of those taxes the railroad tax is chiefly measured. This case is entirely different from those in which the operation of a statute is made to depend upon a contingent *fact*, or upon the decision of an executive or administrative officer as to such fact. *Miller v. New York,* 109 U. S. 385; *Field v. Clark,* 143 U. S. 649. The legislative action of the county, city, town, village, and school district in determining the amount of local taxes, and so largely determining the "average rate" of tax, is entirely independent of any rule prescribed by the state legislature to guide them. This fundamentally distinguishes ch. 315 from the numerous cases holding that a legislature may properly empower executive or administrative officials to adopt incidental, executive rules of detail, which conform to the central plan and principles of a statute. *Buttfield v. Stranahan,* 192 U. S. 470; *In re Kollock,* 165 U. S. 526, 533, 536; *St. Louis C. C. Co. v. Illinois,* 185 U. S. 203, 210–212. The following cases concerning taxation are directly in point to show that ch. 315 delegates the taxing power to the various local legislatures: *Houghton v. Austin,* 47 Cal. 646; *People ex rel. Hopkins v. Kings Co.* 52 N. Y. 556, 566, 567; *Board of Comm'rs v. Abbott,* 52 Kan. 148; *Parks v. Board of Comm'rs,* 61 Fed. 436; *Central R. Co. v. State Board,* 49 N. J. Law, 1, 17, 18; *Muhlenberg Co. v. Morehead* (Ky.) 46 S. W. 484; *Fleming v. Dyer* (Ky.) 47 S. W. 444; *Dawson v. Ward,* 71 Tex. 72, 76; *Wade v. State,* 22 Tex. App. 629; *McCabe v. Carpenter,* 102 Cal. 469; *Schultes v. Eberly,* 82 Ala. 242; *Wells v. Weston,* 22 Mo. 384; *Wilcox v. Paddock,* 65 Mich. 23, 28, 29; *State ex rel. Howe v. Des Moines,* 103 Iowa, 76; *Marr v. Enloe,* 9 Tenn. 452, 454; *Board of Directors v. Houston,* 71 Ill. 318; *Gage v. Graham,* 57 Ill. 144. The following cases give instances of delegation of legislative power in other fields than taxation: *Slinger v. Henneman,* 38 Wis. 504; *Dowling v. Lancashire Ins. Co.* 92 Wis.

63; *In re North Milwaukee,* 93 Wis.· 616; *State ex rel. Adams v. Burdge,* 95 Wis. 390; *King v. Concordia F. Ins. Co.* (Mich.) 103 N. W. 616; *Elliott v. Detroit,* 121 Mich. 611; *Bradshaw v. Lankford,* 73 Md. 428; *People v. Parks,* 58 Cal. 624, 641–643; *O'Neil v. American F. Ins. Co.* 166 Pa. St. 72, 77; *State ex rel. N. Y. & N. J. Tel. Co. v. Bound Brook,* 66 N. J. Law, 168, 48 Atl. 1022; *Stevens v. Truman,* 127 Cal. 155; *Jernigan v. Madisonville,* 102 Ky. 313; *Schaezlein v. Cabaniss,* 135 Cal. 466; *Harmon v. State,* 66 ·Ohio St. 249; *Beasley v. Ridout,* 94 Md. 641, 658; *State ex rel. Montgomery v. Rogers* (Ohio) 73 N. E. 461. The fact that under ch. 315 a railroad has no real opportunity for hearing by the legislature on the question of the amount ·of tax which it shall be required to pay to the state illustrates practically the point that the determination of that amount is not made by the legislature. The rule that a taxpayer is constitutionally entitled to a hearing on the amount of his tax includes the right of hearing on that point before the legislature. Such privilege is part of the general right of ·appearance before, or petition to, the legislature; which is part of the law of the land. Cooley, Const. Lim. (7th ed.) 497, 498; 2 Story, Const. (5th ed.) § 1894; *U. S. v. Cruikshank,* 92 U. S. 542, 552; sec. 4, art. I, Const. of Wis.; *State Tax-Law Cases,* 54 Mich. 350, 382; *Fallbrook Irr. Dist. v. Bradley,* 164 U. S. 112, 170, 174, 175; *French v. Barber A. P. Co.* 181 U. S. 324, 339–341.

Ch. 315 violates sec. 1, art. VIII, Const., which declares that "the rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall pre·scribe." It is clear that ch. 315 imposes a property tax, rather than a specific tax. The language leaves no room for ·doubt; and the exactly similar tax held unconstitutional in Michigan was decided to be a property tax. *Pingree v. Auditor General,* 120 Mich. 95, 97–102. When the legislature ·sees fit, as in ch. 315 it has seen fit, to tax a particular kind

of property upon its value, it is not uniform taxation to impose a rate of tax upon that value which is different from the rate applied to the same value of other property taxed *ad valorem;* and this is so because, even if the right of the legislature to classify property for taxation exists under sec. 1, art. VIII, of the constitution, such classification must tend toward equal taxation, or, at any rate, not unmistakably create unequal taxation. *Pingree v. Auditor General,* 120 Mich. 95; *Savannah v. Weed,* 84 Ga. 683, 11 S. E. 235; *Standard Oil Co. v. Comm.* (Ky.) 82 S. W. 1020; *Nathan v. Spokane Co.* 35 Wash. 26, 76 Pac. 521; *High School Dist. v. Lancaster Co.* 60 Neb. 147, 82 N. W. 380; *State v. Eastabrook,* 3 Nev. 173; *State v. Kruttschnitt,* 4 Nev. 178; *State v. Cumberland & P. R. Co.* 40 Md. 22, 49; *Shenandoah Valley R. Co. v. Clarke Co.* 78 Va. 269; *Western U. Tel. Co. v. Omaha* (Neb.) 103 N. W. 84; *State ex rel. Shriver v. Karr,* 64 Neb. 514; *State v. Ins. Co. of N. A.* (Neb.) 100 N. W. 405; *Little Rock & Ft. S. R. Co. v. Worthen,* 46 Ark. 312; *State ex rel. Bee Bldg. Co. v. Savage,* 65 Neb. 714, 91 N. W. 716; *Board of Assessors v. Ala. Cent. R. Co.* 59 Ala. 551; *Cheshire v. County Comm'rs,* 118 Mass. 386; *Atlantic & N. C. R. Co. v. Carteret Co.* 75 N. C. 474; *Pike v. State,* 5 Ark. 204; *State Bank v. Board of Revenue,* 91 Ala. 217, 8 South. 852. When the legislature says that two or more different kinds of property shall be taxed on the *ad valorem* plan, it thereby recognizes that it finds no sufficient reason for departing from that plan; in other words, it admits that the property can be reliably found for taxation and can be reliably valued. For the purpose of taxation on value, therefore, the legislature puts all those kinds of property into one class; and, after it has done that, no just basis for discriminating rates can be said to exist. See *Knowlton v. Rock Co.* 9 Wis. 410; *Hale v. Kenosha,* 29 Wis. 599; *Weeks v. Milwaukee,* 10 Wis. 242; *Lumsden v. Cross,* 10 Wis. 282; *Att'y Gen. v. Winnebago Lake & F. R. P. R.* '' 11 Wis. 35;

*State ex rel. Reedsburg Bank v. Hastings,* 12 Wis. 47; *Slauson v. Racine,* 13 Wis. 398; *Saltonstall v. Board of Review,* 132 Mich. 196; *State ex rel. McCurdy v. Tappan,* 29 Wis. 664; *Gilman v. Sheboygan,* 2 Black, 510; *Lund v. Chippewa Co.* 93 Wis. 640; *Black v. State,* 113 Wis. 205. Cases under the "equal protection" clause of the United States constitution are not pertinent to sec. 1, art. VIII, of the Wisconsin constitution. That clause is analogous, rather, with sec. 1, art. I, of the Wisconsin constitution; and, like it, has an elasticity not belonging to the provision for "a uniform rule of taxation." But, even under the XIVth amendment of the federal constitution, tax laws and other laws are invalid which directly and necessarily lead to inequality. *Black v. State,* 113 Wis. 205, 218, 219; *Cotting v. Kansas City S. Y. Co.* 183 U. S. 79, 110; *Magoun v. Illinois T. & S. Bank,* 170 U. S. 283, 301; *Santa Clara Co. v. So. Pac. R. Co.* 18 Fed. 385, 399; *Railroad Tax Cases,* 13 Fed. 722, 734. And the doctrine that classification must be reasonable—not arbitrary and discriminatory—obtains with full force under the federal constitution. *Yick Wo v. Hopkins,* 118 U. S. 356, 369; *Bell's Gap R. Co. v. Pennsylvania,* 134 U. S. 232, 237; *Barbier v. Connolly,* 113 U. S. 27, 31, 32; *Gulf, C. & S. F. R. Co. v. Ellis,* 165 U. S. 150, 155, 159, 165; *U. S. v. Cruikshank,* 92 U. S. 542, 554. Uniform taxation requires (even if classification permits unequal rates on the same value of different sorts of property) that the legislature order what it thinks a just relation (whether of equality or prescribed inequality) between the taxes of different persons for the support of those governments whose benefits those persons share; and forbids the establishment of a relation (whether of equality or prescribed inequality) between the taxes of different persons for the support of governments whose benefits those persons do not share. *People ex rel. D. & H. R. Co. v. Salem,* 20 Mich. 453, 474; 1 Cooley, Taxation (3d ed.) 225–227; *Atchison, T. & S. F. R. Co. v. Clark,* 60 Kan. 826,

830; *Hutchinson v. Ozark L. Co.* 57 Ark. 554; *St. Louis v. Spiegel,* 75 Mo. 145; *State ex rel. Trustees v. Township Committee,* 7 Vroom, 66; *Kansas City v. Whipple,* 136 Mo. 475, 484; *State v. Hoyt,* 71 Vt. 59; *Lund v. Chippewa Co.* 93 Wis. 640, 647; *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 575–578; *State ex rel. Garrett v. Froehlich,* 118 Wis. 129, 140. Apportionment on a proper principle is essential in all taxation. 1 Cooley, Taxation (3d ed.) 411; Judson, Taxation, § 340; *Morton v. Comptroller General,* 4 S. C. 430, 454; *Santa Clara Co. v. So. Pac. R. Co.* 18 Fed. 385, 400, 424; *Lexington v. McQuillan's Heirs,* 9 Dana, 513, 517–519; *Railroad Tax Cases,* 13 Fed. 722, 734; *Williams v. Detroit,* 2 Mich. 560, 572; *Central R. Co. v. State Board,* 48 N. J. Law, 1, 11; *State ex rel. Trustees v. Township Committee,* 36 N. J. Law, 66. The effect and purpose of the average-rate plan established by ch. 315 is to put upon the appellant part of the burden of supporting the local governments, and of creating and maintaining the local communities' private investments, in the twenty-five counties of Wisconsin which the railroad does not enter. Consequently it violates the rule of uniform taxation under the doctrine of this court in *Lund v. Chippewa Co.* 93 Wis. 640, 647; *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 575–578; and *State ex rel. Garrett v. Froehlich,* 118 Wis. 129, 140. Ch. 315 really makes the amount a railroad shall pay as a return for the benefits of those local governments which it enjoys depend upon and vary with the taxes (and consequently the expenses) of local governments whose benefits the railroad does not enjoy. Classification for taxation as for other purposes must be reasonable and fair, not arbitrary and discriminatory, and must rest upon a principle of distinction which affords a just basis for such difference of treatment as the different classes receive. *Black v. State,* 113 Wis. 205, 221; *State v. Whitcom,* 122 Wis. 110; *Battles v. Doll,* 113 Wis. 357, 361; *State ex rel. Kellogg v. Currens,* 111 Wis.

431, 436; *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530; *Gulf, C. & S. F. R. Co. v. Ellis,* 165 U. S. 150, 155, 159, 165; *Dibrell v. Morris's Heirs* (Tenn.) 15 S. W. 87, 95; *South & N. A. R. Co. v. Morris,* 65 Ala. 193, 199; *State v. Loomis,* 115 Mo. 307, 314; *Wilder v. Chicago & W. M. R. Co.* 70 Mich. 382, 384; *Lafferty v. Chicago & W. M. R. Co.* 71 Mich. 35; *Park v. Detroit Free Press Co.* 72 Mich. 560, 566, 567; *Grand Rapids C. Co. v. Runnels,* 77 Mich. 104; *San Antonio & A. P. R. Co. v. Wilson* (Tex.) 19 S. W. 910; *Millett v. People,* 117 Ill. 294; *Frorer v. People,* 141 Ill. 171; *Eden v. People,* 161 Ill. 296; *Janesville v. Carpenter,* 77 Wis. 288, 302; *Durkee v. Janesville,* 28 Wis. 464; *State v. Goodwill,* 33 W. Va. 179; *State v. Fire Creek C. & C. Co.* 33 W. Va. 188; *Pearson v. Portland,* 69 Me. 278, 281; *State v. Haun,* 61 Kan. 146, 152–154. The application of the average-rate tax under ch. 315 to an assessment of railroad property at its value in the year before that for which the tax is paid, while all other property in the state has the ordinary rate of state tax applied to an assessment of its value in the very year for which the tax is paid, violates the constitutional rule of uniform taxation. Ch. 315 is invalid because street and interurban railways, formed under secs. 1862, 1863, Stats. 1898, were not included within its operation. No difference exists between such railways and steam railways, except size; and that is not a proper basis for different treatment. *Cotting v. Kansas City S. Y. Co.* 183 U. S. 79; *Chicago & N. W. R. Co. v. Milwaukee, R. & K. E. R. Co.* 95 Wis. 561; *Zehren v. Milwaukee E. R. & L. Co.* 99 Wis. 83; *La Crosse City R. Co. v. Higbee,* 107 Wis. 389.

Ch. 315 violates the XIVth amendment to the federal constitution. It denies to the appellant "due process of law," because the "average rate" (not being founded on an estimate of the state's expenses, and being fixed by the local legislatures of the counties, etc.) is not representative, or even legislative, taxation; because appellant's property is taxed in

aid of communities in which no part of the property is situated and appellant has no office, and the benefits of which appellant, therefore, does not share; and because appellant's property is taxed for purposes which, as to appellant, are merely private. It also denies to appellant the equal protection of the laws. When elements, fundamental in the very conception of a tax, are absent, the charge is not a tax at all, but a form of confiscation. Judson, Taxation, §§ 340, 341, 392; *State Board v. Holliday,* 150 Ind. 216; *Lexington v. McQuillan's Heirs,* 9 Dana, 513, 517, 518; *Woodbridge v. Detroit,* 8 Mich. 274, 301; *State ex rel. Trustees v. Township Committee,* 36 N. J. Law, 66, 69, 70.

The action of the local assessors in assessing, and the action of the state board in valuing (for computation of the average rate), the general property of the state in 1903 unlawfully increased the average rate of tax applied to appellant's property in 1904. The local assessors did not consider at all the franchises of any corporations, except the few *quasi*-public corporations whose franchises the statutes expressly require to be assessed, and did not consider the earnings of any property or of any business done thereon or therewith, or the good will of any business, or the market prices or values of the stock or bonds of any corporation. The state board, in computing the average rate, valued the general property in like manner as the assessors did; but in assessing the railroads they included franchises and considered all the elements which were omitted as to other property. Franchises are taxable property, even when the statute does not expressly and by name require their assessment; and they are personal property. *State ex rel. Milwaukee St. R. Co. v. Anderson,* 90 Wis. 550. Further, franchises cannot be assessed as part, or under the description, of the corporation's tangible personalty or realty; and their value, therefore, cannot be deemed to have been included in the local assessments of the general property of the state or in the state board's

valuation of such general property. *Yellow River Imp. Co. v. Wood Co.* 81 Wis. 554; *Fond du Lac W. Co. v. Fond du Lac,* 82 Wis. 322; *Monroe W. W. Co. v. Monroe,* 110 Wis. 11. If good will is taxable property under the statutes, the situation as to it is the same as the situation about franchises. See *First Nat. Bank v. Douglas Co.* 124 Wis. 15, 19. The earnings, gross or net, of taxable property and the price of the stocks and bonds of corporations owning such property are not themselves taxable property, but are evidences of the value of such property. The action of the assessors and state board was, as to franchises and good will, an omission of property from assessment through mistake of law in believing franchises and good will not taxable; and, as to other property, a systematic refusal at all to consider pertinent evidences of value, through mistake of law again, in believing such evidences not pertinent and not a proper subject of consideration. Intentional omission of taxable property from assessment invalidates a tax affected by it. *Hersey v. Milwaukee Co.* 16 Wis. 185; *Smith v. Smith,* 19 Wis. 615; *Johnston v. Oshkosh,* 65 Wis. 473; *Green Bay & M. C. Co. v. Outagamie Co.* 76 Wis. 587. An omission of taxable property from assessment through mistake of law in believing it not taxable is the same as intentional omission; and likewise invalidates the tax affected by it. *Marsh v. Clark Co.* 42 Wis. 502; *Weeks v. Milwaukee,* 10 Wis. 242, 264; *Johnston v. Oshkosh,* 65 Wis. 473; *Green Bay & M. C. Co. v. Outagamie Co.* 76 Wis. 587. Therefore, the omission of franchises and good will from the assessment of general property by the local assessors and from the valuation of general property by the state board invalidated the tax upon appellant's property for 1904. Equally, intentional under-assessment of property invalidates a tax affected by it. *Spear v. Door Co.* 65 Wis. 298, 305; *Clarke v. Lincoln Co.* 54 Wis. 580; *Salscheider v. Ft. Howard,* 45 Wis. 519; *Scheltler v. Ft. Howard,* 43 Wis. 48; *Goff v. Outagamie Co.* 43 Wis. 55; *Marsh v.*

*Clark Co.* 42 Wis. 502. And (as in the case of omission of taxable property from assessment) under-assessment through mistake of law is the same as intentional under-valuation. Why is not systematic refusal to consider pertinent evidences of value through mistake of law the same thing in nature and effect as omission or under-valuation of taxable property through mistake of law? The former involves the latter. See *Bradley v. Lincoln Co.* 60 Wis. 71, 73; *Hewitt v. Butterfield,* 52 Wis. 384; *Hersey v. Barron Co.* 37 Wis. 75. The assessment of appellant's property by the state board included the things, viz., franchises and good will, which were omitted from the assessment of the general property of the state by the local assessors and from the valuation of that property by the state board; and the assessment of appellant's property by the state board resulted from an extensive and careful consideration of those very evidences of value, viz., gross and net earnings and stock and bond prices, which the local assessors and the state board omitted to consider in valuing the general property. Such fundamentally different treatment of appellant's property and of the general property of the state violates the rule of uniform assessment of property at its value, which is established by ch. 315—especially sec. 7— and by the general tax laws of Wisconsin. *Hale v. Kenosha,* 29 Wis. 599; *Marsh v. Clark Co.* 42 Wis. 502, 509; *Saltonstall v. Board of Review,* 132 Mich. 196; *Knowlton v. Rock Co.* 9 Wis. 410; *Taylor v. Louisville & N. R. Co.* 88 Fed. 350; *People v. Weaver,* 100 U. S. 539; *Sup'rs v. Stanley,* 105 U. S. 305; *Pelton v. National Bank,* 101 U. S. 143; *San Francisco Nat. Bank v. Dodge,* 197 U. S. 70; *Western U. Tel. Co. v. Omaha* (Neb.) 103 N. W. 84; *Little Rock & Ft. S. R. Co. v. Worthen,* 46 Ark. 312; *State ex rel. Bee Bldg. Co. v. Savage,* 65 Neb. 714; *Board of Assessment v. Ala. Cent. R. Co.* 59 Ala. 551; *Doster v. Sterling,* 33 Kan. 381. Appellant's railroad in Wisconsin was subject in 1903 and 1904 to mortgages securing unpaid indebtedness of many

million dollars; but the state board of assessment made no deduction from the gross value of the railroad property, in assessment thereof for taxation against appellant, on account of these mortgages, though mortgagors of real estate generally in Wisconsin were taxed on an assessment of only their equity of redemption in obedience to the provisions of ch. 378, Laws of 1903. This was inconsistent with the constitutional requirement of a uniform rule of taxation. *San Mateo Co. v. So. Pac. R. Co.* 13 Fed. 145; *Railroad Tax Cases,* 13 Fed. 722, 737, 738; *Santa Clara Co. v. So. Pac. R. Co.* 18 Fed. 385, 394, 401, 402; *Russell v. Croy,* 164 Mo. 69; *Nashville, C. & St. L. R. Co. v. Taylor,* 86 Fed. 168, 179; *Fraser v. McConway & T. Co.* 82 Fed. 287; *Kingsley v. Merrill,* 122 Wis. 185, 205. Another discrimination in assessments arises under ch. 315 and ch. 378, in that they command a different rule for taxation of a railroad company and others on the same sort of property, viz., credits, according to the mere incidental contingency whether or not the credits of others than the railroad are secured by land mortgage; and that contingency, on which the different tax is made thus to depend, is not a reasonable basis for such different taxation, because it is made to result in the taxation of secured, and so better quality, debts at less than unsecured debts of like amount. See *Pullman State Bank v. Manring,* 18 Wash. 250, 51 Pac. 464; *Fayette Co. Treas. v. People's & D. Bank,* 47 Ohio St. 503; *Detroit C. St. R. Co. v. Detroit,* 125 Mich. 673; *State Bank v. Board of Revenue,* 91 Ala. 217, 8 South. 852.

*H. O. Fairchild,* of counsel for the appellant, contended, *inter alia,* that ch. 315 unlawfully discriminates between railroad property and general property in the matter of the revenues to which they are to contribute and the rate of taxation imposed. Railroad property is called upon to pay a large state tax from which general property is entirely relieved, and general property is required to pay state, county, and municipal taxes, from which railroad property is wholly exempt.

The rate of taxation imposed on these properties is different in amount and, as between them, is not levied by a uniform rule. This constitutes unlawful discrimination. Under an *ad valorem* system of taxation of property the duty of dividing the state into assessment districts, and the valuing of the property in each and equalizing such values between the districts and apportioning the whole amount of the public burdens between such districts upon the basis of such equalization, is imperative. Cooley, Const. Lim. (7th ed.) 710, 711; Cooley, Taxation (2d ed.) 244, 245; *State ex rel. Ellis v. Thorne,* 112 Wis. 81, 86; *State ex rel. Holt L. Co. v. Bellew,* 86 Wis. 189, 195. As to railroad property the legislature has made the whole state a district and levied but a single tax; while as to general property the state is divided into hundreds of taxing districts, in which other state, county, and municipal taxes are levied, in which railroad property does not participate. See *Pingree v. Auditor General,* 120 Mich. 95; *Pine Grove v. Talcott,* 19 Wall. 666, 675; sec. 1, art. VIII, Const.; *Lund v. Chippewa Co.* 93 Wis. 640, 647; *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 577; *State v. Canda C. C. Co.* 85 Minn. 457, 461; *Board of Co. Comm'rs v. Citizens' Nat. Bank,* 23 Minn. 280, 287; *Adams v. Mississippi State Bank,* 75 Miss. 701, 23 South. 395. There is no middle ground between authority to fix different rates on different subjects taxable *ad valorem* by uniform rule and the power to establish favoritism and destroy equality. Ch. 315 should have been framed so that, after the value of railroad property was ascertained by the state board of assessment, that value should be distributed among the taxing districts of the state through which railroad lines extend—in proportion to operated mileage or other just method of distribution,—where the local rate could be applied. Providing other methods of assessing railroad property and other methods of collecting the tax, in case of default, than the methods adopted as to general property, does

not justify the application of different rates in the levying
of the tax. So long as railroad property and the general prop-
erty of the state remain taxable according to or in propor-
tion to value, neither can be exempted or relieved from a state
tax which the other is charged, without violating both uni-
formity and equality. *Hale v. Kenosha,* 29 Wis. 599; *Opin-
ions of Justices,* 97 Me. 595; *Knowlton v. Rock Co.* 9 Wis.
410; *Knowlton v. Rock Co.* 15 Wis. 600; *Gilman v. Sheboy-
gan,* 2 Black, 510; *Dyar v. Farmington,* 70 Me. 515.

There was also a brief by *George R. Peck,* of counsel for
the Chicago, Milwaukee & St. Paul Railway Company, as
*amicus curiæ.*

The *Attorney General,* and *H. W. Chynoweth* and *I. L.
Lenroot,* of counsel, for the respondents, argued, among
other things, that the legislature, in ch. 315, Laws of 1903,
has properly treated the property of appellant as a unit. *Yel-
low River Imp. Co. v. Wood Co.* 81 Wis. 554; *Fond du Lac
Water Co. v. Fond du Lac,* 82 Wis. 322; *Monroe W. W. Co.
v. Monroe,* 110 Wis. 11; *Chicago, M. & St. P. R. Co. v.
Milwaukee,* 89 Wis. 506; *State ex rel. Milwaukee St. R. Co.
v. Anderson,* 90 Wis. 550; *Pittsburg T. Lab. v. Milwaukee
E. R. & L. Co.* 110 Wis. 633; *Merrill R. & L. Co. v. Merrill,*
119 Wis. 249; *Washburn v. Washburn W. W. Co.* 120 Wis.
575; *Chicago & N. W. R. Co. v. Forest Co.* 95 Wis. 80. The
act prescribes the taxing district and makes the entire state,
for the taxation of railway property, a single district. The
power of the legislature is plenary to create and establish
such a district. *Land, L. & L. Co. v. Brown,* 73 Wis. 294,
303; *Teegarden v. Racine,* 56 Wis. 545; *Dickson v. Racine,*
61 Wis. 545, 549; *T. B. Scott L. Co. v. Oneida Co.* 72 Wis.
158; *State ex rel. Baraboo v. Sauk Co.* 70 Wis. 485. Ch. 315
does not violate the provisions of sec. 1, art. VIII, Const. By
it, railway property is made, for the purposes of taxation, a
class by itself. This is a legitimate exercise of legislative
power. That property may be classified for the purposes of

taxation has been too firmly established by the decisions of this court to now admit of controversy. *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37; *Kneeland v. Milwaukee,* 15 Wis. 454; *State ex rel. Baraboo v. Sauk Co.* 70 Wis. 485; *State ex rel. Sanderson v. Mann,* 76 Wis. 469, 476; *State ex rel. Holt L. Co. v. Bellew,* 86 Wis. 189, 195; *State v. Whitcom,* 122 Wis. 110; *Milwaukee E. R. & L. Co. v. Milwaukee,* 95 Wis. 42; *Black v. State,* 113 Wis. 205; *Battles v. Doll,* 113 Wis. 357. The decisions of the federal courts are in harmony with the doctrine of this court on the subject of classification. *Kentucky Railroad Tax Cases,* 115 U. S. 321; *State Railroad Tax Cases,* 92 U. S. 575, 611; *Columbus S. R. Co. v. Wright,* 151 U. S. 470; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421; *Florida C. & P. R. Co. v. Reynolds,* 183 U. S. 471, 480; *McHenry v. Alford,* 168 U. S. 651, 668; *Pacific Exp. Co. v. Seibert,* 142 U. S. 339; *Charlotte, C. & A. R. Co. v. Gibbes,* 142 U. S. 386; *Coulter v. Louisville & N. R. Co.* 196 U. S. 599; *American S. R. Co. v. Louisiana,* 179 U. S. 89; *Travellers' Ins. Co. v. Connecticut,* 185 U. S. 364; *Kidd v. Alabama,* 188 U. S. 730; *Savannah, T. & I. of H. R. Co. v. Savannah,* 198 U. S. 392; *People ex rel. Met. St. R. Co. v. Tax Comm'rs,* 199 U. S. 1; *Bell's Gap R. Co. v. Pennsylvania,* 134 U. S. 232, 237; *Giozza v. Tiernan,* 148 U. S. 657; *Home Ins. Co. v. New York,* 134 U. S. 594; *Adams Exp. Co. v. Ohio State Auditor,* 165 U. S. 194; *Magoun v. Ill. T. & Sav. Bank,* 170 U. S. 283; *Billings v. Illinois,* 188 U. S. 97; *Merchants' & M. Bank v. Pennsylvania,* 167 U. S. 461; *Gulf, C. & S. F. R. Co. v. Ellis,* 165 U. S. 150; *Clark v. Titusville,* 184 U. S. 329; *Maine v. Grand Trunk R. Co.* 142 U. S. 217; *Hagar v. Reclamation Dist.* 111 U. S. 701; *Connolly v. Union S. P. Co.* 184 U. S. 540; *Adams Exp. Co. v. Ohio State Auditor,* 17 Sup. Ct. 604; *New York v. Barker,* 179 U. S. 279; *Chamberlain v. Walter,* 60 Fed. 788. The decisions are to the same effect and without conflict in the state courts, some of

which are: *State Board v. Central R. Co.* 48 N. J. Law, 146;
*Comm. v. Edgerton C. Co.* 164 Pa. St. 284, 304; *Owensboro
& N. R. Co. v. Daviess Co.* (Ky.) 3 S. W. 164; *Ames v.
People,* 26 Colo. 83, 56 Pac. 656; *Dubuque v. C., D. & M.
R. Co.* 47 Iowa, 196, 200; *Northern Pac. R. Co. v. Barnes,*
2 N. Dak. 310; *Missouri River, Ft. S. & G. R. Co. v. Morris,*
7 Kan. 210; *Central Iowa R. Co. v. Sup'rs,* 67 Iowa, 199;
*Louisville & N. R. Co. v. Louisville* (Ky.) 29 S. W. 865;
*Sawyer v. Dooley,* 21 Nev. 390; *State ex rel. K. C., St. J. &
C. B. R. Co. v. Severance,* 55 Mo. 378; 1 Cooley, Taxation
(3d ed.) 72, 77; 2 Elliott, Railroads, §§ 740 *et seq.* See,
also, *Mich. Cent. R. Co. v. Powers,* 201 U. S. 245, affirming
138 Fed. 223. The power of the legislature to fix the situs
of corporate property for taxation, even though it be in part
real estate and thus subject to a different rate of taxation
in a given district than it would be subjected to were it taxed
in the place of its actual location, is established in this state.
*State ex rel. Milwaukee St. R. Co. v. Anderson,* 90 Wis. 550;
*State ex rel. Ashland W. Co. v. Wharton,* 115 Wis. 457. See
*Travellers' Ins. Co. v. Connecticut,* 185 U. S. 364; *Kidd v.
Alabama,* 188 U. S. 730. Ch. 315 is not invalid because
sleeping-car companies and street railways are excluded from
its provisions. Sleeping-car companies, while taxed under a
different statute (ch. 112, Laws of 1899, as amended by
ch. 477, Laws of 1905), are so taxed in the same manner as
railroads in every respect, both as to the mode of ascertain-
ing the value and the rate imposed, but if they were not, and
were taxed under an entirely different system, the law would
be valid. *Western U. Tel. Co. v. Indiana,* 165 U. S. 304;
*Pacific Exp. Co. v. Seibert,* 142 U. S. 349, 354; *American
S. R. Co. v. Louisiana,* 179 U. S. 95. Sleeping-car compa-
nies are not common carriers. *Pullman S. C. Co. v. Hatch*
(Tex.) 70 S. W. 771; *Scaling v. Pullman's P. C. Co.* 24
Mo. App. 29, 32; *Pullman P. C. Co. v. Gaylord,* 9 Ky. Law
Rep. 58. As to street railways, there is a wide difference

between them and railroads taxed by the act in question, in the business carried on, in their organization and powers, and in practical operation. *Chicago & N. W. R. Co. v. Oshkosh, A. & B. W. R. Co.* 107 Wis. 192. These two properties have been recognized as two distinct classes for purposes of taxation in every Wisconsin law on the subject. The street railways have been taxed under different rules and according to different methods, and such taxation was upheld in the case of *Milwaukee E. R. Co. v. Milwaukee,* 95 Wis. 42, 46. That the two properties constitute distinct classes for the purpose of taxation is not only the doctrine of the supreme court of Wisconsin, but that of the supreme court of the United States, as declared in the cases of *State ex rel. Met. St. R. Co. v. Tax Comm'rs,* 199 U. S. 1; *Savannah, T. & I. of H. R. Co. v. Savannah,* 198 U. S. 392; and *Michigan Railroad Tax Cases,* 138 Fed. 223, affirmed 201 U. S. 245. The provision of ch. 315 taxing railroad property at the average rate paid by the general property of the state is unobjectionable and valid. It is absolutely required that a rate be fixed, and there is no requirement of the constitution as to the manner in which it shall be fixed. While it was held in *Black v. State,* 113 Wis. 205, that the inheritance tax law of 1899 was invalid, for the reason that all property of the same class was not included, it was settled that the rate as to any class might be fixed by the legislature, regardless of the rate fixed on any other class of property. The position of counsel for appellant that property cannot be divided into classes, if taxed under the *ad valorem* system, is novel, and has no foundation in the authorities. See *State ex rel. Baraboo v. Sauk Co.* 70 Wis. 485; *Battles v. Doll,* 113 Wis. 357; *Mich. Cent. R. Co. v. Powers,* 138 Fed. 223; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421; *Fla. Cent. & P. R. Co. v. Reynolds,* 183 U. S. 471; *Coulter v. Louisville & N. R. Co.* 196 U. S. 599; *State ex rel. Abbot v. McFetridge,* 64 Wis. 130, 142. The provision requiring the state board to determine

the average rate of taxation is not a delegation of legislative power. *Board of Ed. v. State Board,* 133 Mich. 116; *State ex rel. Brown v. Mo. Pac. R. Co.* 92 Mo. 137; *Dowling v. Lancashire Ins. Co.* 92 Wis. 63, 68; *Locke's Appeal,* 72 Pa. St. 491, 498; *State ex rel. Adams v. Burdge,* 95 Wis. 390, 402; *In re Oliver,* 17 Wis. 681; *In re North Milwaukee,* 93 Wis. 616; *Dickson v. Racine,* 61 Wis. 545; *State ex rel. Baltzell v. Stewart,* 74 Wis. 620; *State ex rel. Ellis v. Thorne,* 112 Wis. 81; *Field v. Clark,* 143 U. S. 649. The law is well settled in this country that, in conferring power upon a railroad commission to determine and establish freight rates, there is no delegation of legislative authority. The legislature having prescribed that rates shall be reasonable, the duty of a state board in determining what a reasonable rate is, is the ascertainment of a fact only. It will not be contended that the very indefinite standard created by a legislature that railroad rates shall be reasonable involves the exercise of less discretion by a state board of railroad commissioners than the duty of the state board of assessment in the case at bar in arriving at the average rate of taxation. *State ex rel. R. & W. Comm. v. Chicago, M. & St. P. R. Co.* 38 Minn. 281; *State ex rel. Board of Transp. v. Fremont, E. & M. V. R. Co.* 22 Neb. 313; *People v. Harper,* 91 Ill. 357; *State ex rel. Godard v. Johnson,* 61 Kan. 803, 49 L. R. A. 662; *Georgia R. & B. Co. v. Railroad Comm'rs,* 70 Ga. 694; *Tilley v. Savannah, F. & W. R. Co.* 5 Fed. 641; *Reagan v. Farmers' L. & T. Co.* 154 U. S. 362; *St. Louis & S. F. R. Co. v. Gill,* 156 U. S. 649, 663; *Railroad Commission Cases,* 116 U. S. 307; *Chicago, M. & St. P. R. Co. v. Minnesota,* 134 U. S. 418; *Interstate Comm. Comm. v. Cincinnati, N. O. & T. P. R. Co.* 167 U. S. 479. Appellant is not entitled to a deduction from its assessments on account of its mortgage indebtedness. The doctrine of classification so well and conclusively established permits different rules for taxation of different classes of property. It certainly would permit the

exclusion of debts in one case and the inclusion in the other. This would be so without reference to any difference between debts of railroad companies and those of individuals or other corporations. *Bell's Gap R. Co. v. Pennsylvania,* 134 U. S. 232; *Chester v. Pennsylvania,* 134 U. S. 240; *Jennings v. Coal Ridge I. & C. Co.* 147 U. S. 147; *Michigan Railroad Tax Cases,* 138 Fed. 223. There is besides, from an economic standpoint, a fundamental difference between debts of the one class and those of the other. Seligman, Essays in Taxation, 103; McCrea, Taxation of Transportation Companies, 9 U. S. Ind. Comm. Rep. (1901) 1035; *People ex rel. Thurber v. Barker,* 141 N. Y. 118; *People ex rel. Commercial C. Co. v. Morgan,* 178 N. Y. 443; *Central Pac. R. Co. v. State Board,* 60 Cal. 35; *Germania T. Co. v. San Francisco,* 128 Cal. 589. The validity of the tax imposed upon the appellant is not affected by the action of the local assessors in failing to consider franchise values of private corporations, and the good will of partnerships and individuals in making their assessments. Evidence of such facts was not admissible. Sec. 1063, Stats. 1898; *Plumer v. Marathon Co.* 46 Wis. 163, 179; *Marshall v. Benson,* 48 Wis. 558. Independently of statute, it would seem to be settled that an assessor cannot impeach his own assessment. *Coulter v. Louisville & N. R. Co.* 196 U. S. 599, 610; *Fayerweather v. Ritch,* 195 U. S. 276, 306, 307; *Missouri v. Dockery,* 191 U. S. 165. It is not competent even to prove admissions of an assessor. *Marshall v. Benson,* 48 Wis. 558, 563. Omission of property from taxation does not of itself constitute a ground for setting aside the tax. *Smith v. Smith,* 19 Wis. 615; *Hixon v. Oneida Co.* 82 Wis. 515; *Brauns v. Green Bay,* 55 Wis. 113; *Dean v. Gleason,* 16 Wis. 1; *Semple v. Langlade Co.* 75 Wis. 354; *Coulter v. Louisville & N. R. Co.* 196 U. S. 599; *Cummings v. National Bank,* 101 U. S. 153, 157; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421; *Sup'rs v. Stanley,* 105 U. S. 305; *New York v. Barker,* 179 U. S. 279; *Adams*

*Exp. Co. v. Ohio State Auditor,* 165 U. S. 194; *Michigan Railroad Tax Cases,* 138 Fed. 223. The appellant comes into this court as a court of equity, and must show that the tax is not merely irregular but is inequitable. *Beaser v. Barber A. P. Co.* 120 Wis. 599; *Knapp v. Heller,* 32 Wis. 467; *Cook v. Racine,* 49 Wis. 243, 246; *Hixon v. Oneida Co.* 82 Wis. 515, 531; *State ex rel. Schintgen v. La Crosse,* 101 Wis. 208; *State ex rel. Hallauer v. Gosnell,* 116 Wis. 606. Ch. 315 does not violate sec. 5, art. VIII, Const., which prescribes that the legislature shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year. These taxes go into the general fund for the use of the state, and, though they are produced by state taxes, they are not such taxes as are contemplated by sec. 5. This tax is "one of the other sources of income" mentioned in the section, and if this source of income, together with the other sources, is not sufficient to provide for the needs of the state, then it is incumbent upon the legislature to comply with the constitution in levying an annual tax upon the general property of the state to meet the deficiency. But, if this should be regarded as an annual tax within the constitutional provision, it is not in any way in violation thereof. It must be conclusively presumed that the legislature has provided a sum no greater than it deemed sufficient to defray the expenditures of the state, and that the different sources of income which it has provided for are necessary to meet such estimated expenditures. Ch. 315 does not violate the XIVth amendment to the federal constitution. It has been repeatedly held by the supreme court of the United States that this amendment was not violated, if the law treated all property of a similar kind in the same way, discriminating against none, and gave to the owner an opportunity to be heard at some stage of the proceedings in which the tax was levied and assessed, so that it could not be said that his property was taken without due process of law. *Mich. Cent. R. Co. v. Powers,* 201 U. S. 245;

*Bell's Gap R. Co. v. Pennsylvania,* 134 U. S. 232; *State Railroad Tax Cases,* 92 U. S. 575, 611; *Home Ins. Co. v. New York,* 134 U. S. 594; *Magoun v. Ill. T. & S. Co.* 170 U. S. 283; *Merchants' & M. Bank v. Pennsylvania,* 167 U. S. 461; *Barbier v. Connolly,* 113 U. S. 27, 32; *Connolly v. Union S. P. Co.* 184 U. S. 540, 559; *Billings v. Illinois,* 188 U. S. 97, 102; *People ex rel. Met. St. R. Co. v. Tax Comm'rs,* 199 U. S. 1; *Savannah, T. & I. of H. R. Co. v. Savannah,* 198 U. S. 392; *Spencer v. Merchant,* 125 U. S. 345; *Kentucky Railroad Tax Cases,* 115 U. S. 321; *Davidson v. New Orleans,* 96 U. S. 97, 107. This law provides for ample notice to the taxpayer. *Hennessy v. Douglas Co.* 99 Wis. 129; *Dietz v. Neenah,* 91 Wis. 422.

MARSHALL, J. It does not seem practicable nor advisable to attempt to arrange the multitude of propositions submitted by the eminent counsel, who have contributed to lighten our labors in this important case, so as to treat all of them in detail and in logical order. It is not out of place to say, at the outset, that the careful preparation of the case for our consideration on the part of appellant merits the highest commendation, and that such preparation on the part of respondents is meritorious as well. It is gratifying to members of the court to have those whose duty it is to co-operate with them, in the administration of justice, evince proper appreciation of the dignity of important questions to be solved, and their duty in respect thereto. Most especially is that so when questions of such supreme importance as those before us are involved; questions as far reaching, as to the welfare of the people throughout the state and interests of great magnitude to the parties immediately concerned, as any that have been heretofore decided by this court. It is due to counsel to say that they merit the distinction of having fully appreciated such far-reaching importance of this litigation and so risen to the occasion that they may well rest satisfied of having

legitimately laid the full responsibility for the result upon those who must assume it.

As said before, it does not seem best to attempt to treat in detail all the major, and minor questions as well, drawn to our attention by counsel. All may well be grouped under a few grand divisions, as it were, and thus viewed more understandingly than in any other way. The first one in order relates to the scope and meaning of sec. 1, art. VIII, of the constitution.

## I.

It seems quite unaccountable, after the lapse of nearly sixty years since the constitution was framed, and half a century since that feature of the article in question was first considered by this court, notwithstanding the seemingly clear decision then made on the point at that time primarily involved, followed soon thereafter by a second decision covering the precise matter now in hand, that we should find ourselves at this late day face to face with a controversy as to the precise meaning of the words of our organic law: "The rule of taxation shall be uniform, and taxes shall be levied on such property as the legislature shall prescribe." That language seems plain, this court, as we shall see, early said it was very plain, and yet it has been treated time and again as ambiguous, and still seems to be so regarded, notwithstanding all that this court has in fifty years said on the subject. And so it must be regarded, especially since men of the highest attainments, lawyers, jurists, and learned laymen, have read different meanings out of it, having regard, as it has been thought, to the object of state constitutions and the broad powers possessed by the people, unrestrained by a charter on the subject. No better object-lesson, perhaps, could well be presented to illustrate the rule that ambiguity requiring judicial construction may as well arise through the apparent consequences of applying words in their literal sense to the sub-

ject with which they deal as from uncertainty of sense in the words themselves, than by the matter in hand. By such application, especially in the light of the varying views entertained of what this court has decided, the words of the constitution speak one way, seemingly, to some and another way to others. It is to be hoped that by the treatment of the subject in the three cases now before us all obscurities may be cleared up.

The following propositions may be stated as covering all questions that have arisen under the section in question:

(1) Did the fathers of the constitution intend, by sec. 1, art. VIII, thereof, that all taxes on account of property should be direct thereon, the owners being obligated to pay because of ownership, but the taxes to be in form as though the property were to pay the tax?

(2) Did they intend that all property should be taxed, and taxed equally so far as practicable?

(3) Did they design, by such section, to deal with any other form of taxation than that on property?

(4) Did they intend that all property taxed should be affected by the taxing burden equally so far as practicable, there being but one rule applying equally so far as practicable to each member of the one class, as contradistinguished from several rules for as many classes, the rule of uniformity being satisfied by uniformity within each class?

(5) Did they contemplate the establishment of a legislative rule for the taxation of property that should be uniform in that it should bear as equally as practicable on every species of property prescribed for taxation, and each member of each such species?

(6) What is meant by the rule of property taxation which the constitution requires to be uniform?

(a, b) The first proposition is ruled in the affirmative, and the second in the negative, by the repeated decisions of this court: they are not now in controversy. *Milwaukee & M. R.*

*Co. v. Waukesha Co.* 9 Wis. 431, note; *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 8 N. W. 833; *State v. Railway Cos., ante,* p. 449, 108 N. W. 594, and *Nunnemacher v. State,* 129 Wis. ——, 108 N. W. 627. There may be privilege taxes, as indicated in the cited cases, for revenue only, such as taxes on the business of insurance companies, and the former system of railway license taxation; there may be regulation taxes, with incidental revenue features, or for revenue only, such as the inheritance taxes; there may be license taxes for police purposes only, or for such purposes primarily with incidental revenue features, as to subjects within the field of police regulations. None of such taxes fall within the provisions of sec. 1, art. VIII, of the constitution, though they are, of course, under the limitations of other equality clauses of the constitution and the XIVth amendment of the federal constitution.

(c) The third proposition, it would seem, has been quite as decisively settled in the negative, by a long line of decisions commencing with *Milwaukee & M. R. Co. v. Waukesha Co., supra,* as held in the cases decided herewith. The first case went, in the main, as we shall show, upon the ground that the tax was not one on property within the meaning of the constitution, but was an exaction in lieu of such taxation. The mistake subsequently made, at times, of speaking of a tax of a sort other than one on property, but in lieu thereof, as a tax on property, seems so plain that the wonder is that any such process of reasoning could have been indulged in. Privilege taxes elsewhere, under constitutional provisions similar to ours, have been uniformly held not to be taxes on property, and so not to be tested by such provisions when otherwise they would be condemned under the requirement that taxation of property shall be laid by a uniform rule, or on a rule of equality. The constitution of South Carolina provides that taxes on property shall be uniform, and it has been held that it refers only to such taxes as are

commonly understood to be direct on property, not to any other form of taxing the same, though it, in the ultimate, reaches the property and in both cases the owner must make the payment. *Charlotte, C. & A. R. Co. v. Gibbes,* 27 S. C. 385, 4 S. E. 49. The same court held that in all cases where taxes are assessed on property they fall under the constitutional rule of uniformity. *State v. Hayne,* 4 S. C. 403. The constitution of Alabama contains a similar provision, and thereunder it is held that it is referable only to direct property taxation and is not a limitation upon any other form of taxation. *Capital City W. Co. v. Board of Revenue,* 117 Ala. 303, 23 South. 970. Such holdings in large numbers, under similar constitutional provisions, might be given, but we will cite only the following few additional cases: *Jersey City G. L. Co. v. United G. I. Co.* 46 Fed. 264; *Standard U. C. Co. v. Att'y Gen.* 46 N. J. Eq. 270, 19 Atl. 733; *State v. State Board of Assessors,* 47 N. J. Law, 36; *Union T. Co. v. Wayne Probate Judge,* 125 Mich. 487, 84 N. W. 1101; *State v. Philadelphia, W. & B. R. Co.* 45 Md. 361; *Delaware Railroad Tax,* 18 Wall. 206; *Comm. v. Provident Inst.* 12 Allen, 312; *Coite v. Society for Savings,* 32 Conn. 173. Consideration of this branch of the case might be carried to a very great length by referring to the numerous state constitutions and decisions under them, but we shall forego saying more on that line than to record that from a careful review of the entire field it is our conclusion that the term "tax on property," and similar expressions in such constitutions, has been uniformly held to stand for what such term is commonly understood to signify.

It is useless to press upon the attention of courts, as is often done, the idea that all taxes are really on the owners of property, either because of such ownership alone or the use of the property, in some way, so that in practical effect whatever be the form of the tax, let it be direct or indirect, in the ultimate it is on the property respecting the real basis

thereof and on the person respecting the instrument that must necessarily discharge it, and that regardless of the form, the mere shadow of the matter, in substance the exaction should be regarded as a tax on property. All such methods of reasoning, however philosophical they may appear to be, have been met over and over again by the courts with the uniform result that the term "taxes on property," as used in the organic law, means taxes on things tangible or intangible, as distinguished from taxation on the right to use or transfer things, or on the proceeds of business in which the use of things is essential, and that is because such meaning is the common, ordinary meaning and so the one which, nothing appearing to the contrary, it must be presumed was intended in framing the constitutional provision. We will not further pursue this subject, since it is more distinctly involved in *Nunnemacher v. State,* 129 Wis. ——, 108 N. W. 627, and the position of the court has been there so clearly stated by our brother WINSLOW that it is thought there will be no need in the future to rediscuss the matter.

(d) The fourth proposition suggested is the one of greatest significance, in view of the reasons which moved the learned court to pronounce the judgment complained of, and the attitude of counsel in respect thereto. The former held that the constitutional requirement that property shall be taxed by a uniform rule does not mean that all taxes on property shall be at a uniform rate and by one rule; that there may be classification, and that the rule of uniformity is satisfied by uniformity within each class. That idea is the real basis upon which the judgment complained of was rendered. In a very elaborate opinion the circuit judge marshaled many decisions of this court supposed to support it.

While it did not appear, upon the oral argument, that the trial court's theory, as indicated, was relied upon with any great degree of confidence by counsel for the state, we find by their brief that they do not by any means intend to treat

it with indifference. They stand for it with such apparent confidence as to require, if anything other than the trial court's laborious opinion were necessary, careful consideration thereof. If the trial court's position be sound it would certainly be very difficult to escape, if it could be done at all, the conclusion that the judgment appealed from is right.

Counsel for appellant contend that the doctrine that uniformity within each of several classes of property satisfies the calls of an equality provision in a state constitution dealing with the subject has no application to such a constitutional provision as ours; that the only classification permissible thereunder is the separation of property into that to be taxed and that not to be taxed, and such subclassification of the former as may be reasonable, having regard to methods of applying the one rule of uniformity to the one general class so as to work out, as to all, equality so far as practicable.

The trial court started with the idea that this court, in *Milwaukee & M. R. Co. v. Waukesha Co.* 9 Wis. 431, decided in 1855, which for convenience we will call the first case, adopted the doctrine that classification of property for direct taxation: for the application of different rules to different classes, is legitimate. The basic question there, as we shall see, was whether the railway license taxing law of 1854 was one imposing taxes on property within the meaning of the constitution. The result, in effect, was that if it were such a law it satisfied the rule of uniformity, since the taxes imposed were made uniform as to all property of the class, but that it was not a law taxing property. Here is the way the decision was phrased, the propositions being numbered for convenience of future reference in this opinion:

(1) The imposition upon railroad property by the act of 1854 does not violate that provision of the constitution of Wisconsin which provides a uniform rule of taxation, provided like property pertaining to railroads, or all property of that class, is alike taxed or alike exempt, as it appears to be.

(2) But the court does not think that the law of 1854 does impose a tax within the meaning of the constitutional provisions, and therefore the law of 1854 is valid, so far at least as the government is concerned.

It is quite unmistakable, from the phrasing of the decision, that the first proposition was not necessarily decided, since the final conclusion was that the constitutional provision was not involved. However, the unnecessary conclusion was judicial; it was the law for that case and a rule for the future under the doctrine of *stare decisis,* so long as it stood. So the trial court, in tracing the judicial history of the matter, made a well-grounded commencement.

In *Knowlton v. Rock Co.* 9 Wis. 410, which for convenience we will hereafter generally refer to as the second case, the question as to whether the constitution permits classification of property for the purposes of applying different rules of taxation was presented for decision. The circumstance giving rise thereto was the existence of a law providing that, in levying taxes in the city of Janesville, farming lands situated within its boundaries should not be burdened to the extent of the burdens on other property of equal value. The tax on such farming lands was limited to one half of one per cent. for current expenses, for the maintenance of roads and bridges and for the support of the poor, and not more than one half that levied on other property, and for all other purposes such lands were entirely exempted. The decision of the court, Justices DIXON and PAINE concurring, was that the law was invalid because (reciting from the syllabus, which is an accurate epitome of the opinion) "the constitution has fixed one unbending uniform rule of taxation for the state, and property cannot be classified and taxed as classed by different rules. The provision of the constitution that taxes shall be levied upon such property as the legislature shall direct does not sanction a discrimination which provides for taxing a particular kind of property for the support of gov-

ernment by a different rule from that by which other property is taxed; for when the kind of property is prescribed the rule of taxation must be uniform. All kinds of property must be taxed uniformly or be absolutely exempt." That is, certainly, no less emphatic than the language used by the chief justice in his opinion, as the following will show: "There can be no medium ground between absolute exemption and uniform taxation." The theory advanced would permit "different rules of taxation to the number of which there is no limit except that fixed by the legislative discretion, while the constitution established but one fixed, unbending, uniform rule upon the subject." If such theory is adopted "it will afford a direct and solemn constitutional sanction to a system of taxation so manifestly and grossly unjust that there will not be found an apologist anywhere, at least outside of those who are recipients of its favors." The mandate of the constitution, "it is true, is very brief, but long enough for all practical purposes, long enough to embrace within it clearly and concisely the doctrine which the framers of the constitution intended, that of equality. The rule of taxation shall be uniform, that is to say . . . it shall in all cases be alike; the valuation must be uniform, the rate must be uniform." "Uniformity . . . becomes equality. There can be no uniform rule, which is not at the same time an equal rule, operating alike upon all the taxable property throughout the territorial limits of the state, municipality or local subdivision of the government within and for which the tax is to be raised." That doctrine, so vigorously proclaimed, has never been overruled or criticised or even supposed to be open to question in this court so far as we are aware.

It will be seen that the second case overruled most distinctly the conclusion unnecessarily made in the first case. The full scope of the former decision was not definitely known, because the written evidence thereof was not then

at hand.   A full history of that is given in *State v. Railway Cos., ante,* p. 449, 108 N. W. 594.   No attempt to overrule the ultimate conclusion reached in the first case, or occasion therefor, existed, because of the fact, as said in the court's opinion, that the understanding was, as was the fact, that it did not involve the taxing power under sec. 1, art. VIII.

Justice COLE dissented, being more impressed, as plainly appears from his dissenting opinion, with the former conclusion unnecessarily reached than by the dominant one that the case did not fall under the constitutional provision.   He evidently was of the opinion that property could be classified for different rules of *ad valorem* taxation, and that the court so formerly decided.   Manifestly, the first case did not involve a direct tax on property, and the second had no necessary or logical connection with the first, except in that case the two forms of taxation were confused somewhat, when only one was referable to sec. 1, art. VIII, of the constitution.

The circuit judge further reasoned that the questions in the *Knowlton Case* were again passed upon in *State ex rel. Att'y Gen. v. Winnebago Lake & F. R. P. R. Co.* 11 Wis. 35, which we will call the third case, it again being held that in the first case the conclusion was that property could be classified legitimately for different rates or rules of taxation.   In this third case the source of disquieting differences as to the matters in the first decision is very clearly stated.   This language of Justice PAINE as to the attitude of the court in the second case and Justice COLE's then remembrance of the first is significant:

"It was there said that the court held (1) that the amount required to be paid by the railway company was not a tax, (2) that if it was a tax the constitutional requirement of uniformity was complied with, inasmuch as all railroads were taxed alike.   Mr. Justice COLE, however, who was then on the bench, placed his decision upon the last ground, and does not understand that the court relied very strongly upon the first."

It should be observed that the order of the decision was reversed in Justice PAINE's statement; a circumstance, however, emphatically indicating what he and Chief Justice DIXON regarded as the turning matter in the first case. The written decision, under the hand of Justice SMITH, when recovered, showed very distinctly that the dominant, the governing, idea, at least with Chief Justice WHITON and Justice SMITH, was the one that Justice COLE so thought, years after the decision was rendered, was not "very strongly relied on." Only by adhering closely to the dominant idea of the first case, as evidently viewed by the majority of the court then and thereafter, and that in the second as so viewed, laying aside expressions in dissenting opinions, can this matter be set at rest.

When we speak of the first proposition in the first case as having been unnecessarily decided, we do not mean that the solution of that alone would not have, effectually, disposed of the case; but it would not have so terminated the litigation as to settle the controversy as to whether the tax in question was one referable to sec. 1, art. VIII, of the constitution, which was the basic matter of dispute.

Now, while the second case involved the question only subjunctively decided in the first case, and not the one necessarily decided at all, the third involved subjunctively the question necessarily decided in the second case, and necessarily the turning question in the first. That is, while the first case dealt with a privilege tax, not a tax on property within the meaning of the constitution, the second dealt with the latter, not with the former; and the third dealt with the one, but not with the other,—a tax on property. The decision in the third, so far as the second overruled the decision subjunctively made in the first case, followed it as hypothetically necessary to the result reached, and as to the matter necessarily decided in the second case it was subjunctively affirmed, and as to the turning question in the first decision,

in the latter it was overruled. Thus, the second was left re-affirmed as to there being no room under the constitution for classification of property for different rules or rates of taxa-tion, and the first was left wholly overruled. Justice COLE preserved consistency in his record by adhering to his former view that classification of property for taxation by different rules or rates is legitimate. He stood alone on that at first, as it seems, as he did in the second and the third cases.

It is suggested that when the matter was presented to this court later, in *Kneeland v. Milwaukee,* 15 Wis. 454, which we will designate as the fourth case, Justices DIXON and PAINE receded from their position in the second and third cases on all points and indorsed the views of Justice COLE, restoring to full validity the decision in such first case, both on the question there subjunctively decided and the one nec-essarily determined, and also indorsed the views of Justice COLE as to the point necessarily decided in the second case as well. That is plainly a mistake. In the last opinion filed, the one which rehabilitated, so to speak, the decision in the first case, Justice PAINE prefaced the final conclusion reached by stating as the understanding of the court that a difference had existed as to what was decided in the first case, in that while the final writing under the hand of Justice SMITH showed that the court held that the law of 1854 did not "im-pose a tax within the meaning of the constitutional provis-ion," Justice COLE's remembrance was that the court did not hold that the law "did not impose a tax in the just and proper sense," "but," said Justice PAINE, "the difference is wholly immaterial inasmuch as both statements show the court held that even if it was a tax it was no violation of the rule of uni-formity; both show that the law was decided to be no viola-tion of the constitution. This is all that is material for us to know in giving effect to the decision as an authority requir-ing us to sustain the validity of the law, *and that is all the effect we give to it."* In that, by necessary implication, there

is a distinct negation of any intention to overrule anything said in the second case or the third, or anything said in the opinions on the first two hearings in the fourth, except as was necessary to so far restore the decision in the first as to recognize as valid the law of 1854. That covered the point, and that only, as to the law not being referable to sec. 1, art. VIII, of the constitution, because it "did not impose a tax within the meaning of the constitutional provisions." The point subjunctively decided in the first case, and overruled in the second, was plainly left where the second case left it, namely, that there can be no classification for different rules of taxation under sec. 1, art. VIII, of the constitution.

Following along the mistaken line we have indicated as having been taken by the circuit court and maintained by counsel for respondent, it is suggested that this court, in distinctly affirming the *Knowlton Case* in *Hale v. Kenosha,* 29 Wis. 599, overlooked the fact that the former was expressly repudiated in the *Kneeland Case.* Instead of such repudiation there was the most emphatic affirmance thereof, as we have seen, as to the question under consideration here. So the fifth case, on that, is in perfect harmony with the dominant, with the ruling, feature of the second. It is hardly reasonable to suppose that the justices concerned in making so important a decision as that in the second case where they divided, finally united in overruling it in the fourth, and, so soon as the fifth case was decided, united in going back to the position taken in the second and concurred in reinstating it and re-intrenching it in a most decided manner.

The sixth case in order is *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 8 N. W. 833. It is referred to apparently as finally intrenching in our system the idea of classification of property for taxation of it by varying rules, in a subsidiary sense. That seems to be based in part on the very accurate history there given of the treatment, here, of the railway license tax law, dignifying the first decision as regards points

there *"necessarily decided"* as the law of this state, and stamping as *"mere dicta"* all said subsequently inconsistent with "what was so necessarily decided." It also seems to be based, in part, on some general discussion of the subject of classification leading up to the decision of the real question at issue, not involving the subject of controversy here.

When what was said in the sixth case is considered in the proper light, it will be seen to be in harmony with the point necessarily decided in the *Kneeland Case* as well as the one necessarily decided in the first case, leaving the position of this court as to what was necessarily decided in both where it had stood for twenty years or more. The only subject involved was that of the power of the legislature to exempt some property from taxation and tax other property. The power, generally speaking, was not in controversy. The contention was as to whether it extended so far as to permit subdivision of property of the same general class so as to tax part and exempt the rest. No question of the classification of property for the purpose of applying thereto different rates or rules as regards equality of burden of taxation was suggested. The court held, under the peculiar circumstances of the case, Justice ORTON dissenting, that there could be such classification. The land in question was in the nature of trust property for public purposes. It had been formerly held by the state, and was then necessarily exempt. Although transferred to the railway company in execution of the trust, it was held that its trust character was not so wholly changed but what it might be still exempted in further execution of the trust. The situation was peculiar, as indicated, the decision was expressly confined thereto, and it has never been extended.

One should not be misled by the course of the discussion in the sixth case, by reason of citations justifying classification, dealing only with different methods of applying the same rule or rate of taxation to all property so as to effect equality,

so far as practicable, such as *Missouri River, Ft. S. & G. R. Co. v. Morris,* 7 Kan. 210; *Louisville & N. A. R. Co. v. State,* 25 Ind. 177, and the like; nor citations justifying classification for exempting property from general taxation and imposing in lieu thereof a privilege tax, such as *Portland v. Portland W. Co.* 67 Me. 135; *Kittanning C. Co. v. Comm.* 79 Pa. St. 100, and the like; nor such as were shown to justify classification for police regulation, such as *Youngblood v. Sexton,* 32 Mich. 406, and the like; nor those relating to constitutions expressly or impliedly providing or permitting classification for purposes of taxation, and only requiring uniformity within each class, such as *New Orleans v. Kaufman,* 29 La. Ann. 283; *Kittanning C. Co. v. Comm., supra,* and the like,—many constitutions differ from ours in that important particular; nor those dealing with classification by exempting from general taxation and imposing contract taxes, such as *People ex rel. St. Mary's Falls S. C. Co. v. Auditor General,* 7 Mich. 84; or referring to mere manner of and situs for taxation, such as *State v. Runyon,* 41 N. J. Law, 98. All such should be read with reference to the particular questions and conditions involved in them respectively, and the question under discussion in the *Wisconsin Central R. Co. Case,* that of whether property may be classified as between property to be taxed and property not to be taxed.

As to the four previous decisions of this court, ending with the *Kneeland Case,* it was said in the sixth case, as seen, that the decision in the third "was overruled and all points *necessarily decided* by the affirmance of the order in the first case were followed," and thereby that all the court's "utterances inconsistent with the points so *'necessarily decided'* by the united court November 17, 1855, became henceforth as mere *dicta."*

While the quoted language brought into clearer light than existed before the validity of the first decision, since what was said was not accompanied by a plain statement of what

points were, in fact, *"necessarily decided in the first case,"* perhaps the way was left open for a claim that the first of such points, indicated in the written decision under the hand of Justice SMITH, was one, and perhaps the dominant one, as had been claimed by Justice COLE, but which the court, as we have shown, had in effect held was not. That this court did not regard it as such in the sixth case seems plain, from the fact that neither the second case nor the fifth was even criticised.

There is nothing in *State ex rel. Baraboo v. Sauk Co.* 70 Wis. 485, 36 N. W. 396, or *Battles v. Doll,* 113 Wis. 357, 89 N. W. 187, or *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468, inconsistent with the foregoing. Rightly considered, they do not deal with the subject here in hand at all. The first two concerned the matter of creating taxing districts and the last the subject of police regulation governed solely by other equality clauses of our constitution than sec. 1, art. VIII, and by the XIVth amendment to the federal constitution, which permit classification. True, it is there said that the taxation of railroad companies upon gross earnings is a mode of levying taxes upon the property of the corporation, and the idea of classification is treated in that connection as indicated thereby. But a *mode* of taxing property, as certainly all indirect methods are, is not taxing of property.

We do not overlook the circumstance that in *State v. Whitcom,* after referring to the constitutional limitation for the taxation of property (sec. 1, art. VIII, Const.), and following that with language to the effect that on the exercise of the police power there are like equality limitations, citing sec. 1, art. I, of the state constitution and the XIVth amendment to the national constitution, this was said:

"Such command does not require that all property or all persons shall be treated exactly alike, but permits separation of either into classes of property or of persons similarly conditioned or situated, having characteristics legitimately dis-

tinguishing the members of one class from those of another in
respects germane to such general and public purpose and ob-
ject of the particular legislation."

If one were to follow the line of thought which the learned
circuit judge did from the beginning, one would be quite
liable to view the above quoted language as recognizing a
classification of property for direct taxation by rules, uniform
as to each class, under sec. 1, art. VIII, as legitimate. With-
out special reference to such language, the effort here to clear
up obscurities as regards the constitutional provision would
be incomplete; not because there is obscurity in fact in such
language, rightly viewed, but because of the tendency, as we
have seen, not to rightly view it. The court did not intend
thereby to indorse the doctrine of classification of property
for direct taxation with reference to uniformity merely with-
in each class. It had no thought of overruling or saying any-
thing inconsistent with the *Knowlton Case* or the *Hale Case*
on that subject. The term "classification of property" was
used, as was thought, with reference to such as had been uni-
formly recognized in this state as proper: division of property
into that to be taxed and that not to be taxed at all; division
of that to be taxed and that not to be taxed within the mean-
ing of sec. 1, art. VIII, of the constitution, but taxed indi-
rectly; division of property to be taxed directly, and so refer-
able to sec. 1, art. VIII, into classes with reference to situs
and in other respects, in aid of applying one rule to all so
as to affect the different kinds of property with as great a de-
gree of equality as to all as practicable. Classification for
different rules resulting in different rates and unequal taxa-
tion, in that one class might not be made to bear the public
burdens proportionately with other classes, was not thought
of, and the case should not be regarded otherwise. The lan-
guage was carefully and appropriately chosen in respect to
the point to be decided. Read with reference to the settled
law, it is in perfect harmony therewith. Read with refer-

ence to the line of thought upon which the judgment was based, candor compels us to say it would appear consistent therewith.

In discussing questions in a legal opinion leading up to a final result as to some particular controversy, one can hardly be expected to so guard everything written but that another may, readily, mistakenly misapply it, viewing the same without accurate appreciation of its particular bearing in the given case.

The foregoing covers the entire process of reasoning by which the result was reached below that in this state there may be classification of property for different rules and consequently different rates of taxation. The start was not wholly illegitimate, but the force and scope of the intervening decisions was not appreciated, and a wrong conclusion was the result. If the judgment depended upon such process of reasoning for its support a conclusion that it is erroneous would be most likely to follow.

Before passing from this subject we should refer to *Slauson v. Racine,* 13 Wis. 398, which was not noticed in its order of date, because it was thought best to treat, throughout, the line pursued by the trial court and counsel for respondent. In the *Slauson Case* the precise question was presented treated before and after, as will be seen. The law under consideration classified property for taxation as regards whether agricultural lands within the city limits of Racine or other lands therein. It was construed as unconstitutional, Justice COLE, consistent with his position on numerous other occasions, dissenting upon the ground that classification of property for taxation under sec. 1, art. VIII, was permissible. The court referred to the previous occasions of so deciding, and Justice COLE to the previous occasions of his dissenting from the views of his brethren.

To recapitulate briefly: For the direct method of taxing property, taxation on property so called, as to the rule of uni-

formity, there can be but one constitutional class. All not included therein must be absolutely exempt from such taxation. All within such class must be taxed on a basis of equality so far as practicable. In that respect *Knowlton v. Rock Co.* and *Hale v. Kenosha* are, and have been since they were decided, the doctrine of this court. *Expressio unius est exclusio alterius* does not apply to sec. 1, art. VIII, of the constitution so as to limit the taxing power of the state exclusively to property, since when the provision is read in connection with its history as found in the journal of the constitutional convention it is not ambiguous in that regard. Whatever limitations there are on other forms of taxation than that on property must be found in other equality clauses of the constitution than the one under consideration. For the direct method, the constitution puts all property chosen therefor into one class, leaving all other property outside thereof, and contemplates one rule and, so far as practicable, one rate of taxation, as said in the *Kneeland Case.* Privilege taxes, though indirect taxes on property, are not taxation of property, and so are not referable to sec. 1, art. VIII, of the constitution. For the clear understanding thereof looking to the words themselves, one, with the common meaning of the term "taxation of property" in mind, should read such words as suggested in the *Wisconsin Central R. Co. Case,* namely: "The rule of taxation shall be uniform . . . upon such property as the legislature shall prescribe." The court in the *Knowlton Case* said that those words are perfectly plain, but if there were any doubt about the matter, the history thereof found in the journal of the constitutional convention would strongly aid in removing it, in harmony with the position of this court, early most decidedly taken, as we have indicated, and since consistently maintained.

(e) The next stated proposition, in short, is: Does the constitution contemplate that the legislature shall make the rule

of taxation, limited by the requirement as to uniformity? The answer to that will be a long step towards solving the last proposition.

This last subject has fallen into some little, though not serious, confusion. It may be helpful to briefly state the history of it as treated in the constitutional convention. That history is short. The proceedings entire, as to art. VIII, occurred during an hour or two's time at one sitting of the committee of the whole, and about the same length of time during one forenoon session of the convention. They are reported on about seven pages of the official journal, and that part relating to the particular matter on about four.

The subject was taken up in committee of the whole as it came from the committee which framed the article, there having been no discussion in the meantime, in this form: "All taxes levied in this state shall be as nearly equal as may be." Probably if no change had been made therein it would be said, at once, that the "rule of taxation" is to be found in the constitution itself, only requiring action on the part of the legislature to give it vitality. After brief discussion as to the second section of art. VIII dealing with the subject of exemptions, it was agreed to report the second clause of the first section as it now stands, evidently supposing that would leave the matter wholly to the legislature as to what property should be taxed and what should not be taxed. It was then agreed, substantially without debate, to recommend substituting the word "practicable" for the words "may be." Next it was agreed to recommend striking out the section on exemptions: that being done apparently because such section would be rendered useless by adopting the proposed second clause for the first section. Then, without debate, the first clause of the section as we now have it was agreed to as a substitute for the words "All taxes levied in this state shall be as nearly equal as practicable." After some further discussion and effort to reverse the action as to omitting the sub-

ject of exemptions, it was agreed to report the article with the subject in hand covered as indicated, namely, "The rule of taxation shall be uniform throughout the state, and taxes shall be levied on such property as the legislature shall prescribe."

On the succeeding day, as before indicated, after brief proceedings, all recommendations of the committee of the whole were adopted. The article was then ordered engrossed. Without further change it was adopted and sent to the committee on revision, by recommendation of which the words "throughout the state" were stricken out.

When the report of the committee of the whole was acted upon by the convention, renewed efforts were made to add a section on the subject of exemptions, but the convention persisted in leaving the whole matter to the legislature under the second clause of sec. 1. It was during the discussion on this subject that the convention was admonished that the completed work, in case of its specifying property for taxation and property to be exempt from taxation, would be construed by the rule, *expressio unius est exclusio alterius.* Likewise on the floor of the convention several unsuccessful efforts were made to change the first section in the following order and form:

(a) All taxes levied in this state shall be uniform and equal and shall be assessed upon a just value of real and personal property.

(b) All taxes to be levied in this state shall be levied upon all property, both real and personal, according to value.

Thus it will be seen that the convention considerately refrained from tying the hands of the legislature in art. VIII as to any sort of taxation except that on property, or from placing any limit on legislative power as to what particular property to tax or exempt from taxation, or from even specifying, expressly, whether property taxation should be according to valuation. It is quite evident, however, that these two

ideas were at the start intended to be covered by the language of the first section: (a) all taxes shall be on a basis of equality throughout the state; (b) all taxation of property shall be according to value.

During the brief debates the two ideas suggested were voiced time and again, expressly or impliedly, and were universally conceded, as is indicated by expressions used, to be necessarily fundamental. Nevertheless, it would seem that the rule of taxation, so called, was not in the end so definitely and exclusively confined to the constitution, itself, as at first.

The idea is not without reason that, notwithstanding the entire change in language of what became, by the first amendment, the first clause of sec. 1, there was no purpose to change the meaning. The better view, it seems, is that the final adoption of a clause so materially differing from that at first proposed, and the rejection of an expression, modeled after a form used for a similar purpose in many constitutions, was not wholly the result of a mere choice of words to express the one purpose in mind. If the only idea was to make the section as concise as practicable, such an adept in that line as Justice WHITON would have phrased the matter something like this: "Taxation shall be uniform on such property as the legislature shall prescribe," thus cutting the number of words down one third.

It will be noticed that the second clause of sec. 1 was added and the first perfected by the substitution of the word "practicable" before the first clause as we now have it was substituted for the original. Obviously, in the beginning the section referred to all taxation. It covered value as a basis where only value was usable, and other bases to fit the necessities or proprieties of each case. But when the second clause was added, it impliedly prescribed value as the basis, since, as said by Justice BREWER in *Cleveland, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 439, 14 Sup. Ct. 1122, "the rule of property taxation is that the property is the basis of taxation.

It does not mean a tax upon the earnings which the property makes, nor for the privilege of using the property, but rests solely upon value." The same idea was pretty clearly expressed in *Knowlton v. Rock Co.* 9 Wis. 410.

The idea of taxation on a value basis being necessarily embodied in the second clause of sec. 1, all that was necessary to the first was the idea of uniformity. If it had been intended therein to confine the "rule of taxation" in its broader sense to the constitution, the first clause would have been changed so as to merely express the idea, "Taxation shall be uniform on such property," etc. The use of the significant, the peculiar language, "The rule of taxation shall be uniform," etc., suggests, to some extent at least, the making of a rule in conformity with the constitution, and not wholly by the organic law itself, as is commonly done. Had the latter idea been in mind there were plenty of models at hand, as, for example, that adopted in Michigan and several other states, "The legislature shall provide a uniform rule of taxation," or "uniform and equal rate of taxation;" and that adopted in Pennsylvania, Missouri and other states, taxation "shall be uniform," etc.; and that adopted in other states, taxation "shall be uniform," etc., and by "the fair market value;" and more concise still, that adopted in Virginia and other states, taxation shall be "equal and uniform;" and that in Ohio, taxation of property shall be "according to its true value in money."

So, looking at the matter as an original proposition, it would seem that the basic idea of the rule of taxation, the real principle thereof, was placed in the constitution. It expressed this: All taxation on property, as near as practicable, shall bear thereon, relatively equally as to value, throughout the state. To that extent we are to look to the constitution, itself, for the "rule of taxation." But in a broad sense, in that which gives vitality to the basic principle, it was left to the legislature to make the rule; no legislation to be deemed

a part thereof, strictly speaking, except that essential to such vitality. The body of the rule was made by the organic law, it was left to the legislature to breathe into it the breath of life.

True, it might well be said that the foregoing is not in entire accord with all the previous expressions of this court on the subject. When we look to *Knowlton v. Rock Co.* it would seem that the first idea here was that the constitution solely prescribes the rule, and the legislature solely prescribes the property to which the rule shall be applied. Chief Justice DIXON, for the court, there spoke of "the rule of uniformity prescribed by the constitution." He summed the matter up thus: "The very moment that the legislature say that a specific article . . . of property shall be taxed . . . from that very moment the first clause of the section takes effect, and it must be taxed by the uniform rule. The legislature only can prescribe," then "the first clause of the section governs the residue of the proceeding."

True, the court suggested, on the occasion referred to, that the term "the rule of taxation shall be uniform" means "the course or mode of proceeding in levying or laying taxes shall be uniform, that it shall in all cases be alike, each step uniform." Manifestly, however, it was not intended to say that every detail as to all kinds of property under all sorts of conditions must be the same. That would be an impossibility; it has never been attempted, here or elsewhere. Practical construction of the constitution from the time it was adopted, common sense, and all authority is to the contrary.

Our taxing laws are not now, and never have been, uniform as to mere methods of imposing taxes. Property of the same general class is, and generally has been, taxed under some circumstances where the same is located, under others where the owner resides or has his principal office in this state, and under still others where his agent is located therein; some kinds of movables of a tangible character are taxed

where the owner resides, while other kinds of such movables are taxed where they are located, or in use, notwithstanding the owner resides in this state; in some cases property of the same general class is divided, part being taxed where located on the 1st day of April in the year the tax is levied, and part where located on the 1st day of May in such year. There are many other instances that might be given of radical differences in treating different kinds of property, and different parts of the same general class, none of which have ever been supposed to violate the constitutional rule of uniformity. All have been supposed to be valid so long as they were uniform within the general or subclass and reasonably calculated to promote the constitutional object as to the whole. *State ex rel. Holt L. Co. v. Bellew,* 86 Wis. 189, 196, 56 N. W. 782; *State ex rel. Milwaukee St. R. Co. v. Anderson,* 90 Wis. 550, 568, 63 N. W. 746; *Wis. Cent. R. Co. v. Lincoln Co.* 57 Wis. 137, 15 N. W. 121.

The language in the *Knowlton Case* was doubtless used with reference to matters so closely connected with the real principle of the rule as to necessarily be a part thereof. That is evinced by the explanatory clause with which the language as to the proceedings being required to be uniform was closed, namely, "the valuation must be uniform, the rate must be uniform." In *Hale v. Kenosha,* 29 Wis. 599, the idea that the constitution makes the rule was somewhat emphasized in that, without reference to details of imposing taxes, the language of the *Knowlton Case,* that "the legislature only can prescribe the subject of taxation, and then the first clause of sec. 1, art. VIII, takes hold and governs the rest of the proceeding," was most clearly, it would seem, indorsed as a "sound construction of the constitution."

In *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 8 N. W. 833, without referring to either of the foregoing cases, it was said, substantially, the rule of taxation is the law of taxation, and the legislature makes the law and therefore prescribes

the rule; and further, "a denial of the power of the legislature to determine and fix the rule of taxation, subject to the limitation of the rule of uniformity, and attempt to ingraft it [the rule] on the constitution itself, as had been done by apt words in other constitutions, has led to much diversity of opinion if not confusion of terms." The idea that the rule of taxation is the law of taxation was suggested in the opinion of Judge HUBBELL in *Milwaukee & M. R. Co. v. Waukesha Co.* 9 Wis. 431, and it was there grounded on the idea that the constitution, sec. 1, art. VIII, permits various rules of taxation, and as many as there are different legislative classes of property prescribed for taxation, which, we have seen, was only subjunctively considered and decided on the appeal, and was held to be erroneous in numerous cases thereafter.

It might be thought, if not repudiated, that the language quoted from the *Wisconsin Central R. Co. Case* refers to the *Knowlton, Slauson,* and *Hale Cases.* We make the disclaimer, since if there had been, on so important a question, any considerate purpose to overrule or even criticise a line of decisions by which the subject referred to had been supposed definitely settled for some eighteen years, that fact would doubtless have been made plain by special reference to such cases.

There are other expressions in the *Wisconsin Central R. Co. Case,* in their literal sense, suggesting that mere details in laying taxes on property are necessarily part of the rule of taxation, and that they themselves must be uniform, such as "manifestly it [the rule of taxation] is the act of levying a tax or imposing taxes," "it is the measure of individual duty in support of the public burdens and the means of enforcing the same. The rule . . . must be prescribed by the legislature." It "could be applied to rate, or valuation, or mode, or means of assessment or collection, . . . or to all property, or to certain subjects, or to certain classes, or kinds, or species of property." We quote thus at length in aid of harmonizing

upon some clear conception, if practicable, of the rule of uniformity and the source of it, by which the law in question must be tested.

Two years after the first *Wisconsin Central R. Co. Case* was decided, in *Wis. Cent. R. Co. v. Lincoln Co.* 57 Wis. 137, 15 N. W. 121, a case where the subject involved appropriately suggested the expression, Justice LYON, for the court, evidently speaking advisedly, used the term "the uniform rule of taxation ordained by the constitution, art. VIII, sec. 1."

Enough has been said to indicate that the court, in the language quoted from the first *Wisconsin Central R. Co. Case,* could not have intended that the mere mode or manner of assessment of property for taxation or collection of taxes, or assessment of taxes on property, of themselves are parts of the rule of taxation, or that one rule can be applied to one class of property and another rule to another, except in respect to the one being taxable and the other not. True, as the court said and evidently intended, the rule may be applied to details in that details may be provided inconsistent with the constitutional rule or principle. True, the legislature "fixes the rule of taxation:" passes laws subject to the rule of uniformity of the constitution. In other words, the legislature, having regard to the basic principle of uniformity, the real rule in the abstract, must needs pass laws giving vitality thereto and necessarily in conformity therewith. So in a sense the constitution prescribes the basic principle, the real rule of uniformity in the abstract; the legislature prescribes the rule in the concrete: in the sense of creating a union of constitutional principle and such laws as are necessary to give vitality thereto. Those laws are the essentials, as indicated: those for the ascertainment of values and fixing rates and applying the latter to the former so as to effect the constitutional equality, must necessarily be uniform throughout the state, having regard to the varying conditions as to taxing districts requiring varying amounts to be raised in them re-

spectively for the needs of the special localities. Laws as regards mere details, designed to be aids in applying the rule, may or may not violate it according as they reasonably are in furtherance of it or are manifestly otherwise.

As to the legislature prescribing the rule of taxation in any other sense than above indicated, it is considered that cases cited which might be taken, in some nonessentials, as out of harmony herewith, and also *State ex rel. Sanderson v. Mann,* 76 Wis. 469, 476, 45 N. W. 526, 46 N. W. 51; *Black v. State,* 113 Wis. 205, 216, 89 N. W. 522, are to be read in such harmony.

(f) As anticipated, little more need be said on the last proposition suggested at the outset: on what is the uniform rule of taxation; the one by which the law in question must be tested.

It is the rule prescribed by the constitution vitalized by the legislative essentials (no particular law or laws by themselves, but the legislation as a whole) which, in general effect, appropriately provides for imposing upon and collecting from or on account of the property throughout the state prescribed by the legislature for taxation, an equal proportion, as near as practicable, relative to values and taxing districts, of the whole burden of such taxation. Such essentials include the ascertainment of values in the ultimate, not necessarily every instrumentality to that end, and the rate and the application of the latter to the former so as to secure the final object as near as practicable. Mere differences in methods as to nonessentials in applying the rule itself to a particular class or subclass of property, so long as the same is reasonably calculated to promote such ultimate object, is within the rule because within the principle. All legislation outside of such essentials, or not so promoting, are outside the rule and are condemned thereby.

So it is seen that the constitutional rule looks, as it were, always to the object to be attained, not, necessarily, to the

mere manner or means of reaching it. That object is equality; that equality relates to the burdens of state taxation, county taxation, city taxation, and so on down to the smallest and least important governmental subdivision authorized to incur expense to be discharged by taxation or by money previously so provided to that end. In other words, there must be that uniformity, which is essential to equality, throughout each taxing jurisdiction, as to tax burdens imposed on property therein. *Lund v. Chippewa Co.* 93 Wis. 640, 647, 67 N. W. 927; *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 577, 89 N. W. 596, 90 N. W. 1067; *Jones v. Memphis,* 101 Tenn. 188, 47 S. W. 138; 1 Cooley, Taxation (3d ed.) 333.

Practical equality is constitutional equality. As it is said, "mathematical equality of taxation being unattainable, an approximation, reasonably exact, as nearly proportional as possible in consideration of the difficulties of the subject, and sufficient for the practical purposes of substantial justice, is all that is required." *Boston, C. & M. R. Co. v. State,* 60 N. H. 87; *Plumer v. Marathon Co.* 46 Wis. 164, 50 N. W. 416; *Wis. Cent. R. Co. v. Lincoln Co.* 57 Wis. 137, 142, 15 N. W. 121; *Kirby v. Shaw,* 19 Pa. St. 258, 260; 1 Cooley, Taxation (3d ed.) 257; Burroughs, Taxation, § 26.

The idea expressed in the language quoted from the New Hampshire court is found here very distinctly illustratively applied in the opinion of Lyon, J., in *Wis. Cent. R. Co. v. Lincoln Co., supra,* which is substantially as follows: Absolute uniformity in every detail in the assessment of property is impracticable, if not unattainable. It is sufficient to satisfy the constitution, in the case of the assessment of real and personal property, that the law provides for the valuation of real property at its full value, and, though a different method and time are provided for valuing personal property, the difference is immaterial since the law requires that to also be appraised at its full value.

The result, as above, is believed to be universally sustained, especially by decisions in recent years. If we were to undertake to demonstrate it by reference to constitutions elsewhere and decisions under them, this opinion would necessarily be drawn out to a very great length, and probably without its purposes as to the case in hand, or future situations to which the principles may apply, being promoted. It is sufficient, it would seem, that we have shown that it has been the doctrine of this court, without serious disturbance, for some fifty years, that the constitutional requirement is not as to nonessentials, uniformity of methods of taxation, but uniformity in results, within the scope of the rule as stated.

The following citations seem to go to the full extent of what has been said, and cover every phase thereof: *Chamberlain v. Walter,* 60 Fed. 788; *Kentucky Railroad Tax Cases,* 115 U. S. 321, 337, 6 Sup. Ct. 57; *State Railroad Tax Cases,* 92 U. S. 575, 611; *Boston, C. & M. R. Co. v. State,* 60 N. H. 87; *Boston & M. R. Co. v. State,* 63 N. H. 571, 4 Atl. 571; *Wagoner v. Loomis,* 37 Ohio St. 571; *State ex rel. v. Jones,* 51 Ohio St. 492, 37 N. E. 945; *State Board v. Central R. Co.* 48 N. J. Law, 146, 4 Atl. 578; *State ex rel. Prout v. Aitken,* 62 Neb. 428, 87 N. W. 153; *State ex rel. Morton v. Back* (Neb.) 100 N. W. 952; *State ex rel. K. C., St. J. & C. B. R. Co. v. Severance,* 55 Mo. 378; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 133 Ind. 625, 33 N. E. 432; *Baltimore & O. R. Co. v. Koontz,* 77 Va. 698; *Shenandoah Valley R. Co. v. Clarke Co.* 78 Va. 269; *Comm. v. Brown,* 91 Va. 762, 21 S. E. 357; *Missouri River, Ft. S. & G. R. Co. v. Morris,* 7 Kan. 210; *Cent. Iowa R. Co. v. Sup'rs,* 67 Iowa, 199, 25 N. W. 128; *Louisville & N. A. R. Co. v. State,* 25 Ind. 177; *Applegate v. Ernst,* 3 Bush, 648; *Franklin Co. v. Nashville, C. & St. L. R. Co.* 12 Lea, 521; *Chattanooga v. Nashville, C. & St. L. R. Co.* 7 Lea, 561; *Dayton v. Coal & Iron Co.* 99 Tenn. 578, 42 S. W. 444; *Pacific Nat. Bank v. Pierce Co.*

20 Wash. 675, 56 Pac. 936; *Adams Exp. Co. v. Ohio State Auditor,* 165 U. S. 194, 17 Sup. Ct. 305; *Adams Exp. Co. v. Ohio State Auditor,* 166 U. S. 185, 17 Sup. Ct. 604.

Having now set the standard by which the most important questions on this appeal must be tested, before taking them up we will consider those of lesser importance, but which are material, in some aspects of the controversy. That will leave, with all the more significance, the chief subsidiary points of contention for the last subject to be discussed.

## II.

(a) Counsel for appellant contend that the assessment was unjust in that railroad property was valued on one basis: that of including as a distinct element of great value the franchise in this state, while, generally speaking, the local assessors omitted from their considerations similar elements, as to ordinary corporations, and did not consider the business done, the amount, character, market price, or actual value of the corporate stock or funded indebtedness of such corporations or of joint-stock companies, nor the good will of business as to persons or firms, only valuing the physical property in use in business enterprises; and that the omitted matters would, in the aggregate, had they been considered by such local assessors, have added largely to the assessed value of such general property, and that the state board in determining the value of such property and in arriving at the rate to be applied to railway property did not add thereto anything for such omitted matters. The findings to that effect were all excepted to by counsel for respondents.

The evidence is quite lengthy on this branch of the case. It is not only unnecessary, but hardly advisable, to refer thereto, except in a general way. Many assessors testified, in words, as found by the trial court, but to our mind the inference the court drew therefrom is unsound. The reasons leading up to such wrong conclusion seem quite plain. As

the witnesses were interrogated, they were impressed with the idea that it was thought that franchises, good will, and similar elements are property in that they are separable from physical things used in a going business, when one is valuing the latter in the business in which they are used, as is of course true in one sense. In that view they testified uniformly that they did not appraise the intangible elements except as to certain public service corporations which, as they conceived, the state requires to be so separately considered and a definite sum added to the value of physical things on account thereof. On the other hand, all testified, when interrogated in respect thereto directly, that they valued the property in all cases at what the same was worth in their judgment, taking the market value as a standard.

Now, the statute does not contemplate that franchises of any sort of corporations, private or public, or good will, or prospects in business, or any such matters shall be considered by the assessor and valued as separate elements; that any definite sum shall be added to the value of the physical things on account thereof. It only contemplates valuation of such physical things under the circumstances of each particular case. The value of the physical elements of corporations, or business property, is made up largely of those which are invisible. Sometimes the value of the latter exceeds that of the former in that, were the two separated, the visible things in the disorganized condition would be worth less than half the value of the property in use as an organized enterprise. *State ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 68, 100 N. W. 1048. In valuing such property, looking only at the visible elements, one would unconsciously include the invisible. No one would think, in valuing a factory of any sort with an established business, of its value as a disorganized piece of property. In appraising it in the former condition at what it would be thought to be worth in money, and without specially taking into consideration the elements giving

thereto, perhaps, its chief value, such elements would be in fact included. As a going institution it might be worth all which it originally cost, or more; as a disused piece of property it would be quite likely to be of much less value than it cost, and it might be practically valueless except as mere wreckage, as is illustrated in the case cited.

To our minds, when the witnesses, on the trial of this case, said they valued the property of business corporations and companies, observing only the things visible, fixing the value upon those things as they found them, whether they specially thought of the other elements and considered the same or not, they were in effect included. That would be the necessary inference in the absence of very clear evidence to the contrary. There is no such clear evidence in the record before us.

The statute (sec. 1037a, Stats. 1898) referred to as requiring assessments of franchises in certain cases makes no such requirement in any other sense than as above indicated. Before the passage of the statute it was well settled by the decisions of this court that, there being no written law requiring the separation of tangible elements from intangible ones, such as rights, franchises, and privileges, in assessing the property of a corporation no attempt should be made to do it; that the assessment of the one should be included in that of the other by assessing the visible elements at what they are worth in money under the circumstances. *State ex rel. Milwaukee St. R. Co. v. Anderson,* 90 Wis. 550, 63 N. W. 746. The statute did not change the law, but merely made that written which was before unwritten. *Monroe W. W. Co. v. Monroe,* 110 Wis. 11, 19, 85 N. W. 685; *Washburn v. Washburn W. W. Co.* 120 Wis. 575, 98 N. W. 539.

It will be noted that the statute merely declares that all property of certain public service corporations mentioned, used in their business, shall be assessed as one body of personal property, which shall include the franchise. It merely recognizes that the visible things, necessarily, in their value,

include the franchises. Notwithstanding statements here and there in opinions, as to the feasibility of appraising one separate from the other, the better and the prevailing idea is that it is practically an impossibility to do so, without destruction of value:

This court has held that the franchise is the principal, the visible things the minor, part of an organized business machine, in a corporate organization, though the franchise is seen only through the physical part and its use; that the intangible part is personal property and draws to it, and so impresses the physical thing with its own character as to give to the whole the character of personalty. *Yellow River Imp. Co. v. Wood Co.* 81 Wis. 554, 51 N. W. 1004; *Chapman Valve Mfg. Co. v. Oconto W. Co.* 89 Wis. 264, 60 N. W. 1004; *Fond du Lac W. Co. v. Fond du Lac,* 82 Wis. 322, 52 N. W. 439; *State ex rel. Milwaukee St. R. Co. v. Anderson,* 90 Wis. 550, 63 N. W. 746; *Washburn v. Washburn W. W. Co.* 120 Wis. 575, 98 N. W. 539. In the latter case it was supposed that this particular subject would be definitely set at rest for all purposes of administration of public affairs in this state, this language being used for that particular purpose:

"The separate value of the parts in the aggregate would not necessarily approximate to or be any legitimate measure of the value of all the parts, viewed as one complete machine, so to speak. The franchise by itself would be valueless. The plant in its parts as realty and personalty according to the character thereof, irrespective of the combination of all into one entire thing, might be of little value, and probably would be, as compared to what they would represent in the new form, produced by the union of many parts into one. The great value is produced by the combination of parts into one complete working machine, adapted in a high degree to the service of man. . . . So, in order to deal justly in the distribution of public burdens, the entire property in use and for use in the exercise of the public franchise, for the purposes of taxation, should be regarded as realty, the franchise

and movables being viewed as appurtenant to the lands, or the intangible element regarded as personalty, and the physical elements, consisting of lands and movables, be regarded as appurtenant thereto and partaking of its character. The latter . . . is the most consistent with, and really demanded by, the constitutional method of imposing public burdens in the form of taxation, as regulated by the legislation of this state. . . . The system in vogue here contemplates that everything of value constituting a subject of private ownership and wealth, whether tangible or intangible, which the legislature shall select for the purpose, may be included in the aggregate of property to bear the public burdens of taxation, and in the manner best calculated to take account of values produced by the combination of franchises and other things of value; which can only be attained, as regards the former, which in their very nature are inseparable from the latter without destruction, so to speak, of the body in which inheres the great value, by appraising them as integral parts of the combination, to be viewed in its entirety only, every element being impressed with the character of the one from which springs the public duty and the necessity for inseparable union with it of tangible things consisting of lands and movables, in order to perform it."

Viewing the evidence in the light of the law as thus settled, our conclusion is that the inference drawn therefrom by the trial court is not warranted. Notwithstanding the testimony of witnesses that they did not consider intangible elements in viewing corporate or other business property in use, the evidence that they valued the property as they saw it, at what it was worth in their judgment, by necessary implication states that they valued the intangible elements in the only way the statute contemplates they shall.

(b) The companion finding to the one above considered, to the effect that the state board did not add anything to the aggregate valuations made by local assessors on account of elements omitted from their considerations, while in valuing the railway property such elements, particularly the franchises, were considered, and the value of the whole placed at

millions of dollars higher than the value placed upon the physical property, suggesting that the franchises and the physical property were separately valued, seems to be unsupported by the evidence. The mere circumstance that the board made some sort of an estimate of the value, so called, of physical property,—the instrumentality to that end, making the valuation on the basis, it would seem, of what the physical things would cost less, probably, any diminution in value on account of use,—was regarded by the court as an assessment, a valuation of that part of the whole property separate from the other elements, when it was evidently regarded by the board, as it in fact was, merely as an aid in arriving at the value of the one thing to be appraised. The statute does not require any such procedure as the appraisal of physical property separately from the other elements, and judicial policy condemns it. The board, of its own motion, and in aid, as was thought, of reaching the ultimate object of placing a value upon the railroad property *in this state,* in its wisdom did the thing which seems to have confused the trial court somewhat, and which furnished the foundation for the claim, now pressed upon our attention, that millions of dollars were added to the legitimate valuation of the visible part of the railway property on account of a separate valuation placed on the franchises. It were better, as it seems, to have proceeded along the lines of the statute and the doctrine of this court, that there can be no such separation of tangible and intangible elements which will furnish any legitimate basis for the valuation of one or the other. As neither, strictly speaking, is required to be valued, but only the thing which the two in combination make, why attempt to do what lays the very basis for claims which are illegitimate though embarrassing? The departure from the needful, trying to do the impracticable, would seem to be worse than useless. One might as well try to value the life-blood of a horse, or his capacity to breathe, as try to place a value upon the visible part

·of railroad property separate from its rights, franchises, and privileges.

Probably no one appreciates the foregoing better than the ·eminent gentlemen composing the state board of assessors. They knew the law and their duty. They had a wide discretion in respect to the mere elements to be considered in making the valuation. If they thought the so-called valuation of ·physical property would aid them, they were permitted to procure evidence of that sort. We find, however, no satisfactory indication that they arrived at the value of the railroad property by adding together a valuation of visible things and one of other elements, or that they did anything else other than just what they were required to do by the statute, determine the value of the railway property in this state; that included the visible things and the franchise, not as separate things any more than the horse's blood, frame, internal machinery, and other elements are separate things; all taken together constitute the horse; remove any one of the things essential to life and action, and all conception of the animate thing, the horse, disappears.

To our minds the only reasonable inference is that the board, from all the evidence before it, performed the duty that it was required to perform. The evidence as we read it is to this effect. The board considered the report of the person who, as before suggested, performed the feat of separating and valuing the physical property, the market price as to each company of its bonds and stocks for a period of five years, reports of the engineers of the railway companies as to the physical property, the gross and net earnings of ·each company, both in the whole and in this state, and other elements, and fixed the value of the entire property of each ·company in this state at its due proportion of the value of the entire system, not giving to any particular factor of the evidence any particular weight separate from the other, nor placing any particular value upon any particular element of

the property separate from the rest. We see no infirmity in that in any respect. The board did not attempt to value the visible things at one sum and the franchise or any other intangible elements, separately or in combination, at another. The evidence given by the president of the commission is unmistakable as to what was done. He said:

"The board never made any estimate of the value of the physical property of the road." "The board did not have any other evidence of the value of the property, physically considered, than the reports of Prof. Taylor and of the railroad engineers. The board considered the entire property of the railway company, including its franchises and other property, to be of the value stated, being influenced in that consideration by all the matters that related to that subject of valuation." "Those matters of stock and bond prices, the gross earnings, franchises, and the net earnings were under consideration. The board had no reason to doubt the report of Prof. Taylor. These data, price of stock and bonds, gross and net earnings, were considered as evidence of the value of the company's franchises, to help the board in arriving at the value." *"The property was valued as an entirety.* No separate treatment was given to franchises from that which was given to the problem of valuing the property as a whole. It was valued as a whole, and in the valuation of the whole all these methods that I have enumerated were considered."

That seems plain. We are unable to see anything therein to warrant finding that the board placed a value on the physical property and another on the franchise element and added the two together, or making any finding susceptible of being so construed.

The trial court, seemingly, was led to phrase the findings so as to give ground for the idea of physical property and franchise values separately considered in arriving at the value of the whole, by the persistent use of the term "value of the physical property," all through the trial, while it is evident that, so far as the assessing board was concerned, the

term had reference to physical condition and situation only. It does not appear that the value, strictly speaking, of the things visible separate from other elements was considered, much less determined.

(c) The trial court's conclusion does not show clearly the manner in which the board valued the general property of the state. One might think, from reading the findings, that it was thought the local assessors, acting in good faith, omitted giving the dignity, as to value of franchises and some other intangible matters affecting that of tangibles used in corporate and other business, which they should, and that the board, also acting in good faith, adopted their errors. The board was not expected to and did not consider the work of the local assessors in any other way than as evidence to be considered with all other legitimate evidence. They were required not to merely pass upon the work of such assessors, but upon certain specified proofs and upon all the other evidence, proofs, statistics, and information obtained from all sources, "according to their best knowledge and judgment, to ascertain and determine the true cash value of all the general property of the state assessed and to be taxed in the year in which their determination should be made." The finding does not show whether it did or did not perform that duty, except by way of inference. Such finding is to the effect that the board considered all the evidence it was required to consider, and assessed the value of the property, but without adding anything specifically to local valuations for franchises, only considering them as affecting the value of corporate property, and did not add anything for other intangible elements mentioned as having been omitted by local assessors. Whether the trial court thought the board committed error in that does not, anywhere, appear. The inference would be that it was so thought, because of the significant finding acquitting it of having acted in bad faith.

Now, if the board valued the general property of the state

upon a legitimate basis, it is wholly immaterial what errors were committed by the local assessors. Obviously the basis of the rate of taxation applied to railway property in that case would be in no wise affected by any such error.

So, the board did not commit any error in not adding specifically for the value of franchises; they avoided committing error by not so doing. In considering franchises of public service corporations only in connection with visible property they followed the statute and the settled law independently thereof. In omitting to add specifically for any other omitted elements mentioned, or specially considering them, particularly of considering the corporate franchises of mere private corporations and assessing other property any different on account thereof than the same property would have been assessed if the same belonged to an individual or individuals, they committed no error.

(d) A very important fact, going to the justice of the tax, appears by the evidence, which might well have been made a part of the findings, since it was within the issues and was distinctly covered by the evidence. While it does not appear that the board made any specific determination as to any particular kind of personal or other property omitted from the local valuations or valued too low locally, it does appear that it considered, in a general but well grounded way, that there were such omissions and undervaluations, and on account thereof it made its valuation of personal property $215,000,000 more than the aggregate of local valuations, or nearly twice thereof; and likewise it made a very substantial increase to the local valuations as to realty.

Then let it be assumed for the purposes of the case, as counsel for respondent suggests, that the law under which the state board acted did not require it to value any general property except that which was valued by the local assessors; that it was not required to hunt up omitted property and make its valuation larger than it otherwise would have been

on that account, if it erred in that respect, largely diminishing the burdens that would otherwise have been cast upon railroad companies, they can hardly be heard to complain of it, especially in a court of equity. On the whole, as to this branch of the case, the respondent and all taxpayers similarly situated seem, in the painstaking efforts of the state board to do justice in the matter, to have been given the most distinguished consideration.

(e) The board, in endeavoring, as before indicated, to remedy the supposed mistakes of the local assessors as to omitting to assess property at all, perhaps assumed authority not clearly accorded to it. However, there is no proof that such omissions, if there were any, occurred otherwise than as the result of mere ignorance or error of judgment in a good-faith attempt to administer valid laws. Such circumstances furnish no good ground for complaint on the part of a taxpayer to avoid his tax. *Weeks v. Milwaukee,* 10 Wis. 242; *Smith v. Smith,* 19 Wis. 522; *Semple v. Langlade Co.* 75 Wis. 354, 44 N. W. 749; *Green Bay & M. C. Co. v. Outagamie Co.* 76 Wis. 587, 45 N. W. 536. The law is well settled, here and elsewhere, that mere unintentional discriminations occurring through error of judgment, and mere differences between different assessors or assessing boards having equal discretionary authority as to evidentiary circumstances to be considered in valuing property for taxation, are not to be classed with intentional or fraudulent discriminations, or discriminations made by the law itself. In that counsel seem to have misapplied such authorities as *Hale v. Kenosha,* 29 Wis. 599; *Knowlton v. Rock Co.* 9 Wis. 410; *Pelton v. National Bank,* 101 U. S. 143, and similar cases, and also overlooked the limitations placed upon *Marsh v. Clark Co.* 42 Wis. 502, 509, quoted from at considerable length by counsel; *Fifield v. Marinette Co.* 62 Wis. 532, 22 N. W. 705; *Hixon v. Oneida Co.* 82 Wis. 515, 531, 52 N. W. 445; *Wells v. Western F-*

*& S. Co.* 96 Wis. 116, 120, 70 N. W. 1071; *Hayes v. Douglas Co.* 92 Wis. 429, 444, 65 N. W. 482.

The doctrine, as above expressed, is supported generally by the authorities. In Cooley on Taxation the subject is covered thus, using as the text, mainly, the language of this court in *Weeks v. Milwaukee,* credit being duly given:

"It has been decided in a number of cases that incidental omissions from taxation of person or property that should be taxed occurring through the negligence or default of officers to whom the execution of the taxing law is intrusted would not have the effect to vitiate the whole tax. . . . The execution of these laws is necessarily entrusted to men, and men are fallible, liable to frequent mistakes of fact and errors of judgment. If such errors on the part of those who are attempting in good faith to perform their duties were to vitiate the whole tax, no tax could ever be collected, and therefore, though they sometimes increase improperly the burden of those paying taxes, the rule which holds the tax not thereby vitiated is absolutely essential to the continuation of the government. . . . Indeed, where the omission has occurred through no purpose to evade or disregard official duty, the occasion which produced it seems wholly immaterial."

*Spear v. Braintree,* 24 Vt. 414; *Watson v. Princeton,* 4 Met. 599, are to the same effect. In the last, Chief Justice SHAW said that the final remedy for mere ignorance or want of judgment of assessors, the inhabitants believing "that their assessors are acting on erroneous principles, is to elect others in their places." To the same effect are *Wilson v. Wheeler,* 55 Vt. 446; *Burlington & Mo. R. R. Co. v. Seward Co.* 10 Neb. 211, 4 N. W. 1016; *Levi v. Louisville,* 97 Ky. 394, 30 S. W. 973; *Davis v. Newark,* 54 N. J. Law, 144, 23 Atl. 276; *State v. Lakeside L. Co.* 71 Minn. 283, 73 N. W. 970; *People v. McCreery,* 34 Cal. 432; *Georgia M. & G. R. Co. v. State,* 89 Ga. 597, 15 S. E. 301.

It should be said in passing that there are some authorities

holding to a more strict rule than the one indicated, but they are not to be followed in this state.

### III.

We are favored with a very lengthy and interesting argument by counsel for appellant, presenting the idea that the law in question is a delegation of legislative power, and void under sec. 1, art. IV, of the constitution, limiting such power to the senate and assembly.

The situation before us being the same as that presented to the supreme court of Michigan (*Board of Ed. v. State Board,* 133 Mich. 116, 94 N. W. 668) and the federal circuit court (*Michigan Railroad Tax Cases,* 138 Fed. 223), and the federal supreme court as well [*Mich. Cent. R. Co. v. Powers,* 201 U. S. 245], and being supported here by the same argument, as we were told by counsel, as was presented on the former occasions, with the result that the position now taken was held to be unsound, we might rest the matter on the authority of those decisions, especially in view of the recent discussions in this court of the principle involved, particularly that in *State ex rel. Milwaukee Medical College v. Chittenden,* 127 Wis. 468, 107 N. W. 500. However, through abundant precaution, and a desire to do full justice to the efforts of counsel to aid us in arriving at the right of the matter, we have made a reasonably careful study of all the aspects thereof suggested, examining all of the more than fifty authorities cited to our attention, with sufficient particularity to discover, as is thought, their bearing and importance; though, for the reasons stated, we shall not discuss this branch of the case to the extent which we otherwise would.

It seems that counsel have assumed that the law in question authorizes the state board to levy taxes or determine the rate of taxation, in the sense of determining the basic question of how much money shall be raised by taxation for public

purposes from a particular class of property, instead of as the fact seems to be, that it merely authorizes the board, partly by the exercise of merely ministerial powers, and partly by those ordinary *quasi*-judicial powers commonly exercised by administrative boards, to ascertain certain facts, and from those facts, by mere mathematical work, to determine the amount of tax to be paid as a direct imposition on railway property, pursuant to a previous exercise of legislative authority by the duly constituted authorities to that end. Starting with the assumption indicated, it is not to be wondered at that the multitude of authorities presented to our view should have been thought to have a bearing on the question to be decided.

No one need argue to this court that the legislature cannot delegate to any mere administrative board power to determine how much money shall be appropriated, "levied," as the term is used, for state expenses, but we must not confuse the term "levy" in the sense of voting a tax, or determining in gross how much shall be raised by taxing a particular class or general property, with the term "levy" in the sense of merely performing the administrative duty of laying, on a legitimate basis, taxes previously levied, appropriated, or voted by the legislature. Manifestly, without that distinction in mind one would make but very little real headway in the examination of authorities; many would be found stating in terms or in effect that levying of taxes and fixing the rate of taxation are legislative duties, referring, of course, to levying in the sense of determining how much money shall be raised by taxation, fixing the rate in the sense of determining it with reference to the public needs. If there is anything of that sort in the law in question we are as unable to discover it as were the courts that have previously been called upon to consider the similar question in regard to the Michigan law.

It is advisable, in endeavoring to establish the legal status

of a particular matter, to first fix by accurate analysis the exact nature of that to which the legal principles are to be applied. If one starts with a mere assumption in that regard he may easily delude himself into the idea of having arrived at a correct solution of the question at issue, when, in reality, he has not yet helpfully entered upon a discussion of it.

The foregoing is well illustrated by the following authorities, cited in the brief before us. In *Houghton v. Austin,* 47 Cal. 646, we read in the syllabus: The law, "in so far as it delegates to the state board the right to fix the rate of taxation, is void." Looking to the law referred to we find that it gave to the board authority to determine in gross the amount of money to be raised for public purposes, and on that and other data to fix the rate.

In *Board of Directors v. Houston,* 71 Ill. 318, it is said: "It was not in the power of the legislature, under the constitution, to confer upon private persons or private corporations power to levy . . . taxes." Laying aside the element of private instrumentality, the defect in the law was that of levying by the board, in the sense of determining the amount to be raised by taxation.

In *McCabe v. Carpenter,* 102 Cal. 469, 36 Pac. 836, the subject of the decision on the point here is stated thus: "The power to levy a tax is purely legislative." In that connection the opinion is to the effect that state taxes must be levied by the legislature, and taxes of sub-public corporations by the people thereof, or the duly constituted governing authorities therein. The circumstance giving rise to the case was a law permitting a mere executive officer to determine the amount of money to be raised for a particular purpose, and requiring the municipal board, without the exercise of independent judgment as to the right or wrong of the matter, to execute the will of such officer. The distinction between such a law and the one here was indicated by this language of the court: "The legislature imposes the tax when it requires an officer

to make certain computations, the result of which must fix the amount to be raised." We might proceed to analyze in detail a large number of other authorities placed before us, which number might have been greatly increased, with the result indicated by those specially referred to.

So far as we can see, every feature of the work required of the state board under the law in question is in the line of executing, not making, the law. It is required to value the property upon which the tax is to be laid. It is required to determine, as mere matters of fact, the average rate of taxation on general property in the state. It is then required to apply that rate to the value, as determined by it, of the railway property pursuant to the previous determination of the legislature to raise, by taxation, the amount such rate, so applied, will produce.

The Michigan court said of the same feature we have here in its system:

"The board has imposed on it the duty, ministerial in character, of determining, by computation and data which the law provides for placing in its hands, the rate of taxation which other property in the state is subjected to, as it appears by assessment rolls, which are supposed to contain accurate and true assessments of all property at its true value. . . . The language is . . . the board shall ascertain and determine the average rate levied upon other property, but the general tenor of the act clearly indicates the meaning in which that determination is to be made."

Any further treatment of this branch of the case would be wholly unnecessary.

## IV.

This provision of the constitution is referred to as condemning the law:

"The legislature shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year, and whenever the expense of any year shall exceed the income, the legislature shall provide for levying a tax for the

ensuing year sufficient, with the other sources of income, to pay the deficiency as well as the estimated expenses of the ensuing year." Sec. 5, art. VIII.

(a) These ideas are advanced for consideration in respect to that provision: The legislature must determine in advance the amount required to be raised for the particular public purposes, and provide for levying a tax therefor. It cannot legitimately provide for raising a certain indefinite sum by taxation, the sum to be fixed by the action of other bodies over which it exercises no control. As a basis for levying a state tax the legislature, by the constitution, must decide: (1) The question of how much revenue the state needs, that to be determined by its probable expenses; (2) what will be a just distribution, that is apportionment, of the burden.

Many ideas are advanced illustrative of the main propositions. We shall not follow in detail the reasons by which counsel reach the conclusion that the law in question does not successfully stand the constitutional test suggested.

(b) There are these fundamental infirmities in the position of counsel at this point: (1) In that they assume that the constitution requires the legislature, in providing for state revenue, to determine for each year the amount of money required to be raised by taxation, and the purpose making the use of such amount necessary or proper; (2) in that they assume that the enactment in question provides for a state tax, strictly speaking, and that alone.

If the first assumption were sound, all laws we have for indirect taxation, by which the state obtains a large proportion of its revenue, would be invalid. It will be noted that the language of the constitution is general. It does not say the legislature shall provide for an annual tax on property, etc. If counsel's position were correct, the legislature in providing for the raising of money by any sort of taxation would have to, annually, first determine the amount necessary to be raised, the proportion thereof to be obtained by

direct and indirect taxation, and the basis for levying the tax, in order to produce the required result. It does not seem that such a construction of the constitution would be reasonable. The common way of laying taxes, state and national, is to provide for an annual tax sufficient to meet the annual expenses, having regard to the experience of the past and the probabilities of the future, and to appropriate from the fund so accumulated, or to be paid therefrom when accumulated, such sums as seem for the fiscal year necessary for the particular purposes. The raising of the revenue is one thing; the appropriation of the money to proper public purposes is another. The last is covered by sec. 2 of art. VIII, "No money shall be paid out of the treasury except in pursuance of an appropriation by law." Taking the two together it will be seen that one section provides for accumulating the public fund out of which appropriations for public purposes may be made; the other provides for devoting the same to the specific public purposes.

So when the legislature determines upon supplying the public treasury in any legitimate way of annual taxation and the extent required for the annual public needs, in its judgment, and provides a form or forms of taxation the results of which can only be estimated, together with or without one that will produce a sum certain, all in the aggregate supposed to be sufficient to meet the estimated wants, it satisfies the requirement of the constitution. The only limitations are, it cannot exercise the power of taxation for any but public purposes, and having exercised such power it can only devote the money accumulated thereby to public purposes, and by some reasonably proper way of appropriating the same, so that legislative action can be referred to as authorizing payment of the money out of the public treasury. *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 88 N. W. 596, 90 N. W. 1067; *State ex rel. Garrett v. Froehlich,* 118 Wis. 129, 94 N. W. 50.

The two clauses of the constitution, as indicated in the cases cited, are to be read together as limitations upon the purposes of exercising the power of taxation and the power to use the money accumulated by its exercise. *Expressio unius est exclusio alterius.* There is no limitation upon the method of determining the needs, calling for the exercise of the taxing power, in that it is confined to determining by annual or biennial legislative action in advance the precise amount of money required for all or any of the public purposes. True, sec. 5 contemplates that the legislature shall, in imposing direct tax burdens, do so with reference to the public needs, and with reasonable regard for the amount of revenue that will probably be derived from other forms of taxation, so that in the aggregate there will be money produced to the public treasury enough to meet the estimated expense, but not estimated expense in the sense that there must necessarily be a schedule prepared by the legislature, or by any person or persons for its guidance, and that the power of taxation shall be exercised with reference to producing the amount of money suggested thereby. The judgment of the legislature as to what the public needs will be need not be express. It is to be implied, necessarily, from what is done, in the absence of the clearest of indications to the contrary.

It will not do to set up a judicial standard as to the best method of determining the amount of money to be raised by taxation and of framing laws to put the taxing machinery in motion to that end. Probably the annual budget method is the most businesslike way, both with reference to the amount to be raised by taxation and the division thereof to the particular public purposes. But the constitution leaves the way open for the legislature to exercise the widest discretion in that matter. It can proceed by various forms of taxation for raising public revenue, all or most of which may leave the amount that will be produced thereby somewhat indefinite, so long as the legislative idea is an annual

income sufficient for the annual needs, and it would be diffi-
cult to see how a court could determine that such legislative
idea was not involved in the passage of any law relating to
the matter, unless the law itself expressly indicated to the
contrary, by way of making an appropriation for a particular
purpose not public, or providing for the raising of a tax for
such a non-public purpose.

(c) It does not seem that the law in question should be re-
garded as a mere enactment to raise money for state pur-
poses. It is called one to provide for the taxation of railroad
companies. The manifest purpose thereof is to tax the rail-
road property in the state upon the same basis that all other
property is taxed; tax it by the same system (the *ad valorem*
way), at the same rate, and for the same purposes. Whether
the plan of the legislature be reasonably calculated to effect
such purpose we need not enlarge upon at this point. If nec-
essary to the validity of the law, and the idea would be rea-
sonable, we must assume that such was the legislative design
and read it out of the law if it is there in any way expressed.
It was thought, seemingly, that the amount of money which
would probably annually be required to be raised by direct
taxation, so far as the same could well be determined when
the law was passed, with the amount which would be obtained
annually from all other sources of state revenue, would prob-
ably equal or exceed the amount of direct tax burdens that
would fall on railroad property, if it were burdened, in effect,
the same as if it were taxed, proportionally, in all the taxing
districts of the state, on an equality with general taxable
property therein, the value of the former being, for that pur-
pose, apportioned thereto, in the proportion which the value
of such general taxable property in such districts, respect-
ively, would bear to the total value of such property through-
out the state, or, perhaps, if such special property were taxed
on a similar basis of distribution in all of the taxing dis-
tricts of the state through which the roads run. It was fur-

ther, doubtless, thought that the average rate provided for by the law would, as near as the same could be practicably determined, be equivalent to such taxes as would, upon such a distribution, be imposed on the special property. It was further, and within reasonable probabilities, thought, as it would seem, that by applying to the value of special property the average rate of taxation imposed on general property throughout the state, and appropriating all of the results for state purposes, in practical effect each taxing district, while proportionally more heavily burdened for local purposes than it would be under some such method of distributing the value of the railway property for taxation as mentioned, would be correspondingly, as to every dollar of taxable property therein, relieved from state taxes; thus making all property taxed directly, in fact though not in form, bear its relative proportion of all taxes upon a basis of equality. That would satisfy all the requirements of the section of the constitution under consideration.

## V.

The validity of the law in question is challenged under sec. 1, art. I, and sec. 13, art. I, of the state constitution, and the XIVth amendment of the national constitution. Special consideration thereof is omitted because of what is said in respect thereto under other heads.

## VI.

We turn now to that branch of the case involving the principles laid down at first relating to sec. 1, art. VIII, of the constitution. The treatment of that by counsel is under several important subheads. Some of them fall, legitimately, under other equality provisions than sec. 1, art. VIII, as has been indicated. There is little or no difference in the result as to whether they are viewed together or separately. The

first one we will take up is so within the particular class of real or supposed interferences treated in numerous federal cases under the XIVth amendment, that such cases furnish a very fruitful source of illustrations as to whether it does or does not fatally invade the constitutional rule of equality.

(A) Fatal discrimination in the assessments, as between railway property and general property, is claimed in that, as shown by finding 21, under ch. 378, Laws of 1903, mortgage interests in real estate, except as to railway property, were generally assessed to the owners thereof as realty, the residue of the value only being assessed to the mortgagors.

The nature of so much of ch. 378 as is necessary to have in view in this discussion is indicated by the following abridgment:

(a) The term "mortgage" shall include every conveyance or contract lien on realty intended as security for the payment of money and the indebtedness secured to be paid by such mortgage.

(b) Any such interest shall be regarded as realty and, subject to the next provision, be separately assessed for taxation in the taxing district where the land is located, the value of the equity being assessed to the mortgagor, such value to be regarded as the balance between the whole value and that of the mortgage interest.

(c) At the option of the mortgagor the mortgage interest and the value of the equity shall be assessed together, without separate valuations, the same as if the land were unincumbered, such combined valuation not to exceed the just value of the land as unincumbered property.

(d) Any taxpayer, in furnishing to the assessor of his district his statement of credits over liabilities subject to taxation, shall exclude mortgage interests in realty.

(e) Exemptions in favor of the mortgagor of debts owing by him shall not be allowed on account of the mortgage, nor offsets on account thereof allowed in favor of the mortgagee.

(f) Existing laws exempting mortgages of realty from taxation shall not be affected by this act.

(g) This act shall apply only to mortgages on realty subject to direct taxation, and within the foregoing limitations.

Under the last subdivision no diminution of value of railroad property could be or was made by the state board because of incumbrances thereon of a mortgage nature.

Under subdivision (c) it is claimed that regardless of the amount of the credits, whether less or many times the value of the land, in form securing the same, the value of such land must necessarily be the measure of the possible assessment as to both land and credits, and so it is within probabilities that large amounts of property in the nature of credits, not in any legitimate sense representing interests in lands, might escape taxation under the form of law, while like property of the railway companies and others no better situated would be assessed directly or indirectly, and that it is within probabilities that such result occurred as to the assessments in question. That idea is readable out of the act, looking at the words themselves; but such a meaning would make the legislation so very absurd that no one, much less any court, would considerately adopt it if any other which is reasonable can fairly be read from the language used.

It seems that the whole scheme of the act is that the land value, so far as it will go for that purpose, shall stand for the mortgage indebtedness and be assessed to the mortgagee or mortgagor, at the latter's option, and to that extent that the mortgage indebtedness shall not be regarded as matter receivable owned by the mortgagee, and so subject to be diminished in his favor in arriving at his taxable property, by charging against the same debts owing by him, or regarded as matter payable from the standpoint of the mortgagor and usable by him to diminish his credits in arriving at the amount of his taxable property, and that in case of the value

of the land being less than the indebtedness secured in form thereby, the excess shall be regarded the same as any other matter of money demand as to the mortgagee, or money payable as to the mortgagor.

Taking subdivisions (a), (c), and (e) together, having regard for the evident purpose of the law, the meaning suggested cannot only be read therefrom, but is quite unmistakable. We could not think of convicting those who had to do with the legislation with being the authors of so mischievous a measure, and guilty of such stupid blundering, as would be implied by indorsing the construction thereof contended for.

It will be observed that it is the mortgage, not the mortgage indebtedness, that is made by the act an interest in the land; it is that interest which is required to be, separately or in combination with the equity, assessed at the option of the mortgagor. That interest carries the mortgage indebtedness to the extent of the value of the land representing it, and no further. Subdivision (e), relating to the status of the mortgage indebtedness as regards being the basis for exemption on the one hand, or offset on the other, uses the word "mortgage" consistently with the use thereof in subdivisions (a) and (b), and clearly in a way to only carry just so much of the mortgage indebtedness as will correspond to the value of the mortgage interest in the land. True, subdivision (a) declares that the term "mortgage" *shall include the mortgage indebtedness secured to be paid by such mortgage,* but that, fairly, means, shall include it to the extent secured thereby. The idea that a mortgage on a parcel of realty worth $1,000 may, under the act, include a mortgage indebtedness named in a mortgage thereof, say of $10,000, so that the value of the former will, in contemplation of law, be the measure of the value of both for the purposes of taxation, does not appeal to us with any favor. The term "se-

cured to be paid by such mortgage," looking at the substance of things, is seen fairly to be limited by the extent to which the mortgage would pay the indebtedness.

As a model for careful legislation the act is not to be, very highly, at least, commended. Nevertheless, the legislative idea intended to be incorporated therein is not particularly obscure; it is well within the scope of the language used, as we have indicated.

(B) Regardless of the proposition already discussed, it is contended that the effect of ch. 378 is to relieve owners of real estate, generally, incumbered by mortgages, of tax burdens thereon to the extent of the incumbrances, while owners of railway property are not so favored, and that such discrimination invades the constitutional rule of uniformity. That is hardly accurate. The effect is, in view of the railway property not being regarded as realty, to relieve the owners of mortgaged lands generally, at their option, in form, from the burden of taxation, except as to the value of their respective equities, while owners of incumbered personalty, including railway companies, are not so favored, and to exempt all credits secured on realty, generally, to the extent of the value of the security, from taxation, while credits secured on personalty are not so exempt, and to take all indebtedness secured on realty to the extent of the value of the equity out of the list of debts owing by the mortgagor chargeable against his credits in determining the amount of his taxable property of the latter sort, while debts of others, whether secured on personalty or not secured at all, are not so treated.

Counsel for appellant, in their view, refer, as worthy to control, to *San Mateo Co. v. Southern Pac. R. Co.* 13 Fed. 145; *Railroad Tax Cases,* 13 Fed. 722, and *Santa Clara Co. v. Southern Pac. R. Co.* 18 Fed. 385, and some other federal cases, but none decided in the federal supreme court, recognizing the doctrine first laid down definitely by Justice FIELD in the *Santa Clara Case,* as sound. Such doctrine, if

given the force counsel accords thereto, would condemn the law here under the XIVth amendment.

Counsel for respondents assume to break the force of appellant's position as above, by referring to *Cent. Pac. R. Co. v. State Board,* 60 Cal. 35, and *Germania T. Co. v. San Francisco,* 128 Cal. 589, 61 Pac. 178, where similar legislation to ours was sustained. That does not meet the case, since the constitution of California expressly negatives any limitation upon legislative power in respect to the matter. Counsel for respondents further suggest that, if the law be unconstitutional, that fact is immaterial, since then all mortgage indebtedness, like other indebtedness, would be taxable to the creditors, citing *Kneeland v. Milwaukee,* 15 Wis. 454. Here, again, no real advance is made as regards furnishing a basis for solving the question in hand, since the theory suggested as supporting the taxability of mortgages or mortgage indebtedness, if adopted, would present the question anew as to whether the valuation of general property for taxation be not fatally defective by reason of the omission of large amounts of property, or a strong probability in that regard, not through any mistake of judgment or mere inadvertence, but because of the local assessors being required, in form, by an invalid law, not to assess the omitted property. On that the decision in *Kneeland v. Milwaukee,* 15 Wis. 454, has not, as appears, been overruled. The theory thereof is that if a law good in form but invalid in fact commands the assessors to violate the rule of uniformity, and they do so in good faith, prejudicially to taxpayers, it is not one of those mere mistakes said not to affect the tax.

Again, the decisions in California are of little help, in face of the fact that a state law which violates the fundamental right of equal protection of the laws falls under the condemnation of the XIVth amendment, whether it is or is not in harmony with the state constitution. The state constitution itself may violate such fundamental rights. *Nash-*

*ville, C. & St. L. R. Co. v. Taylor,* 86 Fed. 168. That is the
basic principle upon which jurisdiction was taken in the
*San Mateo Case.* Independently of that principle, as said,
commonly, in the federal cases, in terms or in effect, what
invalidates the equality provisions of the federal constitu-
tion depends so much upon the circumstances of each par-
ticular situation and upon the constitutional guaranties, im-
munities, and privileges in the organic law of the state where
the question arises, that the result in one instance does not
furnish any very certain guide as to any other situation, par-
ticularly one under a different constitutional system. ↵

In the last idea expressed is the chief infirmity of the posi-
tion of counsel for appellant. It seems to be assumed that
the case arising in California, decided by Justice FIELD and
an associate, should be controlling here. No differences in
the two situations are recognized by counsel, while there are
such, and of quite a radical nature.

It would take a pretty clear case to warrant a court in con-
demning the law of its own legislature under the equality
provisions of its constitution on the faith of a decision in the
highest tribunal of the land upon a somewhat different situa-
tion. To do so merely on the strength of a decision of a lesser
federal tribunal, even when pronounced by so eminent a
jurist as all recognize in Justice FIELD, would not be war-
ranted at all.

It seems that, so far as the *Santa Clara County Case* is
like, in its facts, to the one before us, it runs counter to many
recent decisions of the federal supreme court. Under our
constitution, it must be remembered, there is the amplest
power on the part of the legislature to exempt an entire class
of property from taxation, and to make such class very nar-
row, even excluding from the benefits accorded to the mem-
bers thereof those owning property of the same general class,
so long as the character of that owned by those of the sub-
class is so far different from that owned by others, as, with-

in the boundaries of reason at least, to suggest necessity or propriety, having regard to the public good and the constitutional object to be attained, and limitations in respect thereto, of substantially different legislative treatment. Few cases that can be found have gone further on that line than *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 8 N. W. 833. There, as we have seen, a very small subclass of real estate, a class so small as to be confined to one owner, was deemed sufficiently different from realty generally to warrant the legislature in exempting it from taxation. It is not likely, as we have before indicated, that this court will soon go further on that line than it did in that case. Certainly there is no call therefor in the case before us. In the particular field covered by the ultimate result there reached, the case is distinguished for definiteness, and has been frequently referred to with approval, here and elsewhere. *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468; *Black v. State,* 113 Wis. 205, 89 N. W. 522; *Kingsley v. Merrill,* 122 Wis. 185, 99 N. W. 1044; *Milwaukee E. R. & L. Co. v. Milwaukee,* 95 Wis. 42, 69 N. W. 794.

We do not find the cases relied upon by counsel for appellant, though nearly a quarter of a century has elapsed since they were decided in the circuit court of California, have been referred to in any decision of the supreme court of the United States as authority on the particular question. We do not find them referred to in any decision in a lesser federal tribunal with approval in a manner sufficiently indicating that the doctrine thereof in question has been received as authority under sufficiently similar circumstances to those in hand, to make them particularly persuasive here. The principle, as thus mildly read out of such cases, has been applied commonly:

"Now, the equal protection of the laws declared by the XIVth amendment . . . of the constitution, secures to each person within the jurisdiction of a state exemption from any

burden or charge other than such as are equally laid upon all others under like circumstances." ANDERSON, Circuit Judge, in *Fraser v. McConway & T. Co.* 82 Fed. 257, 260, citing the *San Mateo Case.*

The following indicates fairly the present temper of the highest tribunal on this question:

In *Kidd v. Alabama,* 188 U. S. 730, 23 Sup. Ct. 401, the court dealt with a state law for taxing part of a general class assumed to be a legitimate subclass, while exempting the rest of such general class from a like burden. That was held to be proper as not violating the XIVth amendment, the court saying, "We need not repeat the commonplaces as to the large latitude allowed to the states for classification upon any reasonable basis. What is reasonable is a question of practical details."

In *American S. R. Co. v. New Orleans,* 181 U. S. 277, 21 Sup. Ct. 646, a law discriminating as to taxation between two classes of refiners, exempting one and taxing the other, the only distinction between the two being that the latter were producers who did their own refining, while the former were in the business of refining only, was sustained, the court saying:

"The act in question does undoubtedly discriminate in favor of a certain class of sugar refiners, but this discrimination, if founded upon a reasonable distinction in principle, is valid." "This court has had, repeatedly, occasion to sustain discriminations upon reasons much more obscure than this. It was not intended by the XIVth amendment to prevent a state from changing its system of taxation in all proper ways; it may, if it chooses, exempt certain classes of property altogether, it may tax real and personal property in a different manner, may tax visible property and not tax securities, and may allow or not allow deductions for indebtedness. All such regulations, and those of like character, so long as they proceed within reasonable lines and general usage, are within the discretion of the state legislature, or the people of the state in framing their state constitution."

In the still more recent case of *Coulter v. Louisville & N. R. Co.* 196 U. S. 599, 25 Sup. Ct. 342, the same doctrine is indorsed quite broadly, as the quotation from the former decision would indicate. The following are in harmony therewith and in general indicate that the federal supreme court does not assume to deal with state laws, under the XIVth amendment, that fall with any fairness within the field of classification: *Bell's Gap R. Co. v. Pennsylvania,* 134 U. S. 232, 10 Sup. Ct. 533; *Adams Exp. Co. v. Ohio State Auditor,* 165 U. S. 194, 17 Sup. Ct. 305; *Magoun v. Ill. T. & Sav. Bank,* 170 U. S. 283, 18 Sup. Ct. 594; *Merchants' & M. Bank v. Pennsylvania,* 167 U. S. 461, 17 Sup. Ct. 829; *Gulf, C. & S. F. R. Co. v. Ellis,* 165 U. S. 150, 17 Sup. Ct. 255; *Clark v. Titusville,* 184 U. S. 329, 22 Sup. Ct. 382; *Home Ins. Co. v. New York,* 134 U. S. 594, 10 Sup. Ct. 593; *Billings v. Illinois,* 188 U. S. 97, 23 Sup. Ct. 272; *New York v. Barker,* 179 U. S. 279, 21 Sup. Ct. 121; *Travellers' Ins. Co. v. Connecticut,* 185 U. S. 364, 22 Sup. Ct. 673; *Turpin v. Lemon,* 187 U. S. 51, 23 Sup. Ct. 20.

In view of the foregoing it could hardly be expected that the *Santa Clara Co. Case* and its companion case would be regarded, in the situation before us, as very persuasive as to condemning the law in question under sec. 1, art. VIII, of our constitution. If it stand the test of that it will necessarily pass the test of all other constitutional equality provisions which counsel for appellant claim condemn it.

If it were not for the great importance of this case, and the painstaking presentation of this particular question by counsel for appellant, we should have felt warranted in saying, with brief discussion of the matter, that it is ruled by the *Wis. Cent. R. Co. Case,* 52 Wis. 37, 8 N. W. 833, and *Kingsley v. Merrill,* 122 Wis. 185, 99 N. W. 1044. In the latter the law exempting from taxation all dues from insolvent debtors while taxing dues from solvent debtors, upon a careful study of the subject, was held legitimate under

sec. 1, art. VIII, and it was shown that practical construction, in that regard, in this state, extended over a period of more than fifty years, supported that view.

The law in question, with some exceptions, specializes as to mortgages on real property. The necessary effect, as indicated, is to exempt from taxation so much of the indebtedness secured by such mortgages as is represented by the value of the security, and substitute the latter for the property exempted, assessing the same to the mortgagee or the mortgagor, at the option of the latter. The ostensible purpose, at least, of such legislation is to make the owner of the mortgage indebtedness bear, proportionally to his interest, so called, in the property, the burden of taxation thereon; but there is no escaping the ultimate effect, as indicated, and the legislature must be presumed to have intended it. The wisdom of the enactment is not a matter for the court to deal with. Experimental and theoretical economists, and those who assume that natural laws can be turned aside by an act of the lawmaking power, have the same right to their day as other people, and, in so far as their notions shall obtain legislative sanction and do not violate the fundamental law, the court must enforce them, regardless of its view of the matter from the practical standpoint, with the same fidelity as it enforces any other enactment. The one here, within the language of the supreme court above quoted, is according to the now somewhat general usage.

In recent years the species of legislation of which the act before us is a type has had very many advocates. Some have approached the matter, favorably, from one point of view and with one motive and some from another point and with another motive. The one have thought to relieve the debtor from a burden, casting it on the creditor, while the other have thought to relieve the creditor while ostensibly relieving the debtor, believing that in the end the latter would inevitably be the one chiefly benefited. The persuasive idea,

all the time kept in evidence, is that mortgage taxation is double taxation and should be avoided as unjust; that to tax the mortgage, taking the value of the security from the value of the land, otherwise necessarily taxable to the mortgagor, in a measure would relieve the latter. There has been much legislation of that sort, and it has been generally sustained. The following would seem to be unmistakable evidence that classification, as between indebtedness secured by mortgages on real estate and other indebtedness for purposes of taxation, is widely recognized as proper: *Firemen's F. Ins. Co. v. Comm.* 137 Mass. 80; *State v. Runyon,* 41 N. J. Law, 98; *Common Council v. Board of Assessors,* 91 Mich. 78, 51 N. W. 787; *State v. Darcy,* 51 N. J. Law, 140, 145, 16 Atl. 160; *People ex rel. Jefferson v. Smith,* 88 N. Y. 576, 585; *Savings & Loan Soc. v. Multnomah Co.* 169 U. S. 421, 18 Sup. Ct. 392; 1 Cooley, Taxation (3d ed.) 272, 273.

(C) If we assume that the mortgages, so called, of railway property are of the same general class as mortgages of realty generally, in that they are to some extent at least on lands, there would still be a very wide distinction between them and ordinary mortgages. The railroad mortgages, so called, are as a rule trust deeds, securing millions of dollars in bonds distributed over a wide extent of country, and in many cases among the people in many countries, the owners, in the aggregate, numbering up into the thousands. It is easily seen that to apply such a law as the one in question to such a situation, requiring each bondholder to be regarded as the owner of so much, in value, of the railroad property as his bonds called for, and to tax him accordingly, would be more than impracticable, it would be impossible as regards producing any real beneficial results. The differences between the railway mortgage indebtedness and ordinary mortgages on realty are very marked. Moreover, it cannot be considered that the former are, in a legal sense, on real property. If the point made by counsel would be good for anything, it

would apply to indebtedness secured on personal property, generally speaking, or indebtedness unsecured, as well as to the railway company indebtedness secured by trust deed.

In dealing with this subject it is to be remembered, at every step, that while this court has held, and now affirms most decidedly, that there cannot be any classification of property under sec. 1, art. VIII, for different rules or rates of taxation, a latitude, under the constitution, stopping only at the boundaries of reason, exists for the classification of property as between that to be taxed and that not to be taxed, and on that branch of the subject the authorities with which the books, state and national, are replete are in point, whether treating of such classification as is permissible here or the classification for different rates and different rules, as is permissible in many jurisdictions.

(D) Our attention is called to that feature of the act requiring the rate of taxation to be applied to railway property to be determined with reference to conditions existing the year previous to the year the tax is imposed, while the burdens imposed on general property in any year are determined with reference to the conditions then existing. That matter is particularly suggested as fatal under sec. 5, art. VIII. What we have said as to the requirements of that section leaves the matter now only important under the equality clause of art. VIII.

As we have seen, uniformity of rule looks to uniformity of burden, not to uniformity in mere methods of laying the burden. It was apparent to the legislature, in considering the subject which resulted in the enactment in question, that it would necessarily take so much time to fairly assess the railroad property and determine the average rate of taxation to be applied thereto that, if the work was to be done with any reasonable degree of accuracy, the circumstances regulating the rate as to general property one year would have to be applied to railway property the succeeding year.

The proceedings in this instance, from the time the state board of assessors commenced its work till the rate of taxation was finally determined, covered a period of about one year and a half. It is perfectly feasible as to general property to levy the taxes of one year with reference to the valuation of property and the public needs in that year. As to railway property, if the burdens imposed on general property are to be taken as the basis for those imposed upon the latter, a delay in levying the tax, into the next year, is unavoidable. The legislature may well have considered that the average rate of taxation throughout the state would not vary materially as between one year and the succeeding year, and therefore, to give the board of assessors ample time to determine all the facts involved in the average rate of taxation on general property as to one year, with the highest degree of certainty attainable, and apply the result upon the value of the railway property ascertained as of such year the succeeding year, the result would more nearly approach the standard of equality required by the constitution than any other method that could be used. That the result falls within the scope of the discretionary authority of the legislature seems plain.

(E) The further special argument is made under sec. 1, art. VIII, that the law in question is unconstitutional in that it provides for taxing railway property at a different rate than general property. In support of that *Pingree v. Auditor General,* 120 Mich. 95, 78 N. W. 1025, is referred to as having passed upon precisely the same question under precisely the same conditions. That case dealt with a law for taxing telegraph and telephone lines on the *ad valorem* plan. The state treasurer, auditor, and commissioner of the land office were required during a stated time to value the property of the companies mentioned in the act, and at the same time to determine the rate of taxation to be imposed thereon, the same to be the average rate of taxation for all purposes

imposed on general property throughout the state the pre-
vious year, the rate to be determined from the records and
files in the auditor's office. The court condemned the law be-
cause, as was supposed, it contemplated the imposition of a
state tax only upon one kind of property, the rate to be de-
termined in a different way and to be other than that imposed
on other property for the same purposes. We are not con-
cerned with the question of whether the Michigan court prop-
erly construed the law. It proceeded to the result reached
without any attempt to carefully analyze the enactment.
Maybe no such analysis was needed. The result is of no con-
sequence in our investigations unless our law receive the
same construction as that given to the Michigan act. We
may well concede that if *the same construction should be
given to our law,* we would reach the same result as the
Michigan court did. *Assuming* that the construction so given
to the Michigan law is correct, there are such differences be-
tween it and ours as, under the circumstances, ·to warrant a
different meaning being read out of the latter. The two are
identical in some respects; they are identical as to the basis
of the rate to be applied to the special property, as to the
manner, generally speaking, the value of the special prop-
erty is to be determined, as to the rate to be applied to the
latter one year being based on the average rate of taxation on
general property the previous year, and the feature as to pay-
ment of the tax on the special property to the state treasurer.
But our act is widely different in administrative features.
It shows a broad, comprehensive plan, having for its evident
purpose the taxing of railway property, in effect, for all
state and local purposes the same as other property is taxed.
If the literal sense of the law would suggest the meaning ac-
corded to the Michigan law, that of itself would raise an
ambiguity suggesting and warranting judicial construction.

It must be presumed that the legislature intended to make
a valid law. It must be construed in the light of history, the

manifest object in view, and all circumstances furnishing any light as to the real legislative intent. No construction should be adopted rendering a law invalid if, under all the circumstances, a meaning can be read therefrom, reasonably, which will render it valid. As is commonly said, the intent of an act, when discovered, if found expressed in any reasonable view of its words, is to be deemed to be as efficiently incorporated therein, by implication, as if expressed by words taken in their literal sense. To that end the terms of a law can be given a literal or a strict construction and the literal sense of words can be violated, as may seem best calculated to carry out the real purpose of the law-makers. *Ogden v. Glidden,* 9 Wis. 46; *Blunt v. Walker,* 11 Wis. 334; *State ex rel. Heiden v. Ryan,* 99 Wis. 123, 127, 74 N. W. 544; *Wis. Ind. School v. Clark Co.* 103 Wis. 651, 659, 79 N. W. 422; *Hoffman v. Maffioli,* 104 Wis. 630, 640, 80 N. W. 1032.

· We cannot be blind to the matter of common knowledge that the act in question was passed as the result of years of agitation of the question of imposing tax burdens upon railway property the same as upon all other property; to take the former out of the class taxed indirectly, independently of sec. 1, art. VIII, and which, as was supposed, was specially favored in that regard, and put it with property directly taxed under such section and, necessarily, to apply thereto the rule of uniformity ordained thereby. The law was not enacted for the primary purpose, as is evident, to make railway property bear a greater burden than before, or a different burden than general property, or for the mere purpose of imposing thereon strictly state taxes. Right the reverse, it was designed to make such property bear equally, dollar for dollar of value, with general property throughout the state prescribed by the legislature for taxation, state, county, city, and all other tax burdens imposed directly on property. That purpose, easily seen in the enactment, should prevail regardless of the mere method adopted by the legis-

lature to effect it, resulting in all taxes collected from railway property being paid to the state treasurer and then regarded as a substitute for state tax, levied in the ordinary way in part, and in part as an equivalent for state taxes in effect imposed on localities and there retained as a just exchange with the state, the state acting as an agency for the former and they as agencies for the latter, the results being sufficiently transferred from the one to the other, so that each would obtain its own by the constructive exchange of equivalents.

In working out the supremely complex problem of how best to tax railway property, under the constitutional rule of uniformity, a problem which has vexed legislatures and courts throughout the country for fifty years or more, as we have before indicated, the legislature has a wide discretion. The necessity for treating railroad property differently from general property as to mere method of attaining the constitutional object, is manifest. That necessity implies more than mere permission; it implies a constitutional command. All reasonable effort to respond to that command, instead of violating the constitutional rule, promotes the very equality it was designed to secure.

(F) There was a suggestion made that the law is invalid for not providing for notice of the proceedings to determine the average rate of taxation upon general property of the state. We cannot see any infirmity in the law in that respect, either under the constitutional requirement for due process of law or under sec. 1, art. VIII, or any other constitutional provision, state or national. No judicial proceedings, or proceedings of a judicial nature, are contemplated in determining the mere rate of taxation upon general property. The duties contemplated are of a ministerial nature only. No notice is ever given as to any ordinary proceeding in respect to determining the rate of taxation on general property in the local taxing districts. In that re-

spect the owner of special property bears the same relation to the state board as the owners of general property do to the ministerial officers in the local taxing districts. The latter, from data previously provided for their use or which they provide by the mere ascertainment of facts, not requiring the performance of judicial duties, perform the work assigned to them by the law.

The terms of the act in question on that are plain.

"The board . . . upon returns . . . from county, town, city and village officers, or both, shall ascertain and determine the aggregate tax in the whole state for state, county and local purposes levied on the general property of the state, excluding special assessments on property for local improvements, and . . . the amount thereof shall be entered on the records of the board. From the aggregate true cash value of the general property of the state, and the aggregate of taxes so determined, . . . the board shall compute and determine the average rate of taxation, state, county and local consolidated, by dividing the aggregate taxes by the aggregate true cash value, etc., . . . which said rate so arrived at and determined, shall be entered upon the records of the board and shall constitute the rate of taxation on the true cash value of the property of the railroad companies liable to taxation under this act."

It seems impossible to read therefrom a requirement for the exercise of any judicial or legislative power.

The same view as above is expressed in regard to precisely the same kind of a provision in the Michigan railroad tax law in *Board of Ed. v. State Board,* 133 Mich. 116, 94 N. W. 668, and *Michigan Railroad Tax Cases,* 138 Fed. 223, 233–235, the latter case being affirmed on appeal to the federal supreme court. In the federal circuit court it was said:

"The rate is fixed by the constitution of the state of Michigan and the legislature. The duty imposed by the constitution and the statute upon the state board of assessors to assess and determine the average rate levied upon other property upon which *ad valorem* taxes are to be assessed is ministerial,

and consists of mathematical calculations. There is, then, no more discretion in the state board of assessors than if the rate had been named in the constitution and statute."

The conclusion in the cases cited, in conformity to elementary principles, is that, in the circumstances contemplated by the statute, no notice to taxpayers is required. 1 Cooley, Taxation (3d ed.) 59; *Hagar v. Reclamation Dist.* 111 U. S. 701, 4 Sup. Ct. 663; *Spencer v. Merchant,* 125 U. S. 345, 8 Sup. Ct. 921; *Fallbrook Irr. Dist. v. Bradley,* 164 U. S. 112, 174, 17 Sup. Ct. 56.

Moreover, the law provides, in addition to affording a hearing to owners of railroad property on the preliminary assessment, that the board shall meet at the state capitol at Madison, on the second Tuesday of November in each year, and continue in session from day to day unless adjourned for a longer time, for such period as is necessary, not later than the 15th day of December following, for the purpose of reviewing the valuation and assessment of railroad property and the valuation of the general property of the state, and further that during such period any railroad company interested may appear and be heard as to the value of and assessment of the property of such company *and the tax to be levied thereon,* and as to general property of the state. It appears by the record that such provisions were complied with in every respect. A date being thus fixed in such a law for sessions of the board, when interested parties may appear and be heard on all questions in respect to which they have any interest, no other notice to them is required unless the written law prescribes otherwise. *Kentucky Railroad Tax Cases,* 115 U. S. 321, 6 Sup. Ct. 57; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421, 14 Sup. Ct. 1114; *Chicago, B. & Q. R. Co. v. Richardson Co.* (Neb.) 100 N. W. 950.

(G) Reference is made as to the facts as to street railway property, and particularly that of interurban railroads oper-

ated by electricity, and some other property not belonging to railway companies, having to do with transportation of some sort, being taxed by a different method than ordinary railroad property, as violating the constitutional rule of uniformity. That seems to be sufficiently answered by what is said elsewhere in this opinion, as to the right of the legislature to classify property under sec. 1, art. VIII, some to be taxed and some to be exempt, so long as each particular class or subclass has real distinctions, reasonably specializing it as to other property. The discretion of the legislature in this field is so broad that it is not competent for the court to mark the constitutional limitations of it other than at the farthest one might go without transcending all reason. Again, we point to *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 8 N. W. 833, as an indication of the scope of that power as here recognized. Applying the circumstances there held to warrant specializing as to part of a subclass of property owned by a single corporation as a test here, the legitimacy of that as between electric railway property and other property mentioned, and ordinary railway property, becomes at once apparent.

True, the rights granted to electric railway corporations, and business done by some of them, now approach more nearly to those of ordinary railway corporations than formerly, but there are yet quite radical differences. That is recognized in the degree of legislative regulation and control here and generally exercised over the latter, not exercised over the former. It finds its justification in the right of classification under constitutional equality clauses, by reason of there being real differences between the two kinds of property, which right, as we have seen all through our discussion, applies to sec. 1, art. VIII, so far as relates to the division between property to be taxed and property not to be taxed. The authorities cited by the circuit judge in his opinion are quite ample on this point. *Chicago & N. W. R. Co. v. Osh-*

*kosh, A. & B. W. R. Co.* 107 Wis. 192, 83 N. W. 294; *Milwaukee E. R. & L. Co. v. Milwaukee,* 95 Wis. 42, 69 N. W. 794; *People ex rel. Metropolitan St. R. Co. v. State Board,* 199 U. S. 1, 25 Sup. Ct. 705; *Pacific Exp. Co. v. Seibert,* 142 U. S. 339, 12 Sup. Ct. 250; *Michigan Railroad Tax Cases,* 138 Fed. 223; *Savannah, T. & I. of H. R. Co. v. Savannah,* 198 U. S. 392, 25 Sup. Ct. 690.

It appears inadvisable to further discuss this branch of the case. No court has yet held, and until great changes occur none is liable to hold, under any of the equality clauses of state or national constitution, that electric railway property, or any of the kinds of property suggested to our attention, must necessarily be classed with ordinary railway property in making a division between property to be taxed directly and that to be exempt from taxation entirely or taxed indirectly, or as to mere details of applying the rule of uniformity to the two classes of property when taxed directly, so as to produce practical equality in results.

(H) Much of the argument of counsel for appellant is centered on the ideas that railway property is wholly located where its visible property is situated, or at least there and where its offices are located; that it is a principle generally recognized, and necessarily so, in fixing the situs of all property for taxation, that it must be located by the law within the boundaries of those minor subdivisions of the state where it or its owner receives, to some degree at least, in some reasonable view of the matter, the benefits of the civil government exacting the tax; and that in disregard of that principle as to railway property, the law in question violates both sec. 1, art. VIII, requiring the rule of taxation to be uniform, and sec. 13, art. I, prohibiting the taking of property for public use without due process of law, and other constitutional guaranties as to equality before the law. The discussion of the subject under this head is sufficient for all.

Counsel assume, not without warrant, that the effect of the

law is to give to the special property a general situs.  If the
claim be sound, that the basis of the right to tax is benefits
received by the person taxed, as to his person or property,
and therefore that the latter cannot be legitimately given a
situs for the imposition of tax burdens beyond the bound-
aries of the taxing district where the property, or the owner
thereof, or his agent or office, is located,—beyond where the
property may be reasonably said to be constructively or actu-
ally located,—and as to railway property that such location
is confined to the territory through which the road runs and
where its place or places of business, its office or offices, are
located, and the effect of the law is as claimed, that is, that
it gives to railway property a situs for taxation in every dis-
trict in the state in the proportion that the assessed value of
the general property subject to taxation in such taxing dis-
tricts, respectively, bears to the entire assessed value of the
railway property, then the conclusion that the law is void
under both of the constitutional provisions specially men-
tioned would be unavoidable, and it would be significantly
so as to violating the constitutional requirement that "the
rule of taxation shall be uniform."                        .

The learned circuit judge, as we have before seen, met this
phase of the case, as also counsel for respondents now do, by
the doctrine, supposed by them to be the law of this state, but
which we were compelled to utterly reject early in this opin-
ion, that it is competent for the legislature, under sec. 1,
art. VIII, to classify property prescribed for direct taxation,
making a uniform rule for one class and a second such rule
for another, and so on, without limitation as to number of
classes except the extent of legitimate differences, resulting
in different rules and different rates of taxation.  If the law
had no more secure foundation to rest upon than that, it cer-
tainly could not survive the judicial test.  Unless it can be
seen that, under the rules heretofore laid down as to the scope
and meaning of sec. 1, art. VIII, the law in question con-

templates substantial uniformity, actual uniformity so far as in the judgment of the legislature that is attainable as between the two great classes of property prescribed for direct taxation, and that the treatment of each class by a method uniform as to that class only, but both aimed at the same general result: to make every dollar in value of the two classes, regarded as one, bear the same burden of taxation, state, county, town, and so on down to the smallest and least important taxing district throughout the state, as every other dollar of such value bears, having regard to differences and circumstances as to taxing districts,—then it cannot be sustained. That broad principle so strongly contended for by counsel for appellant meets with our unqualified approval, and is deemed to have been, as before said, the position of this court from the first instance of its being called upon to necessarily deal with the question.

From the point of view stated the law must stand or fall. It were better that the latter alternative should occur than that the valuable safeguard against oppression so firmly intrenched in our constitution should be broken down by the tribunal especially charged with the duty of guarding it, or frittered away by following the reasoning in decisions elsewhere, under constitutions expressly, or by clear implication, providing for or permitting numerous rules and rates for taxation.

Written constitutions are the bulwarks of civil liberty. In contemplation, they are supposed to be proof against all legislative assaults upon those boundaries definitely fixed thereby, to pass which would endanger that safety of persons and property for which governments are established. However, no constitution can be stronger than the tribunal created thereby to guard it. It is not self-executing, nor is it self-protecting; the legislature must vitalize its provisions and the courts must protect it.

We may justly look with pride upon the manner in which

the duty, indicated, was performed in regard to the important equality clause under consideration, when its true meaning was proclaimed in 1859. The vigorous language of Chief Justice DIXON on that important occasion, speaking for the court, was well calculated, as it was doubtless designed, to leave no manner of doubt for the future as to whether the way was open to discriminate between the burdens to be cast upon different kinds of property. Doubtless it was seen that if such way was left open there would be constant pressure to obtain the advantage of it, and, in the struggle, the large and powerful would inevitably oppress the weak. All that is clearly manifested by the language of the chief justice in connection with that heretofore quoted in this opinion, as to the section under discussion contemplating but one class of property for direct taxation, and one rate of taxation, having regard only to differences in expenses peculiar to localities. He thus emphasized the position of the court:

"We are of the opinion that these are the very mischiefs which they intended to guard against and prevent. Single individuals have seldom acquired such an influence over the legislative mind as to secure to themselves the advantages arising from such legislation. There was little danger to be apprehended from that source; but the combined influence and efforts of corporations and classes had. Such evils had been sorely felt in many of the older states. It was against them and all other unjust discriminations that the people intended to provide." "This principle of justice and equality which requires that each person should contribute toward the public expenses his proportionate share according to the advantages which he receives lies at the foundation of our political system and, in our opinion, it was to give it a greater permanency and force, and to secure its more rigid observance, that the section above quoted was introduced into the constitution."

If it were not for the significance of the doctrine as above

stated, distinguishing our constitution from those permitting the very thing the framers of the former so industriously endeavored to prevent, we might rest this branch of the case, and no doubt many other phases of it, on the authority of the late case in the Michigan supreme court, and the analysis of the Michigan railroad tax law in the two cited federal cases. It is upon this difference in position, largely, as it seems, that counsel for appellant ground their hopes. So this case requires to be treated somewhat independently from those, though in principle, after all, it would seem that the latter might be well said to furnish a sure ground for the decision here.

As we have indicated, the purpose of the law was to effect the very object above said to be the only one permissible under our constitution. In the language of Judge WANTY in deciding the Michigan case in the federal circuit court, "This seems not to have been a scheme to produce inequality but a carefully devised scheme to distribute the burdens of taxation equally upon all taxpayers." The idea was to put all property taxed, directly, on a basis of equality as to purpose and rate of taxation. Did it fail in that by treating the railway property as having a general situs and applying thereto the average rate of taxation imposed on general property prescribed for taxation throughout the state? That is really what this case, in all its features, ultimately comes down to. The purpose being as indicated, if it legitimately fixed the situs of the special property, then most of the contentions of counsel for appellant fail with the one that it was not. In further discussion, in the main, we will assume that the law must necessarily be regarded as an attempt to give to railway property the broad general situs counsel for appellant claim.

Counsel for respondents suggest that the law created a taxing district composed of the whole state, as regards railway property, to tax it in a different manner and by a differ-

ent rate from the manner and rate as to general property, and that the legislature had full power to do so. On that *State ex rel. Baraboo v. Sauk Co.* 70 Wis. 485, 36 N. W. 396, is cited. It does not seem, however, to meet the case at all, since it dealt only with the creation of taxing districts with reference to particular purposes of taxation of local interest specially, but of general interest as well. It is also said, in the learned circuit court's opinion, that the character of the law is as counsel for respondents so contend. There is also a suggestion that the special property was given a situs at the seat of government for the special purpose of a state tax, and for the reasons suggested that the tax is in the nature of a franchise tax. What has already been said requires the rejection of all these theories without further discussion. They are based on the mistaken idea that there may be classification of property under our constitution for direct taxation by different rules and rates.

At the outset it may be conceded, as the fact is, that the constitution does not permit of any wholly arbitrary, capricious location of property for taxation. The burden of effecting a strictly state purpose cannot be imposed on a particular locality or localities, nor the burden of those things which are purely local be imposed on persons or property wholly beyond the boundaries of the municipality concerned, except in such special cases of assumption of the burden by the people under legislative authority. *Lund v. Chippewa Co.* 93 Wis. 640, 67 N. W. 927. We indorse to the fullest extent the doctrine so forcibly stated by Judge Cooley, and relied upon with so much confidence by the learned counsel for appellant, in these words:

"It can, therefore, be stated with emphasis that the burden of a tax must be made to rest upon the state at large or upon any particular district of the state according as the purpose for which it is levied is of general concern to the whole state or, on the other hand, pertains only to the particular district." 1 Cooley, Taxation (3d ed.) 225–227.

The law in question must stand the test of that very valuable principle or go down under the condemnation of the constitutional provision in question, and several others.

The nature of railway property as to whether personal, real, or mixed, has very much to do with the question of where it may legitimately be taxed. Counsel for appellant, while recognizing that, seemingly put aside as absurd the doctrine which has become quite general, that the property of a railway corporation, as a whole, is to be deemed to be all personalty. It is quite familiar that, generally speaking, land and all things attached or appertaining thereto are realty, and all other property, tangible or intangible, with the rights connected therewith and appertaining thereto, are personalty. Those general principles have their exceptions. By intention things fixed to realty and in a sense physically a part thereof may be deemed to be personalty. By the union of land with rights granted by the public classed as personalty, forming a thing of itself in which the personal element predominates and which could not be separated from the other element without disintegration to the point of destruction and to the detriment of public and private interests as well, the combination may be deemed to be personalty of an inseparable nature. So, as we have seen, while a railroad system is largely land and tangible things of a movable character attached or appurtenant thereto, the thing that gives the great value and special character to the whole is the franchise element, creating the public duty; so such special element is deemed to be the principal thing, impressing all minor parts with its character, and making the entire combination one entire machine of a personal nature. That was well settled by the decisions of this court long before the law in question was framed. So, as to giving a legislative situs to railway property, the law must be tested in the light of dealing with personalty.

There is nothing particularly novel in the doctrine above

indicated. It is the generally accepted doctrine elsewhere. It has found place in statutes, but only in recognition of judicial policy. Sec. 8281, Kansas Gen. Stats. 1905; sec. 1037a, Stats. 1898. It is the logical basis of the numerous decisions holding it to be necessary to justice and uniformity of rule in taxing laws, that the property of a railway corporation be assessed as a unit; the physical things being regarded as merged in that produced by union with the franchise element: the one of primary importance. *State Railroad Tax Cases,* 92 U. S. 575, 607; *Carlisle v. Pullman P. C. Co.* 8 Colo. 320, 7 Pac. 164; *Dubuque v. Ill. Cent. R. Co.* 39 Iowa, 56; *State ex rel. K. C., St. J. & C. B. R. Co. v. Severance,* 55 Mo. 378; *People ex rel. Iron S. M. Co. v. Henderson,* 12 Colo. 369, 21 Pac. 144; *Ames v. People,* 26 Colo. 83, 56 Pac. 656; *Chicago & A. R. Co. v. People,* 129 Ill. 571, 22 N. E. 864, 25 N. E. 5; *Shenandoah Valley R. Co. v. Clarke Co.* 78 Va. 269; *Missouri River, Ft. S. & G. R. Co. v. Morris,* 7 Kan. 210; *Franklin Co. v. Nashville, C. & St. L. R. Co.* 12 Lea, 521; *Columbus S. R. Co. v. Wright,* 151 U. S. 470, 14 Sup. Ct. 396; *Missouri, K. & T. R. Co. v. Board of Comm'rs,* 9 Kan. App. 545, 59 Pac. 383.

In the latter case the court said: "All property used or held by a railroad company for the purpose of operating its railroad, including its roadbed, right of way, etc., is to be appraised and assessed as personal property." The opinions in several of the cases cited lay down most clearly the doctrine that the physical things of a railway corporation follow the franchise.

The broad discretion which the legislature has within the boundaries of the rule of uniformity in determining the situs of personal property for taxation, has already been referred to. The mere circumstance of the location of the agent of the owner is regarded sufficient to warrant assessing there large amounts of personal property located in different parts of the state, long distances therefrom and in jurisdictions

having no connection, except through the sovereignty of the state, with the legislative situs. The simple circumstance of the location of the agent is deemed to satisfy the rule contended for by counsel. Again, the situs for taxation of large amounts of personal property is commonly fixed by the legislature at the principal place of business of the corporation as named in its articles of incorporation. Sec. 1041, Stats. 1898; *State ex rel. Milwaukee St. R. Co. v. Anderson,* 90 Wis. 550, 564, 63 N. W. 746. Again, saw-logs are given the situs of the particular mill where the owner on the 1st day of May in the year of the assessment designs to have them manufactured, though he may have no interest in the mill whatever and have only formed a mental purpose to so manufacture the property. All these provisions and others of a similar character, with judicial approval, have existed in this state and elsewhere for years and some of them here ever since the state was organized. All are so familiar therewith that it is useless to refer to the decisions that have dealt with the matter. The situation amply illustrates the very broad limits of the principle that property can only be taxed where it is constructively or actually located, the farthest limits being where benefits reasonably appreciable of some sort are received by the person taxed, either in his person or his property.

The result of the foregoing is that personal property may have a twofold situs: one which is actual, tested by common-law principles, and one which is purely legislative, the latter stopping at the point where to go further would be to pass into the realms of mere caprice or arbitrary action, in that it would have no basis in the nature of the mutual exchange of benefits between the source of the taxing power and the person upon whom the burden is cast.

Sometimes it is said that property must be taxed at its situs, that meaning, of course, the actual situs unless the legislature has fixed another, acting within constitutional limita-

tions. In *State ex rel. K. C., St. J. & C. B. R. Co. v. Severance,* 55 Mo. 378, the prevailing rule on this subject is thus stated:

"It is claimed that the situs of the property is the home of the company where its chief office is located, and there it must be taxed. The proposition is undoubtedly true that where a corporation has its residence there the property of this description is liable to assessment and taxation, if the law has prescribed no different rule or regulation on the subject. This notion of the situs of personal property . . . is a legal fiction. It may be modified by the legislature."

In *State Railroad Tax Cases,* 92 U. S. 575, speaking on the same subject, the court said: "It is merely the law of the state which recognizes it." Enlarging upon that in connection with numerous illustrative authorities it was said in *Ames v. People,* 26 Colo. 83: "It is entirely competent for the legislature, unless restrained by the constitution, to fix for the purposes of taxation the situs of both real and personal property." The following are to the same effect: *Chamberlain v. Walter,* 60 Fed. 788; *Cincinnati, N. O. & T. P. R. Co. v. Comm.* 81 Ky. 492; *In re Apportionment of Tax,* 78 Mo. 596.

Without further discussing the fundamental principle governing the subject of situs of property for taxation, we will state this for our conclusion: In the absence of some statute regulating the situs of property for taxation, it is governed by the common law in regard to actual situs. It is competent, however, for the legislature to give thereto for the purposes of taxation any situs it sees fit, subject to the rule of uniformity and to the limitation that there must be some appreciable relation between the municipality exacting the tax and the person upon whom the burden is cast, either directly or by reference to the property taxed, from which there can reasonably be seen reciprocal duties to accord benefits on the one hand, and to respond therefor on the other. Whether that relation does or does not exist in any given circum-

stances is so conclusively a legislative question that nothing short of manifestly capricious action, amounting to a taking of property for a public use without just compensation, will justify judicial interference.

The franchise of a railway company originates with the people. It is a part of the sovereignty of the state intrusted to private hands, which become thereby public agencies with appropriate and important duties of a public nature. The answer to that, that the same is true of any public service corporation, is, it seems, beside the case, since it is universally recognized that railway corporations, because of the great magnitude of their operations, the dominating power which they possess in the business world referable to the special franchise feature of their property, the closeness of touch between them and every inhabitant of the state and every dollar in value of property therein, by reason of which their legitimate prosperity and that of the people, individually and collectively, are inseparably bound together, are, most significantly, a class apart from all other corporations, one much more nearly a part of the government itself, as it were, than any other *quasi*-public agency. Nothing of a semipublic nature in that regard approaches near enough to such special corporations to give any substantial opportunity, even, for comparison. Such special organizations touch the everyday life of every member of every community from the center to the most remote parts of the state. While they thus, so supremely over all other organizations, have to do, at all points, with the well-being of the people, to the same special degree they are dependent upon the people for support and protection. That support and protection as to an ordinary system by no means is confined to the particular counties, cities, and other governmental subdivisions through which the road runs. It reaches, incidentally at least, far beyond the same. By traffic connections and agencies of various sorts it reaches a broad expanse of country, in some cases a single

Chicago & N. W. R. Co. v. The State, 128 Wis. 553.

line covering to some extent the whole state. Such corporations, in a very marked degree, are interested, in excess of corporations of any other sort, in the capacity of the state, directly and through its local agencies, in promoting and compelling good order. No other class is so subject to dangers which might require the strong arm of the whole people for its protection, or so constantly requires a large part of the time of state and local agencies in administering affairs in respect to matters upon which its welfare depends. ·

True, some railway corporations are small and so do not as significantly fill the picture thus presented as others, but they are of the same general class, have the same rights, and have the fullest opportunity the state can give them to enlarge the sphere of their operations. As a rule they connect in a way with some large system and are affected, generally speaking, by all the conditions which affect the larger organization.

Now, who can set the boundaries which shall accurately define the uttermost limits to which a great railway corporation extends, to some extent receiving some benefit arousing return duty? That the mere taxing districts through which the road runs cannot necessarily be the limit seems plain. We can well say, beyond any reasonable doubt, it extends beyond their boundaries; but who can set the limit beyond which, without any reasonable doubt, it cannot be reasonably said to extend? May not the confines of the state be reached in exploring for such limit, under the broad power of the legislature to fix the situs of personal property for taxation? No court has yet spoken unfavorably in respect thereto. All that have spoken on the subject seem to have inclined the other way.

True, the constitution of Michigan was amended after the decision in *Pingree v. Auditor General,* 120 Mich. 95, 78 N. W. 1025, but the amendment was in the nature of a mere proviso, apparently by way of construction, it would seem,

declaring that the method of taxation condemned in the *Pingree Case* should be considered one for making railway property, on a basis with all other property in the state taxed by the *ad valorem* method, bear its relative proportion of all taxes, state and local. Other states have quite similar laws. They are referred to, in connection with ours, in the decision in the federal circuit and supreme court to which we have referred. Those mentioned are Michigan, New Hampshire, Missouri, and Wisconsin. In that connection, and as supporting the principle of the law in question, reference is made to *State ex rel. Brown v. Mo. Pac. R. Co.* 92 Mo. 137, 6 S. W. 862; *Chicago & A. R. Co. v. Lamkin,* 97 Mo. 496, 10 S. W. 200; *State ex rel. Gottlieb v. Metropolitan St. R. Co.* 161 Mo. 189, 199, 61 S. W. 603; *Boston, C. & M. R. Co. v. State,* 60 N. H. 87. Particular force was given, in the federal circuit court, to the feature of the Missouri statute requiring all school taxes for the several districts in each county in which railway property is taxed, to be laid on the value of such property distributed to such county, on the average-rate plan. Manifestly the principle is the same, whether the average rate is applied to a county having districts where there is no railway line and others differently situated, as where it is applied to the whole state under the same circumstances.

In the New Hampshire case the idea which ruled the Michigan court in the *Pingree Case,* that an average-rate tax levied in the whole state and collected by the state and paid into the state treasury is a state tax necessarily, was not favored. It was in effect said that such a tax may or may not be wholly a state tax, according to the legislative purpose; that the matters of the assessment, levy, and collection are evidentiary circumstances, but not necessarily conclusive ones.

The history of the subject in Michigan leads to the conviction that if the question were presented there as an orig-

inal matter, regardless of the change in the constitution since the *Pingree Case,* the average-rate law would be sustained. Such case turned wholly, as will be remembered, on the question of whether the tax was a state tax; on the construction of the law. The principle of the enactment, applied to a tax intended to be a state tax, and a local tax as well as to every taxing district in the state, on the basis of all other taxes, was quite clearly regarded to be sound. And so it was plainly regarded in the two federal decisions. In the federal circuit court every phase of the Michigan law that has to do with the constitutional rule of uniformity in taxation was examined and found not only to be consistent therewith, but significantly promotive of its object.

We are referred with confidence to *Union R. T. Co. v. Kentucky,* 199 U. S. 194, 26 Sup. Ct. 36, which related to the taxing of property in one state located permanently and used wholly outside thereof, where it had acquired a situs. The tax was condemned on principle, but we are unable to see how such principle affects this case, further than as we have heretofore indicated. The court said:

"If the taxing power be in no position to render any benefit to the person or property taxed, and such property be wholly within the taxing power of another state to which it may be said to owe allegiance, and to which it may look for protection, the taxation of such property within the domicile of the owner . . . is beyond the power of the legislature, and a taking of property without due process of law."

There is no disposition to overlook that salutary principle, but rather to recognize and confirm it. As indicated, we must assume that the legislature fully recognized that principle with reference to sec. 1, art. VIII, and all the constitutional provisions bearing on the question, and kept within such limitation, till the contrary appears beyond all reasonable doubt. In the broad, comprehensive view the legislature may, legitimately, have taken of the matter, it seems that it could

reasonably have concluded, under all the circumstances, that the necessary equivalent would be rendered, or renderable when necessary, from every taxing district, to the property or the owner thereof, to support the corresponding duty to bear proportionally with all other taxpayers in such district the local and all other tax burdens, except such burdens as relate to the subject of special assessments, which are excluded by the law under consideration.

There is another aspect of this branch of the case which we have deemed worthy of consideration. It must be conceded that the only logical way to assess railway property is to value the system as one entire thing, personal in character, and that part in this state as a proportion of such one thing, the division to be made upon a proper basis. That has come to be accepted by all courts. Most states that have adopted that system have done so in connection with the distributive feature of apportioning the value of that part of the entire system in the state to the different taxing districts through which the road runs in the proportion which the length of main line in each such district bears to the entire length of main line in the state. That has been repeatedly sustained under constitutions requiring a uniform rule of taxation. Many of the cases that have dealt with the matter have been heretofore cited. The following are quite recent: *Ames v. People,* 26 Colo. 83, 56 Pac. 656; *State ex rel. Bee Bldg. Co. v. Savage,* 65 Neb. 714, 91 N. W. 716; *Chicago, B. & Q. R. Co. v. Richardson Co.* (Neb.) 100 N. W. 950; *State ex rel. Morton v. Back* (Neb.) 100 N. W. 952. To that extent the problem of taxing railway property was some years ago solved in many states, and the result came to be supposed to be the most rational and logical way discovered for reaching such property with the hand of the tax gatherer, consistent with the constitutional requirement of uniformity.

The doctrine that classification of property along reasonable lines,—as regards methods of making the assessment of

different kinds of property, determining the rate of taxation, applying the same to the value ascertained and realizing the result, all the time working, reasonably, to the constitutional end of burdening, as near as practicable, each dollar in value of one kind of property the same as every other dollar in value of every other kind,—is in conformity with the constitutional command, and that such command has reference to uniformity of burdens and to uniformity of method only so far as the latter promotes the former, has been generally adopted. The doctrine has also been generally adopted, that what promotes the object of the rule of uniformity is primarily a legislative question and that its judgment is to prevail if possible, every reasonable intendment necessary to sustain its enactments being given thereto.

The foregoing leads up to this: If the distributive idea should have regard only to the taxing districts through which the road runs, may not the legislature have thought that to apply the average rate of taxation throughout the state to the value of railroad property, equalized with that of all other taxable property throughout the state, would be more likely, one year with another, to reach railway property on a nearer approach to absolute equality to other property than to use the average rate in the particular taxing districts through which the road runs, on the theory of a constructive distribution of the railroad property to such districts? The question is a very complicated one.

It must be kept in mind that the distribution plan was adopted not as the best method of taxing railway property on an equality with all other property, but as a better one than that of the license fee system, or the *ad valorem* system executed by means of local assessment of parts of a railway system by the various local assessors in the districts through which the road runs.

Who can say with any reasonable degree of certainty that on the distribution plan the mileage of main track in any

particular taxing district would represent justly, as between the railway company and all taxing districts interested, the proportion of the entire value of the railway system which should be assessed in such district? The value of the railway property, looking at physical things, in a given taxing district might be $250,000 represented by one mile of main line, while the actual value in another district might be $100,000, represented by two miles of main line, and the value of the general property in the two districts be substantially equal, thus giving to one taxing district, apparently, five times the benefit, proportional to main track, given to the other. Many other illustrations might be suggested showing the great difficulty involved in any method as to reaching railway property for the purpose of taxation under the constitutional rule by a close approach to absolute equality. Of course, as we have seen, actual equality is unattainable. The best that can be done is to secure as near an approach thereto as practicable.

It seems that whether we regard the legislature as having treated the railroad property as having a general situs or one limited to the particular taxing district through which the road runs, we may well regard it as having kept within the boundaries of reason in determining that the average rate of taxation as to all general property in the state would be more likely to reach the special property equally with such general property than by the distribution plan.

We venture to say, there is much force in the claim that every expression of every court that has spoken on the subject, condemning as unreasonable to the point of absurdity all attempts at valuing a great railway system in small sections with regard to the particular taxing districts through which the road runs, may well be read as condemning, as a mere makeshift, the plan of dividing the value of that part of the system located in the state, having regard to the value of the entire system, into as many parts as there are such tax-

ing districts, on the basis of the length of main line in them respectively. With one accord the courts say, every railway system is a unit, absolutely indivisible for the purpose of determining the value of the parts, the aggregate of such values to be that of the whole; that it is a thing so utterly different "from every other species of property that the discriminations made as between them and other corporations and individuals in the method or instrumentality by which the value is ascertained" are justifiable. *Chamberlain v. Walter,* 60 Fed. 788. Commonly it is said, valuation on the unit theory is necessary to the very object of the constitutional requirement of uniformity. Why does not the same reasoning, logically, require the value when once ascertained also to be treated as a unit, by applying thereto the average rate of taxation imposed upon all other property taxed by the *ad valorem* method in the state, instead of dividing it on an artificial basis into a multitude of parts: not much, if any, less unlikely to represent the actual value of the system in the respective taxing districts than valuations by local assessors, each appraising that part of such system found, as indicated by the visible part thereof, in his district?

The law is not to be condemned because we cannot see just how the legislature viewed the matter. So long as it can reasonably be seen that there is a view consistent with the law and the constitution, that is sufficient. Again, the law is not to be condemned because the average rate might possibly, or even probably, in an instance now and then, exceed the rate in some particular taxing district where some portion of the main line of a railroad is located. On that we cannot agree with the learned counsel for appellant. If the plan of the law be reasonably calculated to accomplish the constitutional object, that is sufficient. If it fails now and then in administration and yet may reasonably be said to have been designed to effect that practical equality which satisfies the constitutional requirement, that is enough. Uniform methods of

treating all kinds of property as regards taxation would inevitably violate that uniformity of rule, referable to equality of burdens, which is the supreme feature of the constitutional requirement. The method of taxing railway property has for fifty years been going through a process of evolution. The problem which so perplexed those who had to deal with it at first was by them solved, temporarily, by resorting to the license fee system. That was simple and fairly fruitful, but illogical, and proved very unsatisfactory to the people. The difference in method of treating such property from that applied to property generally, was fraught with many evils, as the people came to believe. The plan of assessing each system of the special property as a unit, and dividing the value ascertained, between the taxing districts through which the road runs, upon some basis, generally that of length of main line, came into use in time. That rapidly gained favor till it was supposed, as it seems from judicial history, that some near approach to a fairly perfect system had at last been discovered. The states which adhered to the license system the longest, and thus had the benefit of the experience of others with the distributive plan, appear to have seen its chief defect to be in the assumption that a railroad system must necessarily be treated as a unit for the purpose of determining the value thereof with any reasonable degree of accuracy, and yet that such unit, represented by the ascertained value, may logically be divided into a multitude of parts and apportioned upon an artificial basis for the purposes of taxation among as many districts as are traversed, to any extent, by the railway track.

In the natural order of development the last to adopt the *ad valorem* system for taxing the special property took the unit plan for valuing such properties, so universally conceded to be essential, and took it entire, rejecting the distributive feature, which seemed to be manifestly inconsistent

therewith.   The idea indicated in the new order of laws is
to value each railway property as one thing and on the same
basis as other taxable property is valued, and to tax it on the
same basis as such other property is taxed, throughout the
state and as to each taxing district through which the road
runs, as near as the same can be reasonably ascertained, keep-
ing the results in the state treasury, upon the theory of a con-
structive accounting between the state and every taxing dis-
trict which, in any reasonable view, would be entitled to any
part thereof under the constitutional rule of uniformity.  All
upon the theory that, in practical effect, by so doing each dol-
lar of every kind of property prescribed for direct taxation in
every taxing district throughout the state would thereby be
made to contribute its constitutional proportion of all taxes,
state and local.

It is considered that the new method is a long step in ad-
vance of the distributive plan which counsel for appellant
seem to think is the only method which is consistent with
that real equality, or such near approach thereto as is prac-
ticable, which the fathers of the constitution endeavored to
secure.   When we appreciate the idea that mere uniformity
of instrumentalities in accomplishing the constitutional object
is not required; that it is not important except in so far as
may be helpful in securing such object,—the doctrine that all
property prescribed for direct taxation constitutes but a
single class under the constitution, and that such one class
must be taxed by the uniform rule ordained by the constitu-
tion, vitalized by the legislative essentials and promoted by
reasonable legislative aids, seems to be incorporated into the
law under consideration, and vindicated by the conclusion
reached in this case.

The contention of counsel for appellant that the system of
assessing each railway system as a unit, and sending to each
taxing district a ratable proportion thereof, is the only proper

way to legitimately and justly tax such property on the *ad valorem* plan, that each railway company should be required to deal with the multitude of taxing districts through which the road runs, covering in some cases a large part of the state, could not be taken seriously if it were not so vigorously and so confidently, as it appears, insisted upon.  There can be little doubt, it would seem, from a careful review of the decisions in the federal circuit courts, but what the system embodied in the law before us was regarded by such courts as a distinct advance from the old method, in the line of that uniformity commanded by the constitution, and that such view was approved by the federal supreme court.  It appears that the better way to promote that equality and justice to all, which the constitution guarantees, is to maintain the integrity of the unit system in its entirety in treating railway property for taxation, which we find, after a most careful study of all the attacks upon it, to stand the test of the constitution at all points.

There are several matters of detail in the briefs of counsel which we have not referred to, as was suggested must necessarily be the case at the outset.  The major and minor points, including the illustrations used in the argument, cover a very broad field in a most exhaustive manner.  That has seemed to render it necessary to respond, in the opinion, to all such major propositions at considerable length, in order to do justice to the case and to the eminent counsel who so ably prepared it on the side of the appellant, and that of the respondents as well.  To the end that it may not be thought that anything material has been overlooked, though not found specially mentioned, it should be said that the four briefs have been carefully checked, page by page, to avoid such overlooking.  It is believed that every suggestion of counsel upon either side has received the attention it deserves in the preparation of this opinion.

*By the Court.*—The judgment is affirmed.

CASSODAY, C. J. (*concurring*). I fully concur in affirming the judgment in this case. It was tried before Judge HASTINGS, who has had much experience in matters of taxation. His written opinion on file herein is to my mind clear, exhaustive, and convincing. It is to be regretted that it was not printed for the convenience of the court. In that opinion he carefully lined up the decisions of this and other courts, and to my mind has clearly shown that under the uniformity clause of the constitution the legislature has power to classify property for the purposes of taxation and then to impose different rates of taxation upon the different classes of property. Such right of classification seems to have been conceded by counsel on both sides, but counsel for the plaintiff claimed that the classification made by the statutes was repugnant to the constitutional clause mentioned, because they imposed different rates of taxation upon the property of railway companies and other property. My own views in respect to such classification and imposition are sufficiently stated in my separate opinion in the case of *State v. Railway Cos., ante*, p. 449, 108 N. W. 594. That opinion suggests the extreme difficulty, if not impossibility, of sustaining the validity of ch. 315, Laws of 1903, and at the same time reviving and adhering to the rule declared by Chief Justice DIXON in *Knowlton v. Rock Co.* 9 Wis. 410, 420, 421. That rule very clearly required the course or mode of proceeding in levying or laying taxes in *all cases to be alike;* that the several *distinct steps* in the course of such proceeding *must each be uniform*—the *assessment* or *fixing the value* must be uniform, the *valuation* must be uniform, and the *rate* must be uniform; that uniformity in such a proceeding becomes *equality;* that there could be no uniform rule which was not at the same time *an equal rule, operating alike upon all the taxable property* throughout the territorial limits of the state, municipality, or local subdivision of the government within and for which the tax was to be raised. To my mind it is very plain

that ch. 315, Laws of 1903, providing for the taxation of the property of each railroad company as a unit, could not be sustained under the rule so asserted forty-seven years ago. As I understand, the decision in this case is a wide departure from that rule. It is here held that "the rule of uniformity has reference to uniformity of burden, not necessarily uniformity of methods of imposing burdens and realizing thereon." On that theory, a license system which imposed the same burden as an *ad valorem* system would be within the rule of uniformity. So there is a wide departure from the rule so asserted in the *Knowlton Case,* as it seems to me, in holding, as I understand the court does hold in this case, that "the legislature may classify and subclassify property," for direct taxation, "to the extent of distinguishing differences as to a particular class or subclass, reasonably requiring special treatment to promote the constitutional requirement that as to all property taxed the rule of taxation shall be uniform." But, in view of my separate opinion in the penalty cases referred to (*ante,* p. 449), it is unnecessary to say more.